**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| JIM BOGNET, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | No. 3:20-cv-215-KRG |
| | : | |
| v. | : | |
| | : | |
| KATHY BOOCKVAR, in her capacity as Secretary of the Commonwealth of Pennsylvania, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANT KATHY BOOCKVAR'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

I.     The Ballot Receipt Deadline Litigation in the Pennsylvania Supreme Court ................... 2

II.    The Pennsylvania Supreme Court Rules, and the Mail-In and Absentee Balloting
       Process Moves Forward ................................................................................................ 3

III.   Plaintiffs Inexplicably Wait Until the Last Minute to File Suit, Then Urge This Court
       to Act With Haste ........................................................................................................ 4

ARGUMENT ...................................................................................................................... 6

I.     The Court Should Deny Plaintiffs' Motion Because Plaintiffs Are Unlikely to Prevail
       in This Litigation ......................................................................................................... 6

       A.     Plaintiffs Lack Article III Standing ....................................................................... 6

       B.     Plaintiffs Lack Prudential Standing ...................................................................... 12

       C.     This Lawsuit Is an Improper Collateral Attack on the Pennsylvania Supreme
              Court's Order .................................................................................................... 13

       D.     The *Purcell* Principle Bars Plaintiffs' Claims .................................................... 17

       E.     Plaintiffs' Claims Are Barred by the Doctrine of Laches ..................................... 19

       F.     Plaintiffs' Claims Fail on the Merits ................................................................... 21

              1.     The Pennsylvania Supreme Court's Holding That Ballots Mailed On or
                     Before Election Day Can Be Received After Election Day Does Not
                     Violate Federal Election Day Statutes .......................................................... 21

              2.     The remedies the Pennsylvania Supreme Court provided to implement
                     the Pennsylvania Constitution's Free and Equal Elections Clause do not
                     undermine the Elections or Presidential Electors Clause of the United
                     States Constitution. .................................................................................... 23

              3.     Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits of
                     Their Equal Protection Claim. .................................................................... 25

II.    Even if Plaintiffs Could Show a Likelihood of Success, They Are Not Entitled to an
       Injunction ................................................................................................................... 28

       A.     Plaintiffs Have No Injury, Let Alone Irreparable Injury ...................................... 29

       B.     The Balance of Equities and Public Interest Weigh Heavily in Favor of
              Denying Plaintiffs' Motion ................................................................................. 30

CONCLUSION ................................................................................................................. 31

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbot v. Perez*,
138 S. Ct. 2305 (2018) ....................................................................................................8, 29

*Anderson v. United States*,
417 U.S. 211 (1974) ..............................................................................................................8

*Andino v. Middleton*,
No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020) .................................................18

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
576 U.S. 787 (2015) .................................................................................................23, 24, 25

*Baker v. Carr*,
369 U.S. 186 (1962) ..............................................................................................................8

*Balent v. City of Wilkes-Barre*,
669 A.2d 309 (Pa. 1995) .................................................................................................13

*Baten v. McMaster*,
967 F.3d 345 (4th Cir. 2020) ........................................................................................27

*Berg v. Obama*,
586 F.3d 234 (3d Cir. 2009) .....................................................................................7, 30

*Brandon v. Long*,
No. 05-326J, 2005 WL 3185657 (W.D. Pa. Nov. 29, 2005) .....................................6

*Bush v. Gore*,
531 U.S. 98 (2000) ..................................................................................................... *passim*

*Carson v. Simon*,
No. 20-2030, --- F. Supp. 3d ----, 2020 WL 6018957 (D. Minn. Oct. 12, 2020) ........... *passim*

*Corman v. Torres*,
287 F. Supp. 3d 558 (M.D. Pa. 2018) .........................................................................7, 12, 13

*Curling v. Raffensperger*,
403 F. Supp. 3d 1311 (N.D. Ga. 2019) .....................................................................16

*Democratic Nat'l Comm. v. Bostelmann*,
No. 20-2835, 2020 WL 5796311 (7th Cir. Sept. 29, 2020) .....................................12

*Dobson v. Dunlap*,
    576 F. Supp. 2d 181 (D. Me. 2008) ..................................................................................20

*Donald J. Trump for President, Inc. v. Boockvar*,
    No. 20-966, --- F. Supp. 3d ---, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020) ..........10, 11, 28

*Donald J. Trump for President, Inc. v. Cegavske*,
    No. 20-1445, --- F. Supp. 3d ----, 2020 WL 5626974 (D. Nev. Sept. 18, 2020) .................8, 10

*Dunn v. Blumstein*,
    405 U.S. 330 (1972) .......................................................................................................26

*Foster v. Love*,
    522 U.S. 67 (1997) .........................................................................................................23

*Frank v. Walker*,
    547 U.S. 929 (2014) .......................................................................................................18

*Frank v. Walker*,
    769 F.3d 494 (7th Cir. 2014) ..........................................................................................18

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ....................................................................................................8

*Gray v. Sanders*,
    372 U.S. 368 (1963) .........................................................................................................8

*Hope v. Warden York Cnty. Prison*,
    972 F.3d 310 (3d Cir. 2020) ..............................................................................6, 28, 29, 30

*Int'l Union v. Brock*,
    477 U.S. 274 (1986) .......................................................................................................16

*Lance v. Coffman*,
    549 U.S. 437 (2007) .....................................................................................................6, 7

*League of Women Voters of Va. v. Va. State Bd. of Elections*,
    458 F. Supp. 3d 460 (W.D. Va. 2020) ...............................................................................9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .........................................................................................................6

*Maddox v. Wrightson*,
    421 F. Supp. 1249 (D. Del. 1976) ...................................................................................20

*Martel v. Condos*,
    No. 20-131, --- F. Supp. 3d ----, 2020 WL 5755289 (D. Vt. Sept. 16, 2020) ...........................8

*Maryland v. King*,
    567 U.S. 1301 (Pa. 2012) ................................................................29

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ......................................................................29

*McPherson v. Blacker*,
    146 U.S. 1 (1892) ..................................................................24, 25, 26

*Mecinas v. Hobbs*,
    No. 19-5547, 2020 WL 3472552 (D. Ariz. June 25, 2020) ...................30

*Midwest Disability Initiative v. JANS Enters., Inc.*,
    No. 17-4401, 2017 WL 6389685 (D. Minn. Dec. 13, 2017),
    *aff'd*, 929 F.3d 603 (8th Cir. 2019) .....................................................16

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*,
    571 F.3d 299 (3d Cir. 2009) .............................................................15

*Nolles v. State Comm. for the Reorg. of Sch. Dists.*,
    524 F.3d 892 (8th Cir. 2008) .............................................................9

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) .........................................................................27

*Pa. Democratic Party v. Boockvar*,
    No. 133 MM 2020, --- A.3d ----, 2020 WL 5554644 (Pa. Sept. 17, 2020) .................... *passim*

*Pa. Voters Alliance v. Centre Cnty.*,
    No. 20-1761, --- F. Supp. 3d ----, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020) ...................12

*Paher v. Cegavske*,
    457 F. Supp. 3d 919 (D. Nev. 2020) ....................................................9

*Public Interest Legal Found. v. Boockvar*,
    No. 20-2905 (M.D. Pa. Oct. 20, 2020) .................................................20

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ...............................................................2, 17, 18, 19

*Reilly v. Ceridian Corp.*,
    664 F.3d 38 (3d Cir. 2011) ...............................................................12

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020) ....................................................................18

*Republican Party of Pa. v. Boockvar*,
    No. 20A54, 2020 WL 6128193 (U.S. Oct. 19, 2020) ...........................2, 4, 18

*Republican Party of Pa. v. Cortés*,
    218 F. Supp. 3d 396 (E.D. Pa. 2016) ..................................................................20

*Reynolds v. Sims*,
    377 U.S. 533 (1964)..........................................................................8, 25, 26

*Richardson v. Thompson*,
    No. 13-1466, 2014 WL 65995 (W.D. Pa. Jan. 8, 2014) ....................................28

*Robinson v. Fye*,
    192 A.3d 1225 (Pa. Commw. Ct. 2018) ........................................................14, 17

*Scarnati v. Boockvar*,
    No. 20A53, 2020 WL 6128194 (U.S. Oct. 19, 2020) .................................2, 4, 18

*Shaffer v. Smith*,
    673 A.2d 872 (Pa. 1996) ............................................................................14

*Shah v. United States*,
    540 F. App'x 91 (3d Cir. 2013) ...............................................................13, 15

*Smiley v. Holm*,
    285 U.S. 355 (1932)....................................................................................24

*Stein v. Boockvar*,
    No. 16-6287, 2020 WL 2063470 (E.D. Pa. Apr. 29, 2020).................................20

*Stevenson v. Silverman*,
    208 A.2d 786 (Pa. 1965) .............................................................................15

*Stoops v. Wells Fargo Bank, N.A.*,
    197 F. Supp. 3d 782 (W.D. Pa. 2016) ...........................................................12

*Taylor v. Sturgell*,
    128 S. Ct. 2161 (2008)................................................................................15

*Turner v. Crawford Square Apartments III, L.P.*,
    449 F.3d 542 (3d Cir. 2006)..........................................................................14

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995)....................................................................................24

*United States v. Classic*,
    313 U.S. 299 (1941)....................................................................................23

*Va. House of Delegates v. Bethune-Hill*,
    139 S. Ct. 1945 (2019).................................................................................29

*Vooys v. Bentley*,
901 F.3d 172 (3d Cir. 2018)..............................................................................28

*Voting Integrity Project, Inc. v. Bomer*,
199 F.3d 773 (5th Cir. 2000) ..............................................................................23

*Warth v. Seldin*,
422 U.S. 490 (1975)................................................................................................7

**Statutes**

10 ILCS 5/18A-15...................................................................................................22

10 ILCS 5/19-8(c)...................................................................................................22

25 P.S. § 2963 ........................................................................................................25

25 P.S. § 2963 ........................................................................................................25

25 P.S. § 3527 ...................................................................................................22, 23

25 Pa.C.S. § 3511 ..............................................................................................21, 22

1 U.S.C. § 1 .......................................................................................................21, 23

2 U.S.C. § 7......................................................................................................21, 23, 30

Cal. Elec. Code § 3020(b).......................................................................................22

Federal Uniformed and Overseas Citizens Absentee Voting Act,
52 U.S.C. § 20301, *et seq*..................................................................................21

N.J. Stat. Ann. § 19:63-31(m)................................................................................22

N.Y. Elec. Law § 8-412 ..........................................................................................22

Nev. Rev. Stat. Ann. § 293.317(2).........................................................................21

W. Va. Code, § 3-3-5(g)(1)......................................................................................22

**Other Authorities**

39 C.F.R. § 211.2(a)(2)............................................................................................22

**INTRODUCTION**

The relief Plaintiffs seek is extraordinary. They ask this Court to adopt novel and unprecedented election law theories, rely upon these theories to invalidate the Pennsylvania Supreme Court's decision on an issue of Pennsylvania law, and issue an injunction that will disrupt the election administration of the Commonwealth of Pennsylvania and its sixty-seven county boards of elections. Less than two weeks before a high-turnout election, Plaintiffs ask the Court to move the deadline for receipt of mailed ballots back by three days, ensuring that ballots mailed well in advance of the existing deadline will not arrive on time. A grant of this relief is guaranteed to cause confusion, disrupt polling places, and drain election administrators' resources. Most devastatingly, it will likely disenfranchise tens of thousands, if not more, of the 1.3 million Pennsylvania voters who have not yet returned their absentee and mail-in ballots.

It would take a compelling case to justify doing such harm to Pennsylvania's citizens. But Plaintiffs have not presented a compelling case. Indeed, they have not shown any right to relief at all. First, the "harm" Plaintiffs allege is nothing more than a generalized disagreement with the Pennsylvania Supreme Court's decision. They do not allege any particular harm to themselves, and therefore lack standing to bring this lawsuit. Second, one or more of the Plaintiffs are precluded from bringing their claims, because their representative, the Republican Party of Pennsylvania, has already pursued these claims and lost. Indeed, the Republican Party and Republican legislators moved the U.S. Supreme Court for essentially the same relief Plaintiffs seek here (an order enjoining the extension of the received-by deadline), based on the same arguments (purported violations of the Electors and Elections Clauses of the U.S.

Constitution and of federal election day statutes ), *and the Supreme Court denied the motions*.[1]
Third, under the doctrine of laches and the *Purcell* principle,[2] the fact that Plaintiffs waited until
well beyond the last possible minute to file suit dooms their claims. Finally, Plaintiffs' legal
theories are completely without merit.

Moreover, even if Plaintiffs could demonstrate that they can eventually prevail on their
claims, they cannot show that they are entitled to a temporary restraining order. They will not be
harmed at all if an injunction does not issue; thus, they certainly will not suffer irreparable harm.
And the balance of equities and public interest weigh overwhelmingly against a grant of relief. If
the Court grants the injunction Plaintiffs seek, citizens across the Commonwealth, who relied on
their government and its courts to protect their rights, will have their ballots go uncounted.
Disruption and delay at polling places may disenfranchise many more voters. Confusion will be
widespread, and election administrators will bear the brunt of voters' anger. The meager
arguments Plaintiffs present cannot justify such an outcome.

## FACTUAL BACKGROUND

### I.     The Ballot Receipt Deadline Litigation in the Pennsylvania Supreme Court

After Pennsylvania's June 2, 2020, primary election, a group of Petitioners filed suit in
Pennsylvania state court against the Defendants in this action. The Petitioners alleged that in the
primary, a combination of U.S. Postal Service ("USPS") delays, county delays in sending out
mail-in and absentee ballots, and the effects of the COVID-19 pandemic had made it difficult or
impossible for many voters to timely return their ballots. They sought, *inter alia*, a weeklong
extension of the deadline for receipt of ballots. *See Pa. Democratic Party v. Boockvar*, No. 133

---

[1] *Scarnati v. Boockvar*, No. 20A53, 2020 WL 6128194; *Republican Party of Pa. v. Boockvar*,
No. 20A54, 2020 WL 6128193 (Oct. 19, 2020).

[2] *See Purcell v. Gonzalez*, 549 U.S. 1 (2006).

MM 2020, --- A.3d ----, 2020 WL 5554644, at *20-26 (Pa. Sept. 17, 2020). While Secretary

Boockvar at first opposed any deadline extension, she reassessed her position after receiving a

letter from the USPS General Counsel. *Id.* at *26-27. This letter stated that Pennsylvania's ballot

deadlines were "incongruous with the Postal Service's delivery standards" and that "if state law

requires ballots to be returned by Election Day, voters should mail their ballots no later than

Tuesday, October 27." (Wiygul Decl., Ex. 2.)

 The Republican Party of Pennsylvania was granted leave to intervene. In its Application

for Leave to Intervene, the Republican Party asserted that it was representing the rights of its

candidates and members. (*See* Wiygul Decl., Ex. 3, at 4-5.) The Republican Party opposed an

extension of the deadline. *Pa. Democratic Party*, 2020 WL 5554644, at *28-32.

## II.    The Pennsylvania Supreme Court Rules, and the Mail-In and Absentee Balloting Process Moves Forward

The Pennsylvania Supreme Court ruled on September 17, 2020. It held, *inter alia*, that,

given the huge numbers of absentee and mail-in ballots expected during the continuing pandemic

and issues with USPS delivery standards, the Pennsylvania Constitution required a one-time,

three-day extension of the ballot-receipt deadline. *Id.* at *36-38. The Court noted that the

extension would apply only to ballots "mailed by voters via the USPS and postmarked by 8:00

p.m. on Election Day." *Id.* at *37. It adopted a presumption that any ballot that arrived by mail

during this window without a legible postmark was "mailed by Election Day unless a

preponderance of the evidence demonstrates that it was mailed after Election Day." *Id.* at 37

n.26.

On the same day, the Pennsylvania Supreme Court ruled on ballot challenges. Shortly

thereafter, the Pennsylvania Department of State certified the ballot, and counties began printing

and mailing their ballots.[3] The Department of State,[4] public interest groups,[5] the press, and, upon

information and belief, local governments notified voters of the extended ballot receipt

deadline.[6] In the meantime, the Republican Party and another intervenor sought stays from the

U.S. Supreme Court, making the same Constitutional and statutory arguments that Plaintiffs

make here.  The Supreme Court denied the requests. *See Scarnati v. Boockvar*, No. 20A53, 2020

WL 6128194; *Republican Party of Pa. v. Boockvar*, No. 20A54, 2020 WL 6128193 (Oct. 19,

2020)..

      At the time of the *Pennsylvania Democrats* decision, Secretary Boockvar estimated that

nearly three million Pennsylvanians would seek to vote by mail-in and absentee ballot. *Pa.*

*Democratic Party*, 2020 WL 5554644, *26. As of the day before the application deadline, just

over 3 million applications have been submitted and approximately 1.7 million ballots have been

returned,[7] which means that up to 1.3 million voters have yet to return their ballots.

Significantly, during the June 2020 primary election, in which approximately 1.5 million

Pennsylvanians voted by absentee or mail-in ballot, approximately 60,000 ballots returned by

mail were received by county boards of elections during the three days following election day.

**(**Wiygul Decl., Ex. 10.)

## III.    Plaintiffs Inexplicably Wait Until the Last Minute to File Suit, Then Urge This Court to Act With Haste

---

[3] *See* https://www.msn.com/en-us/news/politics/pennsylvania-voters-will-begin-receiving-mail-in-ballots-soon-official-say/ar-BB199I5C.

[4] *See, e.g.*, https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx; https://www.votespa.com/readytovote/Documents/Toolkit/ReadyToVote-Newsletter.pdf.

[5] *See, e.g.*, https://www.vote.org/absentee-ballot-deadlines/.

[6] Additional evidence on this and other topics will be presented at any evidentiary hearing.

[7] *See* Mail Ballot Application Statistics, https://data.pa.gov/stories/s/2020-General-Election-Voting-Story/kptg-uury (visited at 12:15 p.m. on October 26, 2020).

Plaintiffs are a Republican Congressional candidate, Jim Bognet,[8] and four registered voters. Mr. Bognet is presumably registered as a Republican; the Complaint does not state the other Plaintiffs' party affiliation.

Plaintiffs filed suit on October 22, 2020, more than a month after the Pennsylvania Supreme Court's ruling and a mere twelve days before Election Day. They have given no explanation of why they waited so long to file. Now, however, they are demanding that the Defendants and the Court make heroic efforts to accommodate their timing. *See, e.g.*, Plaintiffs' Response in Opposition to Defendants' Motion to Transfer Related Case, ECF 30, at 3 ("[S]peed is of the essence in the resolution of this case…. [E]ven a one or two-day delay will cause prejudice…. [T]his Court already has had this case since Thursday morning.")

Plaintiffs' delay has not merely inconvenienced others; it has dramatically increased the harm that this action may cause the public. By seeking injunctive relief when they did, Plaintiffs maximized the possibility that a ruling in their favor would disenfranchise large numbers of voters. According to the USPS General Counsel, October 27 is the last day that voters should mail their ballots to ensure that they arrive by Election Day. (*See* Wiygul Decl., Ex. 2, at 2.) The three-day deadline extension ensured that voters who mailed their ballots on October 27, 28, or 29 could be reasonably certain that those ballots would arrive on time. The Court, acting as quickly as could possibly be expected, has scheduled argument for October 27. Even as the parties are appearing for argument, and in the days that follow, voters will be putting ballots in the mail that (if Plaintiffs get the relief they seek) will arrive too late to be counted. If the Court rules in Plaintiffs' favor, some of these voters may learn of the development in time to go to their polling places and submit provisional ballots—although this process will slow down in-person

---

[8] *See* https://www.bognetforcongress.com/.

voting. Many more voters, however, will not learn of the ruling, or will not be able to do anything about it. These voters will be disenfranchised.

**ARGUMENT**

I.    **The Court Should Deny Plaintiffs' Motion Because Plaintiffs Are Unlikely to Prevail in This Litigation**

"[T]he standard for granting a temporary restraining order is the same standard that is applied for a preliminary injunction." *Brandon v. Long*, No. 05-326J, 2005 WL 3185657, at *1 (W.D. Pa. Nov. 29, 2005). "For an injunction to issue[,] the plaintiffs ha[ve] to demonstrate (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 319 (3d Cir. 2020). Only if these "two threshold showings" are made may "the District Court then consider[], to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest." *Id.* at 319-20. Here, for a number of reasons, Plaintiffs have failed to show a likelihood of success.

A.    **Plaintiffs Lack Article III Standing**

As a threshold matter, Plaintiffs lack standing to assert their claims. "Article III of the Constitution limits the jurisdiction of federal Courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of injury in fact, causation, and redressability." *Id.* An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not 'conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). To qualify as "particularized," "the injury must affect the plaintiff in a personal and individual way."

*Id.* at 560 n.1. By contrast, "[w]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Plaintiffs here present a quintessential case of an abstract and generalized—rather than concrete and particularized—grievance. They contend that the Pennsylvania Supreme Court's extension of the received-by deadline usurped *the Pennsylvania Legislature's* and *Congress's* purported powers under the Electors and Elections Clauses of the U.S. Constitution. They also allege that the Pennsylvania Supreme Court's Order violates Congress's establishment of a uniform federal election day. But, of course, neither legislative body—nor, for that matter, any member thereof—is a plaintiff in this case, and Plaintiffs cannot assert the rights of the legislature. *Coffman*, 549 U.S. at 441-42 (holding that Colorado voters lacked standing to assert that a Colorado Supreme Court decision violated the Elections Clause and distinguishing earlier Elections Clause cases brought "on behalf of the State rather than [by] private citizens acting on their own behalf"); *see Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (three-judge panel) ("the Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly"). And it is well settled that a complaint "that the law … has not been followed" is "precisely the kind of undifferentiated, generalized grievance" that will not confer standing. *Coffman*, 549 U.S. at 442.

In their motion, Plaintiffs seek to avoid these established principles—and to manufacture standing—by asserting that the votes of Plaintiffs, who allegedly "intend" to vote in-person on Election Day, will be "diluted" by votes that will be counted under the Pennsylvania Supreme Court's Order. (*See, e.g.*, ECF 6, at 8 (asserting that "the Pennsylvania Supreme Court's decision

[will] lead[] to … Defendants accepting ballots that will dilute [Plaintiff voters'] lawful in-person votes"); *id.* at 18-20.) But the precedents Plaintiffs cite are inapposite. To be sure, actions by public officials that "invidiously minimiz[e] or cancel[] out the voting potential of racial or ethnic minorities," *Abbot v. Perez*, 138 S. Ct. 2305, 2314 (2018), or apportion legislative districts in violation of the "one person, one vote" principle (*i.e.*, more populous districts are given the same number of legislative representatives as far less populous ones), *see, e.g.*, *Reynolds v. Sims*, 377 U.S. 533 (1964); *Baker v. Carr*, 369 U.S. 186 (1962),[9] have been held to create cognizable injuries by voters in those specific minority groups or districts. But courts, including the Supreme Court, have consistently distinguished between cases like those, where "[s]tate legislation … unfairly *restricts* a voter's right to vote," and cases—like the one here—in which "plaintiffs assert[] generalized objections to state election laws." *Martel v. Condos*, No. 20-131, ---- F. Supp. 3d ----, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) (citing *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)) (emphasis added).

　　Where, as here, voters complain that a law will result in the counting of fraudulent or otherwise invalid votes cast by third parties, they "allege[] an injury common to all other registered voters"; "every voter [allegedly] suffers the same incremental dilution of the franchise caused by some third-party's [invalid] vote." *Id.* In fact, multiple federal courts have concluded as much in substantially similar cases in recent weeks and months. *See, e.g.*, *Carson v. Simon*, No. 20-2030, --- F. Supp. 3d ----, 2020 WL 6018957, at *8 (D. Minn. Oct. 12, 2020) ("in the

---

[9] Plaintiffs' reliance on *Gray v. Sanders*, 372 U.S. 368 (1963), is misplaced for similar reasons. *Gray* invalidated a "county unit system" that, in counting votes, employed a system which in end result weighted rural votes more heavily than urban votes and weighted some small rural counties more heavily than other larger rural ones. *Anderson v. United States*, 417 U.S. 211 (1974), also cited by Plaintiffs, is equally inapposite. *Anderson* did not involve a suit by voters challenging election regulations but rather a criminal prosecution by the United States for voting fraud.

many challenges to state election laws leading to the November election, other courts have

rejected similar vote dilution theories") (collecting cases); *Donald J. Trump for President, Inc. v.*

*Cegavske*, No. 20-1445, --- F. Supp. 3d ----, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020)

(assuming *arguendo* that challenged statute would result in counting of invalid votes, "plaintiffs'

claims of a substantial risk of vote dilution 'amount to general grievances that cannot support a

finding of particularized injury as to [p]laintiffs'"); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926

(D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible

election fraud may be conceivably raised by any Nevada voter" and "therefore does not satisfy

the requirement that Plaintiffs must state a concrete and particularized injury" (citing cases));

*accord, e.g.*, *Nolles v. State Comm. for the Reorg. of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir.

2008) ("generalized grievance shared in common by all [Nebraska] voters" does not confer

standing); *see also League of Women Voters of Va. v. Va. State Bd. of Elections*, 458 F. Supp. 3d

460 (W.D. Va. 2020) (denying intervention as of right because plaintiffs' alleged "interest in

protecting [their] right [to vote] from dilution or debasement[] is no different as between any

other eligible Virginian").

      The *Carson* case, recently decided by a federal district court in Minnesota, is directly on

point. There, nominees of the Republican Party for presidential electors in the 2020 election

moved for a preliminary injunction to enjoin enforcement of a state-court order extending the

receipt deadline for absentee ballots from 8:00 p.m. on November 3, 2020, to November 10,

2020. 2020 WL 6018957, at *1. Like Plaintiffs here, the *Carson* plaintiffs contended that the

order violated the Electors Clause and "the congressional mandate that Election Day be held on

November 3." *Id.* at *6. And like Plaintiffs here, the *Carson* plaintiffs asserted that they were

injured because "votes received after Election Day are invalid and unlawful, and thus counting

these votes will … render their own lawful votes less influential." *Id.* at *7. Citing the extensive body of case law discussed above, the *Carson* court had no trouble concluding that the plaintiffs' "claim of vote dilution is a paradigmatic generalized grievance that cannot support standing." *Id.* at *8. That conclusion applies with equal force here.

Nor can Plaintiffs conjure standing by attempting to re-cast their allegations as Equal Protection Clause claims. (*See* ECF 1 ¶¶ 100-109 (Count IV).) Plaintiffs appear to assert two different types of Equal Protection injuries. The first alleged injury is the same as that discussed above—vote dilution (*id.* ¶¶ 102-104; ECF 6, at 1, 7)—and it fails for the same reasons discussed above. Further, Plaintiffs' assertion that because "it stands to reason that more late mail-in ballots will be returned from … higher-population density counties," "the lawful votes of voters in lower-population density counties are diluted more than others" (ECF 6, at 20) is simply wrong. As Judge Ranjan observed in a recent decision involving a similar vote-dilution theory of injury and Equal Protection claim—both of which the court rejected—plaintiffs "have, at best, shown only that events [allegedly] causing dilution are more likely to occur in [certain] counties." *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-966, --- F. Supp. 3d ----, 2020 WL 5997680, at *42 (W.D. Pa. Oct. 10, 2020). "[T]he effect of those events will … be felt by every voter across all of Pennsylvania…. Such [alleged] dilution impacts the entire electorate equally; not just voters in the county where it occurs." *Id.* Put otherwise, the Equal Protection Clause claims do nothing to alter the Complaint's threshold deficiency—the "vote dilution" theory fails to confer standing.

Plaintiffs' second theory of injury—that the Pennsylvania Supreme Court's Order imposes "arbitrary and disparate treatment" on "members of [Pennsylvania's] electorate" in violation of the rule announced in *Bush v. Gore*, 531 U.S. 98, 105 (2000)—also misses the mark.

The *Bush* theory of equal protection has no application to this case. As Judge Ranjan explained in *Trump*, the *Bush* Court invalidated "election recount procedures that allowed different counties to use 'varying standards to determine what was a legal vote.'" 2020 WL 5997680, at *41 (quoting *Bush*, 531 U.S. at 107). "[T]he absence of uniform, statewide rules or standards to determine which votes counted" "meant that entirely equivalent votes might be counted in one county but discounted in another." *Id.* The challenged Pennsylvania Supreme Court Order here is not even remotely comparable to *Bush*'s recount order. The Order here plainly *does* impose uniform, statewide rules to determine which votes count: in every county in the Commonwealth, ballots returned by mail and received before the extended received-by deadline will count (unless there is evidence that they were mailed after the deadline), and ballots received after the deadline will not. Indeed, the rules now are exactly as uniform and statewide as those in place before the Order issued; the only difference is that the received-by deadline is three days later, to protect the right to vote from the effects of COVID-19 and mail delays. Simply put, there is no *Bush* injury here.

As already noted, Plaintiffs' Motion is based primarily, if not exclusively, on alleged injuries to voters. To the extent Plaintiffs seek alternatively to invoke an alleged injury to Plaintiff Jim Bognet in his capacity as a candidate for Congress, they fail to allege standing. The Motion contains a single sentence asserting that the Pennsylvania Supreme Court's Order "change[s] the rules governing the ongoing voting in [Mr. Bognet's] federal elections." (ECF 6, at 6.) But this assertion fails to identify a concrete, particularized injury. Indeed, the Order does not change the deadline for voters to cast or mail their ballot; it simply provides more time—in response to anticipated mail delays—for the ballot, after it has been mailed, to be received by the board of elections. Plaintiffs do not and cannot explain how this injures Mr. Bognet or any other

candidate. *See Carson*, 2020 WL 6018957, at *12-13 (rejecting assertion that extension of received-by deadline caused candidates any actual, imminent, or concrete injury); *see also Democratic Nat'l Comm. v. Bostelmann*, No. 20-2835, 2020 WL 5796311, at *1 (7th Cir. Sept. 29, 2020) (holding that Republican Party lacked standing to challenge extensions of election deadlines because they did "not affect any legal interest of [the Party]"), *reconsidered on other grounds*, 2020 WL 5951359 (7th Cir. Oct. 8, 2020).

Plaintiffs appear to suggest that, as a result of the Order, Mr. Bognet might be less likely to be elected. But as the *Carson* court noted, such an injury is, at best, "conjectural and hypothetical." *Id.* at *13. It rests on speculation that "the number of [mail-in] ballots received after Election Day" will be more than the Election Day margin "between the winning and second-place candidates" *and* that those votes would favor Mr. Bognet's opponent *to an extent sufficient to alter the result*. *Id.* It is well settled that such a speculative injury, which depends on the hypothetical actions of independent third parties (*i.e.*, voters), cannot confer standing. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011); *see also Pa. Voters Alliance v. Centre Cnty.*, No. 20-1761, --- F. Supp. 3d ----, 2020 WL 6158309, at *5 (M.D. Pa. Oct. 21, 2020) ("Standing … cannot be predicated on a 'highly attenuated chain of possibilities.'"); *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 801-02 (W.D. Pa. 2016) (Gibson J.) ("it is well settled that a plaintiff 'cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending'").

### B.     Plaintiffs Lack Prudential Standing

Putting aside the absence of Article III standing, Plaintiffs also lack prudential standing to bring their claims under the Electors and Elections Clauses. "[T]he judge-made prudential limitations on standing" "include 'the general prohibition on a litigant's raising another person's legal rights.'" *Corman*, 287 F. Supp. 3d at 572 (M.D. Pa. 2018). As Plaintiffs acknowledge, the

Electors and Elections Clauses "grant rights to state legislatures." *Id.* at 573. (*See* ECF 6, at 7-8.) The constitutional claims "asserted in the … complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly." *Id.* Plaintiffs would have prudential standing to assert these claims "only … if the General Assembly faces a hindrance to vindicating its own rights." *Id.* Because there is no "reason to believe the General Assembly could not vigorously defend its rights," "none of the Plaintiffs has prudential standing to assert claims for relief premised on rights granted to the Pennsylvania General Assembly by the federal Elections Clause" or Electors Clause. *Id.*; *accord Carson*, 2020 WL 6018957, at *13 (no prudential standing for presidential electors or voters to assert Electors Clause claim). The same is true of Plaintiffs' claim that the Pennsylvania Supreme Court's Order "contravened an act of Congress setting Election Day…. [I]f anyone was injured …, it was Congress, not the [Plaintiffs]." *Carson*, 2020 WL 6018957, at *14. Accordingly, Plaintiffs' claims fail to satisfy the prudential prong of standing.

    **C.**    <u>**This Lawsuit Is an Improper Collateral Attack on the Pennsylvania Supreme Court's Order**</u>

    Even if Plaintiffs had standing to bring them, their claims would be precluded under the doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion). This lawsuit is an undisguised attempt to collaterally attack the Pennsylvania Supreme Court's judgment in *Pennsylvania Democratic Party*.

    "Res judicata is not a mere matter of technical practice or procedure but a rule of fundamental and substantial justice." *Shah v. United States*, 540 F. App'x 91, 93 (3d Cir. 2013), *aff'g* No. 12-119, 2013 WL 1869095 (W.D. Pa. May 3, 2013) (Gibson, J.). "It is central to the purpose for which civil courts have been established, the conclusive resolution of disputes, and seeks to avoid the expense and vexation of multiple lawsuits, while conserving judicial resources

and fostering reliance on judicial action by minimizing the possibility of inconsistent decisions."

*Id.* (internal quotation marks omitted); *accord Balent v. City of Wilkes-Barre*, 669 A.2d 309, 315

(Pa. 1995). Under the Pennsylvania preclusion rules that govern here, *see Turner v. Crawford*

*Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006), res judicata applies where four

factors are present: "(1) identity of the thing sued upon or for; (2) identity of the causes of action;

(3) identity of the persons or parties to the action; and (4) identity of the quality or capacity of

the parties suing or being sued." *Robinson v. Fye*, 192 A.3d 1225, 1231 (Pa. Commw. Ct. 2018).

Where it applies, res judicata bars not only "those claims that were 'actually litigated' in the first

adjudication," but also any claims that "could have been litigated … if they were part of the same

cause of action." *Id.* Notably, "[a] judgment is deemed final for purposes of res judicata and

collateral estoppel unless or until it is reversed on appeal." *Shaffer v. Smith*, 673 A.2d 872, 874

(Pa. 1996).

Here, factors (1), (2), and (4) are obviously met. The *Pennsylvania Democratic Party*

case involved the same dispute, namely, whether the Pennsylvania Supreme Court should—and

could lawfully—extend the received-by deadline to protect voters from disenfranchisement as a

result of COVID-19 and mail delays. *See Pa. Democratic Party*, 2020 WL 5554644, at *10-18.

And the Republican Party of Pennsylvania, among others, contended that the requested relief

was unlawful for the same reasons Plaintiffs assert here: it purportedly violated the Electors and

Elections Clauses, as well as the federal statutory designation of a uniform Election Day. (*See,*

*e.g.*, Wiygul Decl., Ex 10, at 19-20, 27-29.) *See Pa. Democratic Party*, 2020 WL 5554644, at

*14-15 (discussing these arguments). Finally, the Secretary of the Commonwealth and the

county boards of elections all appeared in *Pennsylvania Democratic Party* in the same capacities

in which they appear here.

Although Plaintiffs here were not named parties in *Pennsylvania Democratic Party*, factor (3) of the res judicata test is also present, at least with respect to Mr. Bognet and any other Plaintiff who is a registered Republican. "The doctrine of res judicata applies to and is binding, not only on actual parties to the litigation, but also to those who are in privity with them." *Stevenson v. Silverman*, 208 A.2d 786, 788 (Pa. 1965). "Privity is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include that other within the res judicata." *Shah*, 540 F. App'x at 93. Notably, the Pennsylvania rules for res judicata, collateral estoppel, and privity are "not inconsistent with the federal law" on the same issues. *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009). This law recognizes that res judicata may apply to a nonparty to the first proceeding where "the nonparty was 'adequately represented by someone with the same interests who [wa]s a party'" in the first suit. *Id.* at 312 (quoting *Taylor v. Sturgell*, 128 S. Ct. 2161, 2173 (2008)). "Adequate" representation, in turn, requires that "(1) [t]he interests of the nonparty and her representative [*i.e.*, the party] are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Taylor*, 128 S. Ct. at 2176 (citation omitted).

That test is plainly met here. The Republican Party of Pennsylvania and the interests of its candidates and members are clearly aligned with respect to the subject matter of this lawsuit, and the Republican Party indisputably understood itself to be acting in a representative capacity on behalf of its voters and candidates. The Republican Party told the Pennsylvania Supreme Court that it sought to intervene in *Pennsylvania Democratic Party* "to assert and protect the rights of [its] members in upcoming elections" and "to uphold the Election Code under which [it], [its] voters, [its] members, and [its] candidates exercise their constitutional rights to vote and

to participate in elections in Pennsylvania." (Wiygul Decl. Ex. 3, at 4.) In fact, when its standing

to oppose the Pennsylvania Supreme Court's judgment before the U.S. Supreme Court was

contested, the Republican Party asserted that it had "associational standing" to proceed "on

behalf of itself and its members, including its voters." (Wiygul Decl., Ex. 5, at 3.) To the same

effect, in a companion case in which the Party similarly intervened to oppose extending the

received-by deadline based on the same arguments asserted in *Pennsylvania Democratic Party*

and by Plaintiffs here, the Party expressly stated that it was litigating "on behalf of … [its]

candidates, and [its] member voters." (Wiygul Decl., Ex. 4, at 2; *see id.* ¶¶ 17, 22, 24.)

Because the Republican Party asserted associational standing to litigate on behalf of its

candidates and voters, the judgment in *Pennsylvania Democratic Party* precludes at least

Plaintiff Bognet, if not all Plaintiffs, from bringing the same claims here. *See, e.g.*, *Midwest*

*Disability Initiative v. JANS Enters., Inc.*, No. 17-4401, 2017 WL 6389685, at *4 (D. Minn. Dec.

13, 2017) (where party signified an intention to represent interests of its members in its pleadings

in first suit, judgment in that suit bound the non-party member in second suit), *aff'd*, 929 F.3d

603, 607-09 (8th Cir. 2019); *Int'l Union v. Brock*, 477 U.S. 274, 289-90 (1986) (implying that

where entity asserted associational standing, "a judgment won against it" will, absent proof of

inadequate representation, "preclude subsequent claims by the association's members"); *see also*

*Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1328 n.20 (N.D. Ga. 2019) (noting that where

Coalition in earlier lawsuit "asserted associational standing … on behalf of its individual …

[member] electors residing [in particular district], the Coalition's members who resided in [that

district] would have been in privity with the Coalition").

Although it is not a prerequisite of res judicata, it is clear that Plaintiffs here understood

that the Party was representing their interests. That is likely why Plaintiffs did not file this suit

immediately upon the Pennsylvania Supreme Court's entry of judgment on September 17, 2020, but instead waited until more than a month later, after the U.S. Supreme Court denied the Party's application for relief. Not only are the elements of the preclusion doctrine plainly met here, but not applying the doctrine would have distressing practical implications. In *Pennsylvania Democratic Party*, the two major political parties vigorously litigated, on behalf of their candidates and voters, the issue of whether the received-by deadline should and could be extended. To hold that the candidates and voters are not bound by the judgment in that case would be to invite an endless procession of copycat challenges seeking a different result in disputes over election regulations, with election officials having to devote time and resources to defending each one. That is precisely what the doctrine of res judicata is supposed to avoid.[10]

### D.    The *Purcell* Principle Bars Plaintiffs' Claims

Plaintiffs' claims are also foreclosed because of their timing. The status quo is the November 6 received-by deadline established by the Pennsylvania Supreme Court on September 17, 2020. The Republican Party and others moved the Court to stay its Order on September 21 and 22, 2020.[11] The Court denied those motions on September 24, 2020. (Wiygul Decl., Ex. 6.)

---

[10] Although the doctrine of res judicata is dispositive here, collateral estoppel is also applicable. That doctrine "renders issues of fact or law incapable of relitigation in a subsequent suit if, in a prior suit, these (1) same issues were (2) necessary to a final judgment on the merits and (3) the party against whom issue preclusion is asserted was a party or was in privity with a party to the prior action and (4) had a full and fair opportunity to litigate the issue in question." *Robinson*, 192 A.3d at 1232 (cleaned up). Here, as shown above, the Republican Party had a full and fair opportunity to litigate—and did litigate—the same arguments in opposition to the *Pennsylvania Democratic Party* Order that Plaintiffs raise here. Further, resolution of those arguments was necessary to the Pennsylvania Supreme Court's final judgment: in extending the deadline the Court necessarily rejected the Republican Party's/Plaintiffs' arguments that federal law barred such an extension.

[11] *See* Republican Party of Pennsylvania's Application for Partial Stay of September 17, 2020 Judgment, No. 133 MM 2020, *Pa. Democratic Party v. Boockvar* (Pa. filed Sept. 21, 2020); Application for Stay of Court's Opinion and Order of September 17, 2020 by Intervenor Respondents Joseph B. Scarnati III, President Pro Tempore, Jake Corman, Majority Leader of

The U.S. Supreme Court was then asked to stay that deadline on September 28, 2020, but the Court denied the requests on October 19, 2020. *Scarnati v. Boockvar*, No. 20A53, 2020 WL 6128194; *Republican Party of Pa. v. Boockvar*, No. 20A54, 2020 WL 6128193 (Oct. 19, 2020). Now, a week before election day, Plaintiffs ask this federal district court to change the rules—and in a manner that *burdens and restricts the ability to vote*. For many years, however, the U.S. Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)); *accord Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020) (Kavanaugh, J., concurring in grant of application for stay). That is because federal "[c]ourt orders affecting elections, *especially conflicting orders*, can themselves result in voter confusion and consequent incentive [not to vote]. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 5 (emphasis added); *see Frank v. Walker*, 547 U.S. 929 (2014) (vacating Court of Appeals' stay of injunction blocking photo-identification requirement); *Frank v. Walker*, 769 F.3d 494, 498-99 (7th Cir. 2014) (Williams, J., dissenting).

That principle applies with great force here. Shortening the received-by deadline at this extremely late juncture would likely cause disenfranchisement of significant numbers of voters who rely on the "postmarked by Election Day" ballot instructions and other materials and communications that they have received over the last many weeks. In addition, it would cause Defendants to have to devote time and resources to attempting to educate voters about the change that is contrary to the instructions they have been giving pursuant to prior court decisions,

---

the Pennsylvania Senate, Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives, No. 133 MM 2020, *Pa. Democratic Party v. Boockvar* (Pa. filed Sept. 22, 2020).

at the same time as they are processing huge numbers of mail-in ballots and finalizing their preparations for in-person voting on election day. Given USPS delivery delays, voters who mailed their ballots a week or less before the election would likely be disenfranchised through no fault of their own, as their ballots will be rejected as untimely. Undoubtedly, large numbers of voters would not learn of the change before the election, and many of those who did learn would be confused as to which rules applied. Moreover, the basis for the Pennsylvania Supreme Court's Order was that "the timeline built into the Election Code," which allowed voters to apply for mail-in ballots up to a week before election day, but required county boards to receive the voted ballot no later than election day, "cannot be met by the USPS's current delivery standard," "*resulting in the disenfranchisement of voters*." *Pa. Democratic Party*, 2020 WL 5554644, at *18 (emphasis added). And the Court acted when it did precisely to avoid "allowing the chaos to brew, creating voter confusion regarding whether extensions will be granted," so that "the voters in Pennsylvania [could] have clarity as to the timeline for the 2020 General Election mail-in ballot process." *Id.*

It is too late for voters to respond to any shortening of the received-by deadline by applying for a ballot earlier than they otherwise would have done; the ballot application deadline is tomorrow. For all of the reasons already set forth above, shortening the received-by deadline now would undoubtedly disenfranchise significantly more voters than if the extension order had not been entered in the first place. This is a quintessential *Purcell* scenario.

### E.      Plaintiffs' Claims Are Barred by the Doctrine of Laches

Even if the *Purcell* principle did not exist, Plaintiffs' claims would be barred by the doctrine of laches. "Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." As the *Purcell* discussion makes clear, the prejudice is undeniable. And Plaintiffs' delay in bringing suit was inexcusable. The litigation

seeking an extension of the received-by deadline was filed no later than *April* of this year.

(Wiygul Decl., Ex. 7 ¶¶ 3-10; *see also id.*, Ex. 8 ¶¶ 52-58. The Republican Party moved

promptly to intervene. (*Id.*, Ex. 4; *see also id.*, Ex. 3.) Plaintiffs here, by contrast, sat on the

alleged rights they now assert, evidently content to let the Party represent their interests. That

was Plaintiffs' prerogative, but they must live with the consequences of their choice; they cannot

now seek to alter deadlines a week before Election Day. *See Public Interest Legal Found. v.*

*Boockvar*, No. 20-2905 at *12, 14 (M.D. Pa. Oct. 20, 2020) ("[W]e decline to order such drastic

action simply because Plaintiff elected to file its suit on the eve of the national election…. In an

election where the margins may be razor-thin, we will not deprive the electorate of its voice

without notice or proper investigation on the basis of an ill-framed and speculative venture

launched at this late date."); *Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 404-05

(E.D. Pa. 2016) (denying preliminary injunction based on, *inter alia*, prejudicial delay and

proximity to election, where political party and voters waited until 18 days before election before

moving for preliminary injunction prohibiting enforcement of county-residence restriction on

poll watchers, and the "requested relief … would alter Pennsylvania's laws just five days before

the election"); *Stein v. Boockvar*, No. 16-6287, 2020 WL 2063470, at *19-20 (E.D. Pa. Apr. 29,

2020) (laches barred relief where relief sought, namely, order requiring decertification, prior to

November 2020 election, of voting machines used in Philadelphia and other counties, would

"effectively disenfranchise" voters); *Maddox v. Wrightson*, 421 F. Supp. 1249, 1252 (D. Del.

1976) (lawsuit filed "a mere five weeks before the election" was barred by laches where

plaintiffs "were aware of ballot access difficulties at least seven weeks before th[e] suit was

filed"); *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 187-88 (D. Me. 2008) (rejecting plaintiffs'

effort to excuse their delay in filing suit by pointing to pendency of lawsuit brought by another

claimant; plaintiff "voters cannot have it both ways: they cannot disassociate themselves from the [prior] action for purpose of preclusion" while relying on the action to excuse their delay).

 **F.**  <u>**Plaintiffs' Claims Fail on the Merits**</u>

   **1.** **The Pennsylvania Supreme Court's Holding That Ballots Mailed On or Before Election Day Can Be Received After Election Day Does Not Violate Federal Election Day Statutes**

In arguing that the Pennsylvania Supreme Court's decision violates a trio of Federal statutes that establish a uniform Election Day, *see* 1 U.S.C. § 1, 2 U.S.C. § 7, 3 U.S.C. § 1, Plaintiffs muddle the distinction between the casting of votes and the tabulation of votes. The Pennsylvania Supreme Court's decision, however, leaves intact the November 3 deadline for casting mail-in ballots; the Court simply held that ballots mailed before the deadline could be received after the deadline.

This is not an unreasonable, or unusual, policy. As an initial matter, the Pennsylvania Supreme Court's decision is consistent with how Pennsylvania law handles military and overseas ballots timely cast, but not received until after Election Day. *See* 25 Pa.C.S. § 3511 (military and overseas ballots are counted if received within seven days of Election Day). Plaintiffs do not challenge this longstanding statute, which, in fact, effectuates the Federal Uniformed and Overseas Citizens Absentee Voting Act. 52 U.S.C. § 20301, *et seq*. Certainly Congress was aware of its uniform Election Day statutes when it mandated that all states tabulate military and overseas ballots submitted on Election Day, but received after, and did not view such a mandate as incongruous with a uniform Election Day.

The Court's decision is also consistent with the policies of several other states, as they have enacted laws mirroring the Pennsylvania Supreme Court's deadline extension, as well as the evidentiary presumption that ballots with illegible or absent postmarks were timely mailed. Under Nevada law, "[i]f an absent ballot is received by mail not later than 5 p.m. on the third day

following the election and the date of the postmark cannot be determined, the absent ballot shall be deemed to have been postmarked on or before the day of the election." Nev. Rev. Stat. Ann. § 293.317(2). In Illinois, any mail-in ballot received without a postmark "after the polls close on election day and before the close of the period for counting provisional ballots cast at that election, shall be … opened to inspect the date inserted on the certification, and, if the certification date is election day or earlier" it will be counted. 10 ILCS 5/19-8(c); *see also* 10 ILCS 5/18A-15. And New Jersey likewise accepts any "ballot without a postmark … that is received by the county boards of elections from the United States Postal Service within 48 hours of the closing of polls on November 3, 2020[.]" N.J. Stat. Ann. § 19:63-31(m). *See also* N.Y. Elec. Law § 8-412; Cal. Elec. Code § 3020(b); W. Va. Code, § 3-3-5(g)(1).

Moreover, as the Pennsylvania Supreme Court correctly recognized, voters have no control over mail-delivery timetables, or whether their mailed ballots will be legibly postmarked or even postmarked at all. *Pennsylvania Democratic Party,* 2020 WL 5554644 at *13 n.20. Under USPS regulations, post offices are required to postmark election mail. *See* 39 C.F.R. § 211.2(a)(2); Postal Operations Manual at 443.3; Your 2020 Official Election Mail Kit 600, at 25, United States Postal Service, https://about.usps.com/kits/kit600.pdf (last visited 10/24/2020). While these regulations do not guarantee that every ballot envelope will be postmarked, the actions—and diligence—of an unknown postal employee are beyond the control of the voter.

Further, the mail-in ballot envelope contains a Voter's Declaration that must be signed and dated by the qualified elector. 25 P.S. § 3527.[12] Voter fraud in Pennsylvania is a third-degree felony, carrying a maximum 7-year prison term. *Id*.

---

[12] Plaintiffs suggest the "military-overseas ballot" exception to the Election Code's received-by deadline is somehow less likely to cause vote dilution because, "[i]f a military-overseas ballot lacks a postmark, a late postmark, or unreadable postmark, the ballot will only count if the 'voter

The question the Pennsylvania Supreme Court confronted was how to handle ballots with no clear postmarks received from the USPS shortly after Election Day. This issue is an evidentiary one. And on that issue, federal law is silent. While the federal laws set Election Day as November 3, 2020, their plain text provides nothing regarding how to determine whether a ballot was in fact cast by that date. *See* 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7 (establishing date but saying nothing regarding these evidentiary issues). When federal election laws are silent, states are empowered to resolve the election issues. *United States v. Classic*, 313 U.S. 299, 311 (1941); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000) (noting only limit on "a state's discretion and flexibility in establishing the time, place and manner of elect[ions]" is that it "cannot directly conflict with federal election laws on the subject"). In fact, States "are given … a wide discretion in the formulation of a system for the choice by the people of representatives in Congress." *Classic*, 313 U.S. at 311.[13]

2.    **The Remedies the Pennsylvania Supreme Court Provided to Implement the Pennsylvania Constitution's Free and Equal Elections Clause Do Not Undermine the Elections or Presidential Electors Clauses of the United States Constitution**

Plaintiffs' allegations do not make out a violation of the United States Constitution's Elections and Presidential Electors Clauses. As the Supreme Court stated in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787, 817-818 (2015)

---

has declared under penalty of perjury that the ballot was timely submitted.'" ECF 6 at 3 (citing 25 Pa.C.S. § 3511(b)). To be clear, military-overseas ballots do not require postmarks at all. Rather, the voter must submit a declaration that the ballot was submitted for mailing by 11:59 p.m. on the day before the election. The Election Code punishes fraudulently-dated mail-in ballots similarly, which offers the same protections. *See* 25 P.S. § 3527.

[13] Plaintiffs rely heavily on *Foster v. Love*, 522 U.S. 67, 72 (1997), to support their argument that States may not undermine the "single, uniform, federal Election Day." ECF 6 at 14-15. But *Foster* is clearly distinguishable. There, Louisiana law allowed candidates to be elected to federal office in October. The Pennsylvania Supreme Court's Order, in contrast, does not establish a new election date.

(*AIRC*), nothing in the Elections "Clause instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in *defiance of provisions of the State's constitution*." (emphasis added). On the contrary, a state legislature lacks the "power to enact laws" governing federal elections "in any manner other than that in which the Constitution of the state has provided that laws shall be enacted." *Smiley v. Holm*, 285 U.S. 355, 368 (1932). Thus, in *Smiley*, the Court held that, "where the state Constitution … provided" for a gubernatorial veto as "a check in the legislative process," the state legislature was required to enact a redistricting plan "in accordance with" that requirement. *Id*. at 367-369. The Pennsylvania Constitution establishes the Free and Equal Elections Clause as just such a "check in the legislative process." *Smiley*, 285 U.S. at 368.

"[T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833-34 (1995). It makes no difference if those restraints flow from the United States Constitution or, as here, the Pennsylvania Constitution. Indeed, the Supreme Court has already specifically rejected the suggestion that enforcing a state constitutional provision that is inconsistent with a state statute undermines the Elections Clause. In *AIRC*, the Supreme Court was presented with the argument by the Arizona State Legislature that where a constitutional amendment enacted by popular initiative conflicted with existing state law, the Elections Clause required that the statute prevail. 576 U.S. at 818. The Supreme Court rejected that argument because the Elections Clause does not empower a state legislature, through legislation, to "trump" a state "constitutional provision regulating federal elections." *Id*.; *see also McPherson v. Blacker*, 146 U.S. 1, 25 (1892) ("The legislative power is the supreme

authority, except as limited by the constitution of the state"). Indeed, "a state legislature … is bound by substantive restrictions set forth in the state constitution when enacting laws governing federal elections."[5]

As for whether the Pennsylvania Supreme Court's remedy violates the Electors Clause, the Electors Clause is not implicated here. That Clause "vests the power to determine the manner of appointment in 'the Legislature' of the State." *AIRC*, 576 U.S. at 839. The Electors Clause "does not create state legislatures out of whole cloth, but rather takes them as they come—as creatures born of, and constrained by, their state constitutions." *Bush v. Gore*, 531 U.S. at 123 (Stevens, J., dissenting). For example, over the course of American history, electors have been "appointed by the legislatures," "by popular vote for a general ticket," or "elected by districts." *McPherson*, 146 U.S. at 31. The three-day extension and presumption of timely mailing in no way affect the manner in which electors will be appointed: voters will choose the electors who choose their representatives. 25 P.S. §§ 2963, 3191 ("qualified electors," *i.e.*, voters, shall select electors of President and Vice President of the United States); *cf. McPherson*, 146 U.S. at 24 (state legislature, as a body of representatives, could divide authority to appoint electors across each of the State's congressional districts).

### 3.   Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits of Their Equal Protection Claim.

Plaintiffs advance two equal protection arguments, but cannot show they are likely to succeed on either theory. First, Plaintiffs argue the Pennsylvania Supreme Court's decision violates their rights under the Equal Protection Clause "to have their ballots counted without dilution." ECF 6, at 19 (citing *Reynolds*, 377 U.S. at 555 n.29). And second, Plaintiffs argue their right to "'participate in' the ongoing election 'on an equal basis with other citizens' in

---

[5] Michael T. Morley, *The New Elections Clause*, 91 Notre Dame L. Rev. Online 79, 96 (2016).

Pennsylvania" has been violated. *Id.* Neither the facts nor the law support Plaintiffs' Equal Protection claim.

Plaintiffs first argue the Pennsylvania Supreme Court's decision infringes their rights under the Equal Protection Clause because "dilution of lawful votes…violates the right to vote," citing the "one-person, one-vote principle" of *Reynolds v. Sims.* 377 U.S. 533, 583 (1964). In *Reynolds,* the Supreme Court held the "Equal Protection Clause requires that both houses of a state legislature be apportioned on a population basis," to avoid "[w]eighting the votes of citizens differently, by any method or means, merely because of where they happen to reside." *Reynolds v. Sims,* 377 U.S. 533, 563, (1964).[6] These Plaintiffs allege, without evidence, "that votes that are invalid under the duly enacted laws of Congress and the General Assembly *will* be counted" despite the Supreme Court of Pennsylvania's clear admonishment that "voters utilizing the USPS must cast their ballots prior to 8:00 p.m. on Election Day, like all voters." *Pa. Democratic Party*, 2020 WL 5554644, at *18 n.26. Unlike the Plaintiffs in *Reynolds*, Plaintiffs here cannot show that their in-person votes have any less weight or value than mail-in electors' votes. Thus, *Reynolds* simply does not apply. As discussed above, Plaintiffs' allegations of vote dilution are, at best, speculative, generalized grievances.  *See supra* Section I.A.

Plaintiffs also contend that the Pennsylvania Supreme Court's decision creates an election administration scheme that will proceed "in an arbitrary fashion pursuant to nonuniform rules" in violation of the principles set forth in *Bush v. Gore*, 531 U.S. 98, 107 (2000). As

---

[6] Plaintiffs also cite *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), for the proposition that they ought to be able to participate in the ongoing election "on an equal basis with other citizens in" Pennsylvania. ECF 6, at 19. In *Dunn,* the Supreme Court found an Equal Protection violation where "[d]urational residence requirements *completely bar* from voting all residents not meeting the fixed durational standards." *Id.* (emphasis added). The Plaintiffs in *Dunn* were shut out from voting altogether. *Id.* Here, the Pennsylvania Supreme Court's decision in no way prevents Plaintiffs from participating in the election.

discussed in Section I.A above, however, *Bush v. Gore* is also inapposite. The standard here is clear and uniform: Everyone must cast their ballot on or before Election Day, and ballots validly received within three days of Election Day will receive the same weight as those received before Election Day. Moreover, in a sharp departure from the ordinary voting-rights lawsuit, no one is hurt by this deadline extension. The extension does not in any way infringe a single person's right to vote: all eligible voters who wish to vote may do so on or before Election Day. *See Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020) (finding "no vote . . . is diluted…. [when] [e]very qualified person gets one vote and each vote is counted equally in determining the final tally.").

And, even if the Pennsylvania Supreme Court's decision about ballot-counting treated voters' ballots differently, it would not amount to an equal protection violation. While the Constitution demands equal protection, that does not mean all forms of differential treatment are forbidden. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id*. (citation omitted). What's more, "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id*. (citations omitted). Plaintiffs' equal-protection claim fails at this first step, without even reaching *Anderson-Burdick*, because Plaintiffs have not alleged or shown that Pennsylvania's system will result in the dilution of votes in certain counties and not others. Furthermore, even if the *Anderson-Burdick* framework applies, the attenuated "burden" Plaintiffs

have identified—an increased risk of vote dilution created by the possibility for untimely ballots to evade the USPS mandatory postmark regime—is more than justified by Defendants' important and precise interests in regulating elections. *See Trump*, 2020 WL 5997680, at *38 (denying an Equal Protection claim based on similarly thin record of potential voter fraud at unmanned dropboxes).

Finally, this is a matter of state law. The Pennsylvania Supreme Court has already held that, under Pennsylvania law, votes cast consistent with the procedures in its opinion are lawful, and that this counting method is the only way to remain faithful to the Free and Fair Elections Clause of the Pennsylvania Constitution. The meaning of the Free and Fair Elections Clause, and the factual findings of the Pennsylvania Supreme Court in making its determinations are not on trial here. Plaintiffs obliquely reference state officials administering the election in an "arbitrary fashion pursuant to nonuniform rules that will result in the unequal evaluation of ballots" and argue vaguely about "[d]ilution of lawful votes … by the casting of unlawful votes." ECF 6, at 20, 21. Whether ballots are illegally counted if they are received more than three days after Election Day depends on an issue of state law from which this Court must abstain. *See Vooys v. Bentley*, 901 F.3d 172, 194 n.129 (3d Cir. 2018) ("state supreme courts are the final arbiters of matters of state law"); *Richardson v. Thompson*, No. 13-1466, 2014 WL 65995, at *5 (W.D. Pa. Jan. 8, 2014) ("the Pennsylvania Supreme Court [is] the final arbiter of the meaning of the Pennsylvania Constitution").

## II.     Even if Plaintiffs Could Show a Likelihood of Success, They Would Not Be Entitled to an Injunction

Even if Plaintiffs could show that they are likely to prevail, they would not be entitled to an injunction; they must also show that "they are likely to suffer irreparable injury without relief." *Hope*, 972 F.3d at 319. And even if they make this showing, the Court should consider

"whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs" and "whether granting relief would serve the public interest." *Id.* at 319-20. Here, Plaintiffs cannot show any injury, and the balance of harms weighs strongly against relief. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis original and internal quotation marks omitted). Plaintiffs have not made a clear showing that they are entitled to relief; indeed, they have made no showing at all.

## A.   <u>Plaintiffs Have No Injury, Let Alone Irreparable Injury</u>

Plaintiffs cannot show irreparable harm for the same reasons that they do not have standing. Tellingly, Plaintiffs' primary "irreparable harm" argument is that "[t]he inability to enforce its duly enacted plans … inflicts irreparable harm *on the State.*" (ECF 6, at 22 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)) (emphasis added); *see also id.* (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (Pa. 2012)). But unlike in the *Abbott* and *Maryland* cases, neither Pennsylvania nor any organ or representative thereof is a party to this case. Even if such hypothetical parties could show irreparable injury here, Plaintiffs cannot. *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951-53 (2019) (holding that one house of Virginia's legislature lacked standing to assert the Commonwealth's interest in defending its own laws).

As for Plaintiffs' "vote dilution" theory of harm, it is not only non-cognizable (as shown above); it is truly puzzling as a supposed basis for finding "irreparable harm." Under the Pennsylvania Supreme Court's Order, all voters must cast their vote by November 3. All the Order does is provide three additional days—in accommodation of an election process and postal service operating under the unprecedented strains of COVID-19, at a time when nationwide infection rates are at their highest levels since the pandemic began—for the mail to arrive. The

Order does not burden anyone's ability to vote. By contrast, it makes it less likely that mail delays will disenfranchise qualified electors. Contrary to Plaintiffs' suggestion, democracy is not an irreparable injury.

Plaintiffs' real concern, though they do not expressly acknowledge it, seems clear: it is the possibility that their preferred candidate(s) will not be elected.[7] But not only do Plaintiffs provide no evidence whatsoever showing that the Pennsylvania Supreme Court's Order will make the difference as to whether that happens, it is well settled that "an individual voter is not [cognizably] harmed by a candidate losing an election." *Mecinas v. Hobbs*, No. 19-5547, 2020 WL 3472552, at *6 (D. Ariz. June 25, 2020) (collecting cases); *see Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009) (voter lacked standing to assert claim that President Obama was ineligible to be President; voter's "wish that the Democratic primary voters had chosen a different presidential candidate … do[es] not state a legal harm"). Because Plaintiffs cannot show any injury, let alone an irreparable one, their motion must be denied. *See Hope*, 972 F.3d at 319 (3d Cir. 2020).

### B.   The Balance of Equities and Public Interest Weigh Heavily in Favor of Denying Plaintiffs' Motion

Plaintiffs fail to show that the equities or the public interest favors the relief they seek. Plaintiffs glibly assert that "the Defendants can in no way be harmed by the granting of this motion 'because the enforcement of an unconstitutional [practice] vindicates no public interest.'" (ECF 6, at 23-24.) That statement does not even attempt to grapple with the actual equities and entirely ignores the practical effects of the relief Plaintiffs seek. Notably, Plaintiffs do not dispute

---

[7] Although Plaintiff Bognet is a candidate for office, he does not allege that the Pennsylvania Supreme Court's decision will cause him to lose the election, only that extending the received-by deadline for mail-in ballots "undermines his right to run in an election where Congress has paramount authority to set the 'Times, Places, and Manner' and has done so in 2 U.S.C. § 7." ECF 1 ¶ 69.

what the Pennsylvania Supreme Court found—namely, that in the absence of the modest extension the Court ordered, "the strain of COVID-19 and the 2020 Presidential Election" will "unquestionably … result[] in the disenfranchisement" of qualified voters who have abided by Pennsylvania's election timeline. *Pa. Democratic Party*, at \*18. As shown above, at this late day, the negative consequences of shifting deadlines backwards are even more significant, and would likely lead to disenfranchisement of many voters, confusion by the electorate, and a diversion of the limited resources of election officials from other crucial tasks on the eve of the election. By comparison, the interests invoked by Plaintiffs are abstract and modest; they are measured by whatever injury is done to the General Assembly's alleged legislative prerogatives as a result of altering one of its many prescribed election deadlines, by only three days, in a single election, in response to an unprecedented pandemic. If there was any doubt as to how the scales tilt, this dispels it: *the U.S. Supreme Court has already considered and denied a request to stay the Pennsylvania Supreme Court's Order*. In sum, both the equities and the public interest dictate denial of Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court deny Plaintiffs' motion for a temporary restraining order.

Respectfully submitted,

HANGLEY ARONCHICK SEGAL
Dated: October 26, 2020     PUDLIN & SCHILLER

By: */s/ Michele D. Hangley*
    Mark A. Aronchick (ID No. 20261)
    Michele D. Hangley (ID No. 82779)\*
    Robert A. Wiygul (I.D. No. 310760)\*
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel: (215) 568-6200
Fax: (215) 568-0300

OFFICE OF ATTORNEY GENERAL

By: */s/ Karen M. Romano*
      Karen M. Romano (ID No. 88848)
      Keli M. Neary (ID No. 205178)*
      Stephen M. Moniak (ID No. 80035)
Strawberry Square, 15th Floor
Harrisburg, PA 17120
(717) 787-2717

*Counsel for Defendant Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania*

*\*Admitted pro hac vice*

TUCKER LAW GROUP

Joe H. Tucker, Jr. (I.D. No. 56617)
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609

*Counsel for Defendant Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania*