**EXHIBIT 7**

EXHIBIT 7

Case 3:20-cv-00215-KRG   Document 59-9   Filed 10/26/20   Page 2 of 37

Received 4/22/2020 3:51:19 PM Commonwealth Court of Pennsylvania

Filed 4/22/2020 3:51:00 PM Commonwealth Court of Pennsylvania
266 MD 2020

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Michael Crossey, Dwayne Thomas, Irvin Weinreich, Brenda Weinreich, and the Pennsylvania Alliance for Retired Americans, | |
| Petitioners, | |
| v. | No. _____ |
| Kathy Boockvar, Secretary of the Commonwealth, and Jessica Mathis, Director of the Bureau of Election Services and Notaries, | |
| Respondents. | |

### PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF

Petitioners Michael Crossey, Dwayne Thomas, Irvin Weinreich, Brenda Weinreich, and the Pennsylvania Alliance for Retired Americans file this Petition for Declaratory and Injunctive Relief against Defendants Kathy Boockvar in her official capacity as Secretary of the Commonwealth and Jessica Mathis in her official capacity as the Director of the Bureau of Election Services and Notaries, and allege as follows:

### NATURE OF ACTION

1.      The United States is in the midst of an unprecedented pandemic. The highly infectious coronavirus ("COVID-19") is rapidly spreading throughout the country. As of April 22, 2020, there are 34,528 confirmed cases of COVID-19 in Pennsylvania, and 1,564 deaths. These numbers are rapidly increasing and projections from the federal government indicate that the virus will persist at least into the fall, if not longer. Indeed, the Director of the Centers for Disease Control and Prevention recently cautioned that the country may encounter a second, more deadly

wave of COVID-19, which will "be even more difficult than the one we just went through."[1] This means that Pennsylvania's upcoming elections will occur in the middle or immediate aftermath of a severe public health crisis. If the recent primary election in Wisconsin is any guide, it illustrates that advance planning and proactive measures to ensure that voters have sufficient access to vote by mail are essential to protect the right to vote and prevent large-scale disenfranchisement.[2]

2.      Petitioners bring this lawsuit because the primary and general elections are fast approaching, yet the Commonwealth has failed to implement adequate safeguards to ensure a free and fair election, in which all citizens have a meaningful opportunity to vote as required by the Pennsylvania Constitution. County election officials have already indicated that in-person voting will be severely compromised in upcoming elections and have encountered some of the same election administration challenges that plagued the Wisconsin primary: some institutions, including retirement communities and nursing homes, are refusing to serve as polling locations and others will likely follow suit, which has led to the consolidation of polling places; poll workers, many of whom are elderly, are already refusing to report to duty; elections staff responsible for processing voter registration and absentee ballot applications were sent home; and county officials have expressed concern that the existing infrastructure is ill-suited to conduct in-person voting while complying with social distancing guidelines. At the same time, Pennsylvania voters are already requesting absentee and mail-in ballots (collectively, "mail ballots") at record rates, even though the June primary election is still several weeks away.

---

[1] Zack Budryk, *CDC director warns second wave of coronavirus might be 'more difficult'*, THE HILL (Apr. 21, 2020), https://thehill.com/policy/healthcare/493973-cdc-director-warns-second-wave-of-coronavirus-might-be-more-difficult

[2] Peter Baker & Eileen Sullivan, *U.S. Virus Plan Anticipates 18-Month Pandemic and Widespread Shortages*, N.Y. TIMES (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/politics/trump-coronavirus-plan.html.

3.      As Pennsylvanians are increasingly forced to turn to absentee or mail-in voting—made possible by new legislation that expanded vote by mail to all eligible voters ("Act 77")—they will encounter numerous obstacles that, unless enjoined, will disenfranchise significant numbers of voters and violate state law, including the constitutional guarantee to a free and fair election. For instance, Pennsylvania law requires that all mail ballots must be *delivered* to election officials by 8:00 p.m. on Election Day ("Election Day Receipt Deadline"). While Petitioners do not currently challenge this rule's validity as a general matter—nor do they seek any relief that would trigger Act 77's non-severability clause—the challenges faced by the U.S. Postal Service during this pandemic, and the resulting disruptions in mail delivery, require additional protections for voters whose ballots are delayed through no fault of their own. At the very least, Pennsylvania should be required to count ballots received for up to seven days following Election Day, on an emergency basis during the current pandemic, in order to account for the delivery of delayed mail ballots. This would ensure that all Pennsylvania voters have an equal chance to vote by mail during this difficult and unprecedented crisis, aligning the receipt deadline for everyone with the current deadline imposed for overseas and military voters to submit their ballots.

4.      Making matters worse, Pennsylvania law prohibits voters from obtaining assistance from third parties in mailing or submitting ballots in person, and requires that ballots be returned by mail or delivered *by the voter*, unless the voter is disabled. 25 P.S. §§ 3146.6(a); 3150.16(a). This restriction burdens the franchise for countless Pennsylvanians who lack access to reliable mail service and cannot safely deliver their ballots in person, and denies historically disadvantaged communities—along with those attempting to navigate the mail-in voting process for the first time—the necessary assistance required to ensure timely delivery of their ballots.

5.     Voting by mail further requires payment of postage, which creates an unnecessary burden that threatens to disenfranchise the most vulnerable members of the electorate. It imposes a monetary cost on the voting process at a time when many Pennsylvanians are suffering from the devastating economic impact of COVID-19, and it requires voters who do not have ready access to postage to subject themselves to public health risks in order to visit a post office or return their ballots in-person.

6.     Removing these barriers is only the first step to ensuring a meaningful opportunity to vote; the Pennsylvania Constitution also guarantees voters the right to have their properly submitted ballots counted. But in addition to the obstacles posed above, outdated and highly error-prone signature verification procedures threaten to disenfranchise eligible voters. It is unclear what, if any, standards election officials follow in verifying signatures on mail ballots; election officials are not required by law to engage in signature verification training, nor are they required to provide voters any prior notice or an opportunity to cure a perceived signature defect. The current mail ballot system thus subjects voters in some counties to an impermissible risk of arbitrary disenfranchisement.

7.     To be sure, the Commonwealth's officials have recognized the disrupting effect of the COVID-19 pandemic and have taken some action, but much is left to do in order to guarantee a free and fair election. On March 27, Governor Tom Wolf signed Senate Bill 422 (Act 12 of 2020), which, among other provisions, moved the 2020 primary election from April 28 to June 2. But the Commonwealth is currently under a stay-at-home order, which requires residents "to stay at home except as needed to access, support, or provide life-sustaining business, emergency, or government services." The order also requires residents to practice social distancing and prohibits gatherings of individuals outside of the home except to access, support, or provide life-sustaining

services. While the order as it is currently written expires on May 8, the Governor has not indicated that he is ready to ease safety restrictions.[3]

8.  Even assuming the Governor's order is lifted, the number of confirmed COVID-19 cases will rise, and efforts to minimize the spread of the virus or the risk of infection will continue to disrupt day-to-day life. As Governor Wolf has cautioned, Pennsylvanians will not return to business as usual with the snap of a finger. Election officials will continue to encounter difficulty in securing and staffing polling places, and voters will be deterred by the public health risks created by packing more precincts or divisions—and, by extension, more people—into fewer, crowded polling locations. That is why Commonwealth officials have been actively promoting voting by mail, according to a Department of State spokesperson.

9.  By all accounts, Pennsylvanians have heeded this warning and are applying to vote by mail in record numbers for the upcoming June and November elections. As of this week, Pennsylvania counties have received approximately 600,000 applications for mail ballots for the June 2 election, a contest still several weeks away. In comparison, approximately 84,000 absentee ballots were cast in the 2016 primary election.[4] To protect the right to vote and ensure a meaningful, free, and fair election in the midst of the current pandemic, as required by the Pennsylvania Constitution, the Commonwealth must implement safeguards to ensure that all voters have an opportunity to submit mail ballots and to have those ballots counted.

10.  Petitioners therefore request that the Court issue an Order requiring Defendants to: adopt additional procedures to ensure that ballots delivered after the Election Day Receipt

---

[3] *See* Governor's Remarks of April 17, 2020,  https://www.governor.pa.gov/newsroom/governor-tom-wolf-covid-19-remarks-april-17-2020/ ("Unfortunately, we cannot flip a switch and reopen the commonwealth. There won't be one big day. We need to make smart, data driven decisions.").
[4] Mark Scolforo & Michael Rubinkam, *Mail-in, absentee ballot applications surge for June primary*, Pittsburgh Post-Gazette  (Apr.  15,  2020),  https://www.post-gazette.com/news/politics-state/2020/04/15/Mail-in-absentee-ballot-applications-surge-for-June-primary-pennsylvania/stories/202004150076.

Deadline due to mail delivery delays or disruptions are counted if received within seven days of Election Day—to the extent that such procedures do not trigger Act 77's non-severability clause; permit third parties to assist voters in submitting their sealed mail ballots; provide pre-paid postage for all mail ballots; and impose uniform guidelines for mail ballot verification that mandates training for election officials engaged in signature matching, and requires officials to provide voters with notice and a reasonable opportunity to cure before rejecting mail ballots for any signature-related defect. With the primary and general elections fast approaching, the time to act is now, to prevent widespread disenfranchisement and ensure that voters have a meaningful opportunity to participate in the electoral process.

## JURISDICTION AND VENUE

11.    This Court possesses original and exclusive jurisdiction over Petitioners' claims against the Secretary and Director, statewide officers of the "Commonwealth government." 42 Pa. C.S. § 761(a)(1), (b).

## PARTIES

12.    Petitioner Michael Crossey is a duly registered Pennsylvania voter and resident of Allegheny County. Mr. Crossey is 69 years old and is a retired schoolteacher and former president of the Pennsylvania State Education Association. He is currently the treasurer for the Pennsylvania Alliance for Retired Americans. Mr. Crossey has always voted in-person at the polls on election day in Pennsylvania but due to arthritis in his knees, he will face a hardship if forced to stand in line for extended periods of time. Because of the current spread of COVID-19 throughout Pennsylvania, and because he knows that the disease is particularly harmful to voters his age, Mr. Crossey requested a mail-in ballot this year so that he would not need to vote in public on election day. Mr. Crossey is concerned that, because of mail delivery delays, he may need to personally deliver his ballot to ensure it arrives on time. Not only does this present health concerns—due to

COVID-19's effect on the 65 and older population—but Mr. Crossey is also concerned that he will need to stand in line for long periods of time to submit his mail ballot, exacerbating his injuries. Mr. Crossey would seek assistance in returning his ballot if a third party were permitted to assist him. Finally, Mr. Crossey is also concerned about the risk that his ballot may not be counted due to the mail ballot verification procedures and potential variations in his signature.

13.     Petitioner Dwayne Thomas is a duly registered Pennsylvania voter and resident of Fayette County. He is 70 years old and is a retired mineworker. Mr. Thomas is the current president of the Pennsylvania Alliance for Retired Americans. Mr. Thomas usually votes in-person at the polls on election day and often encounters long lines at his polling site. This year, Mr. Thomas requested an absentee ballot as a precautionary measure to avoid high-trafficked public places in light of the spread of COVID-19 across the state. Mr. Thomas has consistently had issues sending and receiving mail through the U.S. Postal Service: his letters and packages rarely arrive on time at their desired locations; he often receives returned mail even when he has correctly addressed envelopes and packages; and he often fails to receive letters and packages sent to him through the postal service. Knowing this, Mr. Thomas is concerned that he will need to personally deliver his absentee ballot but is also concerned that this will expose him to COVID-19. He would seek assistance in returning his ballot if a third party were permitted to assist to him. Mr. Thomas is also concerned about the risk that his ballot may not be counted due to the mail ballot verification procedures and potential variations in his signature.

14.     Petitioner Irvin Weinreich is a duly registered Pennsylvania voter and resident of Catasauqua County. Mr. Weinreich is a disabled war veteran and retired maintenance worker. He has never missed an opportunity to vote in person on election day. Mr. Weinreich frequently has trouble navigating his polling site because it is difficult for him to ascend steps or steep ramps at

his polling site, and he struggles to walk the distance from the street and through the building to reach the voting area. Mr. Weinreich has heart issues and diabetes; even before the spread of COVID-19, Mr. Weinreich was afforded limited public interactions because the common cold could render him incapacitated. For the first time in his life, Mr. Weinreich requested a mail-in ballot this year due to the hardships he faces when voting in-person at his polling site. But he is concerned that his ballot may not arrive in time for the Election Day Receipt Deadline and therefore he may be forced to personally deliver his mail ballot. If permitted, Mr. Weinreich would rely on a third party to assist him in delivering his ballot to the proper location. Because this is his first time voting by mail, Mr. Weinreich is also concerned about the risk that his ballot may not be counted due to the mail ballot verification procedures and potential variations in his signature.

15.     Petitioner Brenda Weinreich is a duly registered Pennsylvania voter and resident of Catasauqua County. Ms. Weinreich is a retired textile factory worker. She has never missed an opportunity to vote in person on election day. Ms. Weinreich frequently has trouble navigating her polling site because, due to a knee replacement, it is difficult for her to ascend steps or steep ramps at the polling site, and she struggles to walk the distance from the street and through the building to reach the voting area. Ms. Weinreich is a caretaker for her husband and would be unable to push him up the steep ramp at the polling site if he needed to be in a wheelchair or scooter. Because she is his caretaker, Ms. Weinreich is frequently required to do tasks that require public exposure, such as grocery shopping. But at 70, Ms. Weinreich is within the age group of people who are vulnerable to the more dire consequences of COVID-19. Therefore, limiting her exposure to the public is both necessary for her own health and her ability to care for her husband. Ms. Weinreich is voting by mail this year but is concerned that her ballot may not arrive to the proper polling location in time to meet the Election Day Receipt Deadline, and therefore she is concerned that she will need to

risk both the public exposure and the physical hardships of delivering her ballot in person. If permitted, Ms. Weinreich would rely on a third party to assist her in delivering her ballot. Finally, Ms. Weinreich is concerned about the risk that her ballot may not be counted due to the mail ballot verification procedures and potential variations in her signature.

16.    The Pennsylvania Alliance for Retired Americans ("the Alliance") is incorporated in Pennsylvania as a 501(c)(4) nonprofit, social welfare organization under the Internal Revenue Code. The Alliance has 335,389 members, composed of retirees from public and private sector unions, community organizations and individual activists. It is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work. The Election Day Receipt Deadline, the prohibition on third party mail ballot collection assistance, the lack of pre-paid postage for mail ballots, and the mail ballot verification process which allows election officials to engage in an arbitrary signature matching and erroneously reject mail ballots frustrates the Alliance's mission because it deprives individual members of the right to vote and to have their votes counted, threatens the electoral prospects of progressive candidates whose supporters will face greater obstacles casting a vote and having their votes counted, and makes it more difficult for the Alliance and its members to associate to effectively further their shared political purposes. The Alliance and its individual members intend to engage in voter assistance programs. These programs would, but do not currently, include voter education and awareness campaigns and returning mail ballots for those electors who require assistance. The Alliance cannot further these activities because of Pennsylvania's prohibitions.

17.    Defendant Kathy Boockvar is the Secretary of the Commonwealth and is sued in her official capacity. As Secretary, she is Pennsylvania's Chief Election Official and a member of

the Governor's Executive Board. The Secretary is charged with the general supervision and administration of Pennsylvania's elections and election laws. Among her numerous responsibilities in administering elections, including ballots cast by mail, she is charged with tabulating, computing, and canvassing all votes cast as well as certifying and filing the votes' tabulation, 25 P.S. § 3159, and ordering county boards to conduct recounts and recanvasses, *id*. §2621(f.2).

18.     Defendant Jessica Mathis is the Director of the Bureau of Election Services and Notaries ("Bureau"). The Bureau is responsible for planning, developing, and coordinating the statewide implementation of the Election Code, voter registration process, and notaries public.

## GENERAL ALLEGATIONS

A.     **The COVID-19 pandemic has upended Pennsylvania's electoral processes.**

19.     Virtually all aspects of life in our country today are affected by the unprecedented Covid-19 pandemic. Schools and businesses are closed; a majority of people in the country are sheltering in their homes; more than 20 million people have lost their jobs; and approximately 45,000 people have lost their lives. The dangerous virus that has already infected 34,528 Pennsylvanians and resulted in 1,564 deaths has begun to wreak havoc on Pennsylvania's voting systems. And the crisis has no clear end in sight.

20.     On April 1, Governor Wolf issued a state-wide stay-at-home order and urged residents to maintain social distancing guidelines in order to combat the virus's spread. Counties across the state have reported difficulty recruiting and retaining poll workers, and venues that have typically served as polling locations—i.e., senior centers, schools, and churches—are unwilling to do so in upcoming elections because of the attendant public health risks. For the limited group of poll workers who agree to staff polling places on Election Day, and the few locations that agree to

open their doors to the public, county election officials have struggled to provide sufficient sanitary supplies and protective equipment to keep voters and election workers safe during in-person voting. This may prove especially problematic for those counties employing touchscreen voting machines, which may require sanitizing after every voter.

21.     At the same time, some counties are still in the early stages of the rollout for Pennsylvania's new voting machines, which will require in-person training before Election Day. Because of the current state of the public health emergency, some of those trainings either have been canceled or have not been scheduled at all, sparking concerns of Election Day confusion, and prompting some local officials to question the Commonwealth's Election Day readiness.[5]

22.     The Commonwealth is also likely to see a significant reduction in the number of polling places offered for voting. Not only has the public health emergency restricted available sites, the Pennsylvania General Assembly passed emergency legislation earlier this month to postpone the primary election to June 2, and to loosen restrictions on polling place consolidation, among other last-minute changes. As a result, counties may now consolidate polling locations without a court order in the June primary, and if this policy is extended to the November general election, it will allow counties to pack more voters into fewer polling places, which could spell disaster both from a public health and an election administration standpoint.

23.     Because of the pandemic, mail ballots—without additional assurances—will not provide an adequate alternative means for Pennsylvanians to vote. The U.S. Postal Service is

---

[5] *See* Jonathan Lai, "Officials in three Southeastern Pa. counties cast doubt on primary voting methods." PHILA. INQUIRER (April 10, 2020), https://www.inquirer.com/politics/election/coronavirus-covid19-election-pennsylvania-20200410.html.

experiencing difficulties, delays, and budget shortfalls.[6] These pressures threaten to shutter the entire agency by this summer.[7]

24.     As the pandemic continues to spread, postal workers have increasingly been infected. As of mid-April, nearly 500 postal workers across the country have tested positive for the coronavirus, 19 have died, and more than 6,000 are in self-quarantine because of exposure.[8] Postal workers in Pennsylvania are no different. Reports of the virus infecting and, unfortunately, killing Postal Service employees throughout the state abound.[9]

25.     And as it attempts to deliver an unprecedented number of absentee ballots across the country—both from county elections officials to voters, and then back again—the system will be under increasing pressure, causing delays and, ultimately, some number of ballots that are not received by voters in time.

26.     The Postal Service's budget and personnel struggles have harsh implications for Pennsylvanians' voting rights. In the past, when the U.S. Postal Service has faced a budget crisis, it has responded by closing hundreds of processing centers.[10] Moving forward, it is likely that the

---

[6] The Postal Service is experiencing dramatic decreases in mail volume compared to last year and, as a result, is projecting a $13 billion revenue shortfall this fiscal year because of the pandemic and another $54 billion in losses over 10 years." Nicholas Fandos & Jim Tankersley, *Coronavirus Is Threatening One of Government's Steadiest Services: The Mail*, N.Y. TIMES (Apr. 9, 2020), https://www.nytimes.com/2020/04/09/us/politics/coronavirus-is-threatening-one-of-governments-steadiest-services-the-mail.html.

[7] Kyle Cheney, *House panel warns coronavirus could destroy Postal Service by June*, POLITICO (Mar. 23, 2020), https://www.politico.com/news/2020/03/23/coronavirus-postal-service-june-145683.

[8] Jacob Bogage, *White House rejects bailout for U.S. Postal Service battered by coronavirus*, WASH. POST (Apr. 11, 2020), https://www.washingtonpost.com/business/2020/04/11/post-office-bailout-trump/.

[9] *See, e.g.*, *Two United States Postal Service employees test positive for COVID-19 in Harrisburg*, CBS 21 News (Apr. 15, 2020), https://local21news.com/news/local/two-united-states-postal-service-employees-test-positive-for-covid-19-in-harrisburg; Bill Rettew, *Exton postal employee dies from coronavirus complications*, DAILY LOCAL NEWS (Apr. 12, 2020), https://www.dailylocal.com/news/exton-postal-employee-dies-from-coronavirus-complications/article_c466fd92-7b6e-11ea-9429-9b1e64c419a2.html; CBS3 Staff, *Northeast Philadelphia Postal Worker Tests Positive For COVID-19*, CBS 3 PHILLY (Mar. 30, 2020), https://philadelphia.cbslocal.com/2020/03/30/coronavirus-bustleton-station-postal-worker-positive-covid-19/; John Luciew, *U.S. Postal Service employee in Pa. has coronavirus: 'Risk is low'*, PA. PATRIOT-NEWS (Mar. 24, 2020), https://www.pennlive.com/coronavirus/2020/03/us-postal-service-employee-in-pa-has-coronavirus-risk-is-low.html.

[10] *See* U.S. Postal Service Office of Inspector General, *Area Mail Processing Consolidations* (June 5, 2015), https://www.uspsoig.gov/sites/default/files/document-library-files/2015/no-ar-15-007.pdf.

USPS will need to make cuts to routes, processing centers, or staff—any of which is likely to increase mail processing delays. Pennsylvania voters casting mail ballots and facing the Election Day Receipt Deadline will bear the brunt of these cuts because of the recent introduction of no-excuse mail-in ballots—already surging in demand for a primary election weeks away—and safety measures needed to slow the spread of COVID-19, such as Governor Wolf's stay-at-home order.

27.    The recent primary election in Wisconsin should serve as a cautionary tale because election officials there encountered many of the same issues leading up to election day. Like here, "the extent of the risk of holding [the] election ha[d] become increasingly clear" well before Election Day. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *1 (W.D. Wis. Apr. 2, 2020). Election officials were facing a huge backlog of requests for absentee ballots and questions about voting absentee, including how to satisfy certain registration requirements, how to properly request an absentee ballot, and how to return it in time to be considered. *Id.* Election officials were also dealing with the loss of poll workers due to age, fears of illness, or actual illness. *Id.* The likely consequences of holding an election in that context were clear:

> (1) a dramatic shortfall in the number of voters on election day as compared to recent primaries, even after accounting for the impressive increase in absentee voters, (2) a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State, or (3) a failure to achieve sufficient in-person voting to have a meaningful election *and* an increase in the spread of COVID-19.

*Id.*

28.    When Wisconsin proceeded to hold an election without sufficiently addressing these issues, chaos and widespread disenfranchisement ensued. The Postal Service struggled to deliver absentee ballots to voters. Some ballots were delayed, but others did not arrive at all. In

response, both of Wisconsin's U.S. Senators wrote to the Inspector General for the U.S. Postal Service seeking an investigation into "absentee ballots not being delivered in a timely manner" and the Postal Service's failure to deliver in this regard.[11] There were similar delays returning ballots to elections officials. In total, approximately 107,871 absentee ballots were received by elections officials after the day of the election.

29.     Additionally, cities in Wisconsin were forced to close polling locations. In Milwaukee, a city with twice the population of Pittsburgh, 18,803 voters cast their ballots in person at only five polling locations. The result was crowds, long lines, and excessive wait times—in the middle of a global pandemic:



Source: David D. Haynes, Haynes: *Wisconsin's Election May Have Been 'Ridiculous' but Those Who Braved Coronavirus to Vote Were Anything but*, MILWAUKEE J. SENTINEL (Apr. 8, 2020), http://www.jsonline.com/story/new s/solutions/2020/04/08/wisconsin-election-ridiculous-voters-who-braved-coronavirus-lines-inspiring-

---

[11] *See* Letter from Senators Tammy Baldwin and Ron Johnson to U.S. Postal Service Inspector General (Apr. 9, 2020), https://www.wispolitics.com/wp-content/uploads/2020/04/200409LETTER.pdf.



Source: Astead W. Herndon & Alexander Burns, *Voting in Wisconsin During a Pandemic: Lines, Masks and Plenty of Fear*, N.Y. TIMES (Apr. 7, 2020), https://www.nytimes.com/2020/04/ 07/us/politics/wisconsin-election-

[Remainder of the page intentionally left blank]



Source: *Coronavirus Wisconsin: Scenes from Election Day*, April 7, MILWAUKEE J. SENTINEL (Apr. 9, 2020), http://www.jsonline.com/picture-gallery/news/2020/04/07/coronavirus-wisconsin-scenes-election-day-april-7/2962085001/.



Source: *Coronavirus Wisconsin: Scenes from Election Day*, April 7, MILWAUKEE J. SENTINEL (Apr. 9, 2020), http://www.jsonline.com/picture-gallery/news/2020/04/07/coronavirus-wisconsin-scenes-election-day-april-7/2962085001/.

30.     Reports of COVID-19 cases resulting from voters who turned out to vote in Wisconsin's election have already emerged.[12]

31.     Without adequate safeguards to ensure access to vote by mail options, Pennsylvania could suffer the same fate. To their credit, Commonwealth and local officials have been encouraging voters to cast ballots by mail, and early indications from mail ballot applications suggest that voters will do so in record numbers. As of today, still six weeks away from the June 2 election, Pennsylvania counties have received approximately 600,000 applications for mail-in and absentee ballots. By contrast, only around 84,000 absentee ballots were cast in the 2016 primary election.

32.     But the current mail voting process in Pennsylvania is not equally accessible to all eligible citizens—particularly those in disadvantaged communities, the poor, the elderly, and other vulnerable populations. Many of these individuals have historically relied on in-person voting, which will be severely restricted (and may pose significant health risks) in upcoming elections. In order to ensure that all citizens have reasonable and equal access to the electoral process, the Commonwealth must remove unnecessary restrictions on mail voting that will otherwise deny its citizens the free and equal election guaranteed by the Pennsylvania Constitution.

**B.     Election Day Receipt Deadline**

33.     In the 2018 general election, according to data from the Election Administration and Voting Survey, approximately, 8,162 absentee ballots—3.7% of all absentee ballots cast—were rejected because they were delivered to election officials after 5:00 p.m. on the Friday before Election Day.

---

[12] Alison Dirr, *At least 7 new coronavirus cases appear to be related to Wisconsin's election, Milwaukee health commissioner says*, MILWAUKEE J. SENTINEL (April 20, 2020), https://www.jsonline.com/story/news/local/milwaukee/2020/04/20/coronavirus-milwaukee-7-new-cases-may-tied-april-7-election/5168669002/.

34.     Since then, the Pennsylvania General Assembly enacted legislation to allow all eligible voters to vote by mail and extended the deadline for election officials to receive mail ballots: now, to be counted, all absentee and mail-in ballots must be received by 8:00 p.m. on Election Day in the county board of elections office. 25 P.S. §§ 3146.6(c), 3150.16(c). Petitioners do not challenge the validity of this law, nor do they seek any relief that would trigger Act 77's non-severability clause. However, the disruptions in the voting process caused by the COVID-19 pandemic require the Commonwealth to implement additional voting procedures that would allow election officials to count mail ballots that arrive after 8:00 p.m. on Election Day due to mail service delays or disruptions.

35.     As detailed above, the ability to process mail ballot applications and deliver ballots on time has been compromised by the public health crisis. The demand for mail ballots is already testing the limits of some counties: in Delaware County, for example, election officials have begun "falling behind on processing mail-in ballot requests."[13] And as the number of self-quarantined and infected postal workers increase nationally and locally, the more likely it is the U.S. Postal Service will continue to face severe staffing shortages, thereby slowing the delivery and receipt of a rapidly increasing volume of election mail.

36.     Because mail ballots must be received by 8:00 p.m. on Election Day, voters must mail them several days before Election Day to ensure timely delivery. This date operates as a shadow pre-election cutoff date. But in a post-COVID-19 world, where the Postal Service's regular mail functions have been disrupted, the pre-election cutoff date by which voters should mail their

---

[13] Jonathan Tamari & Jonathan Lai, *Pennsylvania, New Jersey, and other states struggle to avoid repeat of Wisconsin election fiasco*, PHILA. INQUIRER (Apr. 12, 2020), https://www.inquirer.com/news/pennsylvania-new-jersey-vote-by-mail-primary-election-challenges-20200412.html.

ballots to ensure timely delivery is entirely unclear, subjecting voters to arbitrary disenfranchisement.

37.     For instance, Pennsylvania voters can apply for absentee and mail-in ballots if their applications are received by 5:00 p.m. on the Tuesday before Election Day. *See* 25 P.S. §§ 3146.2a(a), 3150.12a(a). But it is anyone's guess whether voters who request absentee ballots on this day will receive their ballots in time to submit them before the Election Day Receipt Deadline. Pennsylvania officials must mail absentee and mail-in ballots to a qualified absentee or mail-in voter "within forty-eight hours after approval of their application." 25 P.S. §§ 3146.5(a), 3150.15. It is even less predictable now when that ballot will arrive. Even assuming the ballot arrives before Election Day, the voter may not have time to fill it out and mail it back to ensure timely delivery.

38.     Although Pennsylvania may have an interest in the finality of elections, the Commonwealth can continue to enforce its Election Day Receipt Deadline while providing separate, temporary procedures to allow voters who submit their mail ballots well in advance of Election Day, but are affected by mail service disruptions, to cast an effective ballot. And doing so can still serve the Commonwealth's interest. Pennsylvania currently counts military-overseas ballots so long as they are received "by 5 p.m. on the seventh day following the election." *Id*. at § 3511(a). County boards of elections have seven days after Election Day to examine provisional ballots. *Id*. at § 3050(a.4)(4). Challenges and appeals to provisional ballots can last another nine days. *Id*. at § 3050(a.4)(4)(ii), (v). And Pennsylvania officials need not certify election results to the Secretary until 20 days after Election Day. 25 P.S. § 2642(k).

39.     There is nothing sacrosanct about the receipt deadline as past (and current) exemptions indicate. Shortly after Hurricane Sandy struck parts of Pennsylvania in 2012, the Governor extended the deadline for absentee ballots returns in Philadelphia, Bucks, Montgomery,

and Chester Counties from 5:00 p.m. on the Friday before Election Day to 5:00 p.m. on the Monday before Election Day.[14] In 2016, a Montgomery County Court judge extended the Deadline from the Friday before the election to 8:00 p.m. on Election Day after elections officials received "unprecedented demand" for absentee ballots and voters "complain[ed] that they had not yet received their ballots" with the Friday deadline impending.[15]

40.     Adopting such emergency procedures, moreover, does not trigger the non-severability clause added to recent legislation, Act 77, that expanded mail voting to all eligible voters and moved the mail ballot receipt deadline to 8:00 p.m. on Election Day. Petitioners' requested relief does not render the Election Day Receipt Deadline invalid. Rather, it would implement additional, emergency procedures to count mail ballots delayed by postal service disruptions in light of the COVID-19 pandemic.

41.     Rejecting all mail ballots that arrive after 8:00 p.m. on Election Day, notwithstanding the current public health emergency, the unprecedented increase in requests for absentee ballots, and the budgetary crisis at the U.S. Postal Service, disenfranchises Pennsylvania voters—many of whom already lack reasonable access to safe, in-person voting options—for reasons entirely out of their control.

## C.     Third-Party Ballot Collection Assistance

42.     Pennsylvania's failure to safeguard the rights of voters affected by mail service disruptions is compounded by the fact that Pennsylvania law in most cases prohibits third parties from assisting voters in delivering mail ballots. Thus, to avoid the uncertainty of mail delivery,

---

[14] *Absentee ballot deadline extended in some Pa. counties*, WHYY (Nov. 5, 2012), https://whyy.org/articles/absentee-ballot-deadline-extended-in-aome-pa-counties/.
[15] Laura McCrystal, *Montco judge extends deadline for absentee ballots*, PHILA. INQUIRER (Nov. 3, 2016), https://www.inquirer.com/philly/news/politics/20161104_Montco_seeks_to_extend_deadline_for_absentee_ballots.html.

voters will be forced to submit their ballots in person, potentially subjecting themselves to health risks.

43.     For example, Petitioner Dwayne Thomas usually votes in-person on election day but has applied to vote absentee this year as a precautionary measure due to the current health crisis. Relatedly, Mr. Thomas has struggled for years with having his mail arrive promptly—or at all—using his local postal service. Because the current pandemic exacerbates postal service delays and creates further uncertainty in the timing of mail delivery, Mr. Thomas will be forced to deliver his ballot in-person this year to ensure his vote is counted, or subject himself to the risk of arbitrary disenfranchisement. The benefits he gains from voting by mail—avoiding crowded polling locations or waiting in line to vote—are lost if he must nevertheless wait in crowded lines for prolonged periods just to deliver his ballot on time. If the state permitted, Mr. Thomas would designate a third party to safely deliver his ballot on time.

44.     The burden caused by the prohibition on third party ballot collection is particularly pronounced this year because many Pennsylvanians, like Mr. Thomas, will be voting by mail for the first time—in light of Act 77's recent expansion of mail voting—and will have to navigate the public health risks posed by the COVID-19 pandemic.

45.     Mr. Thomas's predicament, moreover, is far from an isolated incident. Pennsylvania has an aging population, ranking fifth among the 50 states by the size of its population over the age of 65 in 2017. Seniors, especially those living in community homes or nursing homes, are particularly vulnerable to the current health risks and have expressed concern that they have no reliable way to deliver their ballots to the proper polling site; they cannot trust that the ballot will be delivered on time through the postal service and they cannot personally deliver the ballot due to health concerns.

46.     The prohibition on third party ballot collection also disproportionately burdens poor, minority, and rural communities who generally have less access to postal services, live in areas that lack reliable access to public transportation, and are less able to bear the costs of waiting in long lines to vote or exposing themselves to health risks in order to submit a mail ballot in person. Voters in rural communities, moreover, face longer travel distances to their county board of elections office and even less reliable mail service.

47.     Absentee and mail-in ballots are a positive step for Pennsylvania. But, as shown above, voters who opt for these ballots still require assistance in returning their ballots to the appropriate election officials. Pennsylvania allows third party ballot collection in very limited circumstances where someone is disabled or hospitalized but prohibits third party ballot collection in every other instance. This prohibition presents an undue burden on voters generally and will operate to disenfranchise a large swath of Pennsylvania's eligible voters during the current pandemic.

**D.      Pre-Paid Postage**

48.     In Pennsylvania, most voters who choose to return their ballots by mail must also provide their own postage. 25 P. S. §§ 3146.6(a); 3150.16(a). This requirement imposes both monetary and transaction costs that bear most heavily on individuals who are least likely to be able to overcome them.

49.     In this digital era, many voters do not regularly keep postage stamps in their homes, and therefore must visit a post office or other essential business to obtain the correct postage. Purchasing a book of 20 stamps online will cost voters $11—an unnecessary expense that could be cost prohibitive for individuals with lower incomes, along with those whose employment and source of income were eradicated due to the devastating economic impact of COVID-19 and the Governor's ensuing stay-at-home order. A trip to the post office or any other establishment that

sells stamps, during a public health crisis in which individuals have been instructed to maintain social distancing guidelines, forces voters to expose themselves to health risks in order to vote. This is especially true for elderly voters, as well as voters who lack access to vehicles and must rely on public transportation.[16]

50.     Providing postage to allow citizens to complete important government-related functions is a common practice that has been adopted by federal, state, and county governments in other contexts. For instance, the United States Census Bureau sends census surveys with postage-prepaid return envelopes. Pennsylvania provides, as the National Voter Registration Act requires, a postage-prepaid return envelope when it asks voters to verify their address for the purpose of voter registration. Counties in Pennsylvania send juror questionnaires with postage-prepaid envelopes. Recently, Allegheny County Executive Rich Fitzgerald announced that the county will send mail-in ballot applications to all registered voters with prepaid postage.[17] And in its coronavirus stimulus package, Congress allocated $400 million for elections, which can be used to cover the cost of prepaying postage, among other expenses.

51.     Studies have shown that sending absentee ballots in postage-prepaid envelopes increases mail voting turnout. When King County, Washington launched prepaid postage pilot programs during the 2017 and 2018 primary elections, the county found that voters returned their absentee ballots via USPS at higher rates when they received return envelopes with postage prepaid. In the 2016 general election, 48% of the tested group of voters returned their absentee

---

[16] In Southeastern Pennsylvania, public transportation has been radically reduced in light of the COVID-19 pandemic. Dozens of bus, train, and trolley routes have been cancelled; many subway stations have been shuttered; and those routes which are operating are doing so on a significantly lessened schedule.  *See* Se. Pa. Trans. Auth., *New Lifeline Service Schedules Effective Thursday, April 9, 2020*, http://septa.org/covid-19/, (last visited Apr. 22, 2020).

[17] Ryan Deto, *Allegheny County is sending all county voters mail-in ballot applications with prepaid postage*, PITTSBURGH CITY PAPER (April 17, 2020), https://www.pghcitypaper.com/pittsburgh/allegheny-county-is-sending-all-county-voters-mail-in-ballot-applications-with-prepaid-postage/Content?oid=17142631.

ballots via USPS. In 2017, 81% of those same voters did. Voters were not only more likely to return their ballots by mail, they were also more likely to *vote*. In the 2017 primary, turnout rose 10%. In the 2018 primary, it rose 6%. Following these pilot programs, King County sent all absentee ballots with postage-prepaid return envelopes. And shortly after that, the Governor and Secretary of State of Washington funded prepaid postage for every county in the state.

52.     While Allegheny County's efforts to provide prepaid postage are laudable, such safeguards should be extended to all voters and not left to the counties' discretion. Beaver County, for instance, had provided postage-prepaid envelope in its absentee ballot mailing in prior elections, but county officials announced in January of this year that they will no longer cover the cost of postage.[18] Thus some voters in Beaver County and other parts of the state that do not have access to mail ballots with prepaid postage will be forced to put their health at risk—either to obtain postage or stand in line at potentially crowded, consolidated polling places—or incur additional expense in order to exercise their right to vote.

**E.     Signature Matching**

53.     Submitting a ballot by mail is only part of the battle; once the ballot is delivered, county election officials must then engage in an opaque verification process, which in some counties involves signature matching, conducted without any identifiable standards or guidelines, by officials who are untrained in signature or handwriting examination.

54.     Under Pennsylvania law, county boards, as part of the canvassing process, must "examine the declaration on the envelope of each [mail ballot] . . . and . . . compare the information" on the declaration with the applicable voter file in order to "verify [the individual's]

---

[18] Daveen Rae Kurutz, *No stamp: Beaver County to cease providing postage for absentee ballots*, ELDWOOD CITY LEDGER (Jan. 20, 2020), https://www.ellwoodcityledger.com/news/20200120/no-stamp-beaver-county-to-cease-providing-postage-for-absentee-ballots.

right to vote." 25  Pa. Stat. Ann. § 3146.8(g)(3). And some counties, on information and belief, rely on signature matching to determine whether mail ballots should be counted.

55.     The statute does not set forth any guidelines for conducting this comparison, nor does Pennsylvania law require election officials to provide notice or an opportunity to cure before rejecting a ballot during the verification process.[19] Indeed, the General Assembly failed to act on proposed legislation in 2019 which would have required election boards to provide notice of signature mismatches and set forth procedures for curing rejected ballots. Thus, counties are left to their own devices in determining whether the information on a voter's declaration and the applicable voter file verifies their right to vote, or whether the signature on the declaration is sufficiently similar to the information on file to allow the mail ballot to be counted.

56.     This lack of guidance or identifiable standards is problematic because signature matching, as one federal court put it, is inherently "a questionable practice" and "may lead to unconstitutional disenfranchisement." *Democratic Exec. Comm. of Fla. v. Lee*, 347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018). Studies conducted by experts in the field of handwriting analysis have repeatedly found that signature verification conducted without adequate standards and training is unreliable, and non-experts are significantly more likely to misidentify authentic signatures as forgeries.

57.     Even when conducted by experts, signature matching can lead to erroneous results in the ballot verification context because handwriting can change quickly for a variety of reasons entirely unrelated to fraud, including the signer's age, medical condition, psychological state of mind, pen type, writing surface, or writing position. It is, thus, inevitable that election officials will

---

[19] Pennsylvania law requires election officials to provide notice to the voter and a formal hearing only when a ballot or application has been challenged, and sets forth procedures for conducting hearings and adjudicating challenges, none of which are at issue here. *See* 25 Pa. Stat. Ann. § 3146.8 (5), (6).

erroneously reject legitimate ballots due to misperceived signature mismatches, which, without notice and a reasonable opportunity to cure, will result in the disenfranchisement of eligible voters.

58.     Furthermore, the absence of any clear guidance in the statute—and the Department of State's willingness to allow counties to adopt their own verification procedures—means that voters will encounter varying and conflicting signature matching practices depending on the county in which they reside. Voters in some counties may receive notice of a potential signature mismatch and an opportunity to cure before the ballots are canvassed, while others may not. Indeed, voters in some counties may avoid signature matching entirely while others will have their ballots rejected. These diverging procedures all but ensure that voters across all counties will not have an equal opportunity to cast an effective mail ballot.

59.     In upcoming elections, this signature matching procedure will be applied to hundreds of thousands of mail ballots (and perhaps more), subjecting voters to the risk that their ballots will be rejected erroneously without notice, and their ability to cast an effective vote will ultimately depend on whichever arbitrary standard is employed by their local election board.

## COUNT I

### Violation of Pennsylvania Constitution, Article I, Section 5
### Free and Equal Elections Clause

60.     Petitioners reallege and reincorporate by reference all prior paragraphs and the paragraphs in the counts below as though fully set forth herein.

61.     "Elections shall be free and equal" in Pennsylvania. Pa. Const. art. I, § 5. Elections are "free and equal" only when "the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him." *Winston v. Moore*, 91 A. 520, 523 (1914). The Free and Equal Elections Clause is "specifically intended to equalize the power of voters in

our Commonwealth's election process," *League of Women Voters of Pa. v. Pennsylvania*, 178 A.3d 737, 812 (2018), and protects voting rights even if they are denied or impeded "by inadvertence." *Id*. at 810 (citing *In re New Britain Borough Sch. Dist.*, 145 A. 597, 599 (1929)).

62.     The Commonwealth's failure to implement adequate safeguards to protect the right to vote and ensure access to vote by mail, in the midst of a public health emergency, severely burdens the right to vote and violates the Free and Equal Elections Clause in several ways.

63.     Pennsylvania's failure to provide additional safeguards for voters whose mail ballots, due to mail delivery disruptions, arrive at the local county board of elections office after 8:00 p.m. on Election Day will arbitrarily disenfranchise thousands of voters for reasons outside their control. In the 2018 general election alone, 3.7% of all absentee ballots were not counted because they arrived after the deadline and, as a result, 8,162 voters were denied the franchise. "The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted); *see also Stein v. Cortes*, 223 F. Supp. 3d 423, 437–38 (E.D. Pa. 2016) ("The right to vote necessarily includes the right to have the vote fairly counted."). In light of Act 77's expansion of mail voting, and the barriers to in-person voting posed by COVID-19, the number of Pennsylvanians voting by mail will increase dramatically in upcoming elections; but their ballots will be subject to the vagaries of the U.S. Postal Service, an agency facing grave difficulties because of the ongoing global pandemic. Thus Petitioners, and many Pennsylvanians who vote by mail, will face an impermissible risk of arbitrary disenfranchisement, in violation of their constitutional rights.

64.     Pennsylvania's prohibition on third party ballot collection assistance further denies voters their right to a free and fair election. Many Pennsylvanians will vote by mail for the first time in upcoming elections, in part because the health risks posed by COVID-19 has limited access

to polling places and precludes in-person voting for vulnerable individuals. The U.S. Postal service is facing increased demands from the spike in absentee and mail-in ballots while simultaneously confronting a devastating budgetary and resource crisis. Therefore, many voters will be forced to incur the burden and health risks of personally delivering their completed mail-in ballots to ensure they arrive on time, or risk disenfranchisement.

65.     The prohibition also presents an undue burden on poor, rural, and other disadvantaged communities that do not have access to reliable mail service, lack of access to reliable transportation, and will be forced to incur significant burdens and health risks to submit their ballots in person. Voters in these groups are less likely to vote without third party assistance to safely collect and deliver their ballots on time to the appropriate county board office. Pennsylvania's prohibition on this practice denies voters access to the electoral process.

66.     Pennsylvania's failure to provide pre-paid postage for mail ballots imposes monetary costs on the only safe alternative to voting for individuals who would otherwise have to subject themselves to the health risks of waiting to vote at the few consolidated and potentially crowded polling locations available. These costs bear most heavily on those who are affected by the devastating economic impact of the ongoing public health emergency. Even for voters able to withstand the economic costs, the postage requirement imposes practical burdens—i.e., traveling to a post office to purchase stamps—that will dissuade voters in light of the attendant health risks. Thus, Pennsylvania's failure to provide an opportunity for eligible citizens to vote by mail, without cost, violates the Free and Equal Elections Clause.

67.     Finally, Pennsylvania's signature-matching process for absentee ballots subjects Pennsylvanians who vote by mail to an arbitrary and error-prone verification process that can result in the rejection of their ballots without notice or an opportunity to cure. By empowering county

boards to "examine the declaration on the envelope of each [mail ballot] . . . and . . . compare the information" on the declaration with the applicable voter file in order to "verify [the individual's] right to vote," 25 P.S. § 3146.8(g)(3), and conduct signature matching without any guidelines, Pennsylvania law ensures that some voters will have their ballots rejected erroneously, which violates their right to have their ballots counted, and fails to "equalize the power of voters in [the] Commonwealth's election process." *League of Women Voters of Pa.*, 645 Pa. at 113.

## <u>COUNT II</u>

### Violation of Pennsylvania Constitution, Article I, Sections 1, 26
### Equal Protection

68.    Petitioners reallege and reincorporate by reference all prior paragraphs and the paragraphs in the counts below as though fully set forth herein.

69.    The Pennsylvania Constitution states that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. It also prohibits the Commonwealth and any other political subdivision from denying to any person "the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa. Const. art. I, § 26. These equal protection provisions are analyzed "under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution." *Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1139 (1991) (citing *James v. Se. Pa. Transp. Auth.*, 477 A.2d 1302 (1984)).

70.    Those standards are best understood under the *Anderson-Burdick* balancing test, which commands courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as

justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also In re Zulick*, 832 A.2d 572, 580 (Pa. Commw. Ct. 2003) (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), which in turn cites the *Anderson-Burdick* balancing test). Where the restrictions are severe, "'the regulation must be narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Reed*, 502 U.S. at 289). "However slight th[e] burden [on voting] may appear, … it must be justified by relevant and []legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quotation marks omitted).

71.    Pennsylvania's rejection of ballots delayed by mail service disruptions, the prohibition on third party ballot collection assistance, the failure to provide pre-paid postage for mail ballots, and the arbitrary rejection of mail ballots through signature matching substantially burdens the right to vote and bear heavily on certain groups of voters without sufficient justification. This includes voters who are over the age of 65 or who have underlying health conditions that make them vulnerable to COVID-19, minority voters, individuals with limited financial means, and voters who live in rural areas, among others. Pennsylvania has no interest of sufficient importance that outweighs the burdens on otherwise eligible members of the electorate, who will also be denied the opportunity participate in the electoral process on an equal basis with other voters.

## COUNT III

### Violation of Pennsylvania Constitution, Article I, Section 1
### Due Process

72.     Petitioners reallege and reincorporate by reference all prior paragraphs and the paragraphs in the counts below as though fully set forth herein.

73.     "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. Due process rights "emanate" from this section of Pennsylvania's Constitution. *Pa. Game Comm'n v. Marich*, 666 A.2d 253, 229 n.4 (1995). The requirements of Article I, Section I "are not distinguishable from those of the 14th Amendment . . . [and courts] may apply the same analysis to both claims." *Id*. at 229 n.6. Pennsylvania courts have adopted the U.S. Supreme Court's methodology in reviewing procedural due process claims. *R. v. Dep't of Public Welfare*, 636 A.2d 142, 153 (1994) (adopting the federal procedural due process analysis expressed in *Mathews v. Eldridge*, 424 U.S. 319 (1976), for assessing due process claims under Article I, Section 1). The Commonwealth, having created processes for voting with absentee or mail-in ballots, "must administer it in accordance with the Constitution," including with "adequate due process protection." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018).

74.     What process is due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *Mathews*, 424 U.S. at 334–35. Courts must first consider the nature of the interest that will be affected by the government's actions as well as the "degree of potential deprivation that may be created" by existing procedures. *Id*. at 341. Second, courts consider the "fairness and reliability" of the existing procedures "and the probable value, if any, of additional procedural safeguards." *Id*. at 343. Finally, courts consider the public interest, which

"includes the administrative burden and other societal costs that would be associated with" additional or substitute safeguards. *Id*. at 347. Overall, due process is a "flexible notion which calls for such protections as demanded by the individual situation." *Dep't of Transp., Bureau of Licensing v. Clayton*, 546 Pa. 342, 351 (1996).

75.     "Having induced voters to vote by absentee ballot," the Due Process Clause requires the Commonwealth to "provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted." *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018).

76.     The nature of interest at stake in this case—the right to vote and to have that vote count—is "the most treasured prerogative of citizenship in this nation and this Commonwealth." *In re Recount of Ballots Cast in General Election on November 6, 1973*, 325 A.2d 303, 308 (1974).

77.     Pennsylvania's failure to provide safeguards to voters whose ballots are delivered after the Election Day Receipt Deadline, due to the postal service disruptions caused by the ongoing public health emergency, is neither a reliable nor fair way to administer voting by mail. Rejecting ballots delivered after the Election Day Receipt Deadline under these circumstances effectively requires some voters to submit their ballots blindly, with no reasonable assurance that they will be delivered in time, even when submitted well in advance of Election Day.

78.     The value of additional or substitute procedural safeguards to ensure that the votes of Pennsylvania's absentee and mail-in voters are both meaningfully cast and actually counted is readily apparent. For instance, accepting absentee and mail-in ballots that arrive within seven days after Election Day, if they contain any indicia, such as a postmark or barcode, made by the U.S. Postal Service to track or record the time that a ballot entered the postal system on or before

Election Day alleviates the risk of arbitrary deprivation that Pennsylvania's Election Day Receipt Deadline currently inflicts on voters affected by mail delivery disruptions.

79.     Further, Pennsylvania officials do not need to certify election results to the Secretary until 20 days after Election Day, and the Commonwealth currently accepts mail ballots from overseas and military voters that arrive up to seven days after Election Day. Extending this allowance to voters affected by mail service disruptions would place minimal administrative burden on the state, if any.

80.     Pennsylvania's signature-matching process also violates the Due Process Clause. During the canvassing process, county boards must "examine the declaration on the envelope of each [mail ballot] . . . and . . . compare the information" on the declaration with the applicable voter file in order to "verify [the individual's] right to vote." 25 P.S. § 3146.8(g)(3). The statute does not set forth any guidelines for conducting this comparison, and some counties engage in signature matching as part of the verification process. Signature matching, however, is highly error-prone, and Pennsylvania law does not require election officials to provide notice or an opportunity to cure before rejecting a ballot during the verification process for a signature mismatch. Thus, Pennsylvania's ballot verification process allows for the erroneous rejection of mail ballots and arbitrary disenfranchisement of Pennsylvania voters.

81.     The value of additional or substitute procedural safeguards to ensure that the votes of Pennsylvania's absentee and mail-in voters are not rejected for a mismatched signature is clear. Providing an opportunity to contest or cure signature mismatch determinations will reduce the risk of erroneous deprivation of the right to vote. Moreover, providing these adequate safeguards to will impose a minimal burden on the Commonwealth and advances the public's interest in counting validly-cast ballots.

82.     Having induced voters to cast mail ballots—made all the more necessary and urgent in light of the ongoing public health crisis—Pennsylvania must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to submit their mail ballots and to have those ballots counted. Pennsylvania's failure to provide safeguards to voters whose ballots are delayed due to mail service disruptions, or voters whose ballots may be rejected under an error-prone signature-matching process, violates Petitioners' and other Pennsylvania voters' procedural due process rights.

## PRAYER FOR RELIEF

Wherefore, Petitioners respectfully request that this Honorable Court enter judgment in their favor against Defendants, and:

a)     Declare unconstitutional the Commonwealth's failure to: (i) provide prepaid postage on absentee and mail-in ballots; (ii) provide additional procedures that allow mail ballots delivered after 8:00 p.m. on the Election Day, due to mail delivery delays or disruptions, to be counted—to the extent such declaration does not trigger Act 77's non-severability provision; (iii) allow third party mail ballot collection assistance; and (iv) provide adequate guidance to election officials when verifying mail ballots through signature matching and require notice and an opportunity to cure a mail ballot flagged for signature mismatch.

b)     Issue an order requiring that Defendants:

a.  Provide prepaid postage on all absentee and mail-in ballots;

b.  Implement additional emergency procedures to ensure that ballots delivered after 8:00 p.m. on Election Day due to mail service delays or disruptions, will be counted if otherwise eligible, to the extent that such procedures do not trigger Act 77's non-severability clause;

    c.   Allow voters to designate a third party to assist in collecting and submitting absentee or mail-in ballots and ensure that all such ballots are counted if otherwise eligible; and

    d.   Provide uniform guidance and training to election officials involved in verifying mail ballots and implement procedures to ensure that voters receive reasonable notice and an opportunity to cure signature-related defects on absentee or mail-in ballots before any ballot is rejected.

c)    Maintain jurisdiction over this dispute to ensure that the Defendants comply with their obligations under the Pennsylvania Constitution.

d)    Provide such other and further relief as the Court may deem just and proper.

Dated:  April 22, 2020

By: _____

Adam C. Bonin
LAW OFFICE OF ADAM C. BONIN
The North American Building
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 701-2321
adam@boninlaw.com

Marc E. Elias*
Uzoma N. Nkwonta*
Emily R. Brailey*
Stephanie I. Command*
Zachary J. Newkirk*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211

*Counsel for Petitioners*

*Not admitted in Pennsylvania. Pro hac vice
motion to be filed.