**EXHIBIT 8**

Received 7/13/2020 4:32:04 PM Supreme Court Middle District

Filed 7/13/2020 4:32:00 PM Supreme Court Middle District
108 MM 2020

## IN THE SUPREME COURT OF PENNSYLVANIA

| | |
|---|---|
| Michael Crossey, Dwayne Thomas, Irvin Weinreich, Brenda Weinreich, and the Pennsylvania Alliance for Retired Americans,<br><br>        Petitioners,<br><br>    v.<br><br>Kathy Boockvar, Secretary of the Commonwealth, and Jessica Mathis, Director of the Bureau of Election Services and Notaries,<br><br>        Respondents. | No. 108 MM 2020 |

## AMENDED PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Petitioners Michael Crossey, Dwayne Thomas, Irvin Weinreich, Brenda Weinreich, and the Pennsylvania Alliance for Retired Americans file this Amended Petition for Declaratory and Injunctive Relief against Respondents Kathy Boockvar in her official capacity as Secretary of the Commonwealth and Jessica Mathis in her official capacity as the Director of the Bureau of Election Services and Notaries, and allege as follows:

## NATURE OF ACTION

2.     Pennsylvania's June 2, 2020 primary election, set amidst a global pandemic, proved to be a true voting rights debacle. Despite multiple lawsuits seeking emergency extensions of deadlines to avoid disenfranchisement, and

numerous county officials warning of the dangers the June 2 primary would present to public health and safety, the Commonwealth failed to take action to ensure that all those who wanted to vote could do so and have their votes counted. Measures like Act 12 of 2020 and the directives of the Department of State proved to be vastly insufficient and failed to ensure access to the ballot box.  Many in-person voters showed up at their usual polling places only to discover they had been shut down, sometimes with not even as little as a sign informing them such. Those who tried to vote by mail in accordance with the Commonwealth's recommendations faced similar woes. Despite Governor Wolf's last-minute emergency order extending mail-in and absentee ballot (collectively, "mail ballot") deadlines by a week in six counties affected by protest activity, thousands of voters who had requested mail ballots were either forced to use provisional ballots at the polls, or worse, disenfranchised altogether after tens of thousands of mail ballots did not even arrive at voters' homes until the week *after* the primary. Things should have gone better, to say the least.

3.      Pennsylvania finds itself in the midst of an unprecedented global pandemic. The highly infectious coronavirus ("COVID-19") has rapidly spread throughout the country. As of this filing alone, there are 99,794 confirmed cases of COVID-19 in Pennsylvania, and 6,950 deaths. The federal government has indicated that COVID-19 will persist at least into the fall, if not longer. The Director of the

Centers for Disease Control and Prevention recently cautioned that the country may encounter a second, more deadly wave of COVID-19, which will "be even more difficult than the one we just went through."[1] This means that the November election will occur, once again, in the middle of a severe public health crisis. The massive volume of applications for mail ballots requested by Pennsylvania voters during the primary, and the ensuing strain it placed on the Commonwealth's election administration, was only a glimpse of what is likely to unfold come November's general election—where voter turnout is historically much higher. Pennsylvanians will again be forced to choose between risking their health and safety to vote in person or risk disenfranchisement at the hands of a structurally deficient vote by mail system.

4.      Perhaps most troubling, preventative measures could have been taken in advance of the June 2 primary that would have alleviated much of the confusion and disenfranchisement that ultimately resulted. But while the primary has now come and gone, it is not too late for the Commonwealth to correct course in time for the general election. As one desperate and frustrated county elections director put it,

---

[1] Zack Budryk, *CDC director warns second wave of coronavirus might be 'more difficult'*, THE HILL (Apr. 21, 2020), https://thehill.com/policy/healthcare/493973-cdc-director-warns-second-wave-of-coronavirus-might-be-more-difficult

"We've been saying what was going to happen, and nobody was listening to us, and it happened . . . I hope they'll listen to us now."[2]

5.      Petitioners, like many election officials, also sounded the alarm on the Commonwealth's failure to take adequate precautions and implement safeguards to prevent disenfranchisement ahead of the June 2 primary and the November general election, even identifying the likely barriers to the franchise during the COVID-19 pandemic, all of which were borne out in the June 2 primary. All indications are that in-person voting will be severely compromised in the upcoming general election, as it was in the June primary, and the backlogs, processing and mailing delays, and resulting disenfranchisement that plagued the vote by mail system will be magnified exponentially in the fast-approaching general election. But the Commonwealth has yet to implement adequate safeguards to ensure a free and equal election in which all citizens have a meaningful opportunity to vote, as required by the Pennsylvania Constitution, without risking their health and safety.

6.      As the Commonwealth turns to the general election in November, little has changed, and its citizens still do not have sufficient access to safe and reliable means to exercise their constitutional right to vote during the COVID-19 pandemic.

---

[2] Jonathan Lai, *Tens of thousands of Pennsylvania mail ballots were turned in after the deadline. November could be worse.*, PHILA. INQUIRER (June 10, 2020), https://www.inquirer.com/politics/election/pa-mail-ballots-deadline-2020-primary-election-20200610.html?fbclid=IwAR1lgxciLknrb75yq2VFjfTJ12wdnJXxBPcycDjyYO1T1bLC11IXiCqdf6A

The same obstacles to the franchise remain: (a) in-person voting will be severely restricted due to shortages of poll workers, polling locations, and the need to follow social distancing guidelines; (b) as in June, thousands of voters will not be able to meet Pennsylvania's Election Day ballot receipt deadline because of backlogs in processing record numbers of mail ballot requests and delays or disruptions in mail delivery of said ballots in both directions; (c) voters, including elderly and immunocompromised individuals, cannot seek assistance from third parties—not even immediate family members—to return their mail ballots to avoid mail delivery delays or the risk of exposure to COVID-19; and (d) those who submit their ballots by mail must provide their own postage in most cases, which imposes monetary and transaction costs at a time when many Pennsylvanians are suffering from the devastating economic impact of COVID-19, and requires voters who do not have stamps at home to subject themselves to public health risks in order to visit a post office or return their ballots in-person.

7.      Much is left to do in order to guarantee a free and equal election come November. As one county commissioner observed, the need for additional safeguards should have been clear "the day after the election. It was so obvious."[3] The 1.8 million mail ballot applications for the June 2 primary, while unprecedented for the Commonwealth (approximately 84,000 absentee ballots were cast in the 2016

---

[3] *Id.*

primary), will pale in comparison to the ballots requested and submitted for the November election, in part because of recent legislation allowing all eligible voters to cast a ballot by mail, Act 77 of 2019, P.L. 552 ("Act 77"), but also because of the health risks posed by COVID-19 and subsequent guidance by the Commonwealth's officials encouraging its citizens to vote by mail.

8.      Petitioners therefore request that the Court issue an Order requiring Respondents to implement additional safeguards to ensure that all Pennsylvania voters, including the millions who will likely vote by mail, have access to a free and equal election during the COVID-19 pandemic. Such measures should include: (a) emergency procedures to ensure that voters affected by delays in mail ballot processing or delivery will have their ballots counted if postmarked by Election Day and received up to seven days after Election Day; (b) permitting voters to designate third parties to assist them in submitting their sealed mail ballots; and (c) prepaid postage for all mail ballots—but only to the extent that such procedures do not require the Court to apply Act 77's nonseverability clause. With the lessons learned from the primary election, and the general election fast approaching, now is the time to act to prevent widespread disenfranchisement, ensure that voters have a meaningful opportunity to participate in the electoral process, and provide comprehensive notice to voters about the safe, legal voting options available to them.

## JURISDICTION AND VENUE

9.     This Court possesses original jurisdiction over this matter pursuant to the order entered on June 17, 2020 by the Hon. Mary Hannah Leavitt, President Judge of the Commonwealth Court, which determined that Section 13(2) of Act 77 of 2019 vested exclusive jurisdiction in this Court to hear this matter, and accordingly transferred it to this Court pursuant to 42 Pa. C.S. § 5103(a).

## PARTIES

10.     Petitioner Michael Crossey is a duly registered Pennsylvania voter and resident of Allegheny County. Mr. Crossey is 69 years old and is a retired schoolteacher and former president of the Pennsylvania State Education Association. He is currently on the Board of Directors for the Pennsylvania Alliance for Retired Americans. Mr. Crossey has always voted in-person at the polls on election day in Pennsylvania, but due to arthritis in his knees, he will face a hardship if forced to stand in line for extended periods of time. This year, because of the current spread of COVID-19 throughout Pennsylvania, and because he knows that the disease is particularly harmful to voters his age, Mr. Crossey plans to request a mail-in ballot for the general election to avoid voting in person on Election Day and subjecting himself to the attendant health risks. For the June 2 primary election, Mr. Crossey requested a mail-in ballot about five weeks before the deadline, but waited for several weeks to receive his mail-in ballot. To avoid disenfranchisement due to

documented delays in mail delivery, Mr. Crossey was forced to submit his ballot weeks in advance of Election Day, well before he had originally planned, which left him with significantly less time to evaluate the candidates and issues, and without an opportunity to consider relevant, late-breaking news or events before making his final candidate selections.

11.     Mr. Crossey is concerned that the delays in mail ballot application processing and U.S. Postal Service delivery will disenfranchise him in the general election, or at the very least, will require him to submit his ballot well before Election Day—once again, with significantly less time to evaluate candidates, issues, and late-breaking news or events—in order to avoid disenfranchisement. And due to the health risks posed by COVID-19 that will last well into the fall, voting in person is not a viable alternative. Mr. Crossey would seek assistance in returning his ballot if a third party were permitted to assist him, but the law currently does not permit Mr. Crossey to enlist another individual whom he trusts—not even a family member or an individual in the same household—to return his ballot. As a result, the Commonwealth's failure to implement additional safeguards to ensure a free and equal election during the COVID-19 pandemic will force Mr. Crossey to risk either his health or his vote in the upcoming general election.

12.     Petitioner Dwayne Thomas is a duly registered Pennsylvania voter and resident of Fayette County. He is 70 years old and is a retired mineworker. Mr.

Thomas is the current president of the Pennsylvania Alliance for Retired Americans. Mr. Thomas usually votes in-person at the polls on election day and often encounters long lines at his polling site. This year, Mr. Thomas requested an absentee ballot for the primary election and intends to do the same for the general election to avoid exposure to the health risks posed by COVID-19. But mail service at Mr. Thomas's residence has been inconsistent at best: his letters and packages rarely arrive on time at their desired locations; he often receives returned mail even when he has correctly addressed envelopes and packages; and he often fails to receive letters and packages sent to him through the postal service. For the June 2 primary election, Mr. Thomas waited nearly two weeks to receive his mail-in ballot and submitted his marked ballot one week before Election Day, without knowing whether it would arrive on time.

13.     Mr. Thomas is concerned that the delays in mail ballot application processing and U.S. Postal Service delivery will disenfranchise him in the general election, or at the very least, will require him to submit his ballot well before Election Day—with significantly less time to evaluate candidates, issues, and late-breaking news or events—in order to avoid disenfranchisement. And due to the health risks posed by COVID-19 which are expected to last well into the fall, voting in person is not a viable alternative. Mr. Thomas would seek assistance in returning his ballot if a third party were permitted to assist him, but the law currently does not permit Mr. Thomas to enlist another individual whom he trusts—not even a family member or

an individual in the same household—to return his ballot. As a result, the Commonwealth's failure to implement additional safeguards to ensure a free and equal election during the COVID-19 pandemic will force Mr. Thomas to risk either his health or his vote in the upcoming general election.

14.     Petitioner Irvin Weinreich, a disabled war veteran and retired maintenance worker, is a duly registered Pennsylvania voter and resident of Northampton County. Due to ongoing health issues that affect his mobility and render him especially vulnerable to the health risks posed by COVID-19, Mr. Weinreich requested a mail-in ballot for the June 2 primary election and plans to do the same for the general election. Mr. Weinreich is concerned, however, that delays in mail ballot application processing and U.S. Postal Service delivery will disenfranchise him in the general election. Even if Mr. Weinreich's ballot request is processed in a timely fashion—which is all but certain as the primary election showed—he will be forced to submit his ballot weeks in advance of Election Day to ensure timely delivery and avoid disenfranchisement, leaving him with significantly less time to evaluate the candidates and issues, and without an opportunity to consider relevant, late-breaking news or events before making his final candidate selections. Mr. Weinreich would seek assistance in returning his ballot if a third party were permitted to assist him, but the law currently does not permit Mr. Weinreich to enlist another individual whom he trusts—not even a family member

or an individual in the same household—to return his ballot. As a result, the Commonwealth's failure to implement additional safeguards to ensure a free and equal election during the COVID-19 pandemic will force Mr. Weinreich to risk either his health or his vote in the upcoming general election.

15.    Petitioner Brenda Weinreich, a retired textile factory worker, is a duly registered Pennsylvania voter and resident of Northampton County. For many years, Ms. Weinreich voted exclusively in-person, but due to ongoing health issues that affect her mobility, along with the fact that her age, 70, places her among the groups of citizens who face a heightened risk of serious illness from COVID-19, Ms. Weinreich voted by mail in the June 2 primary and plans to do so in the general election. Ms. Weinreich is concerned, however, that delays in mail ballot application processing and U.S. Postal Service delivery will disenfranchise her in the general election. Even if Ms. Weinreich's ballot request is processed in a timely fashion— which is all but certain as the June 2 primary showed—she will be forced to submit her ballot weeks in advance of Election Day to ensure timely delivery and avoid disenfranchisement, leaving her with significantly less time to evaluate the candidates and issues, and without an opportunity to consider relevant, late-breaking news or events before making her final candidate selections. Ms. Weinreich would seek assistance in returning her ballot if a third party were permitted to assist her, but the law currently does not permit Ms. Weinreich to enlist another individual

whom she trusts—not even a family member or an individual in the same household—to return her ballot. As a result, the Commonwealth's failure to implement additional safeguards to ensure a free and equal election during the COVID-19 pandemic will force Ms. Weinreich to risk either her health or her vote in the upcoming general election.

16.    The Pennsylvania Alliance for Retired Americans ("the Alliance") is incorporated in Pennsylvania as a 501(c)(4) nonprofit social welfare organization under the Internal Revenue Code. The Alliance has 335,389 members composed of retirees from public and private sector unions, community organizations, and individual activists. It is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work. The failure to implement adequate safeguards to ensure that eligible citizens, including the Alliance's members, have sufficient access to reliable voting opportunities and to a free and equal election threatens the electoral prospects of progressive candidates whom the Alliance and its members support to advance their mission. Alliance's members, most of whom are over the age of 65 and are especially vulnerable to the health risks posed by COVID-19, will also face greater obstacles casting a vote and having their votes counted, making it more difficult for the Alliance and its members to associate and effectively further their shared, common goals through the political process.

Because of the barriers to the franchise that have emerged during the ongoing public health crisis, the Alliance will be forced to divert resources from its ongoing mission and programs to educate voters and assist them to exercise their right to vote safely, including conducting awareness campaigns to ensure voters obtain and submit mail ballots on time and providing stamps for mail ballots so that voters do not have to risk their health to obtain postage. The Alliance would also assist voters in returning their mail ballots if such assistance were permitted by law.

17.     Respondent Kathy Boockvar is the Secretary of the Commonwealth and is sued in her official capacity. As Secretary, she is Pennsylvania's Chief Election Official and a member of the Governor's Executive Board. The Secretary is charged with the general supervision and administration of Pennsylvania's elections and election laws. Among her numerous responsibilities in administering elections, including ballots cast by mail, she is charged with tabulating, computing, and canvassing all votes cast as well as certifying and filing the votes' tabulation, 25 P.S. § 3159, and ordering county boards to conduct recounts and recanvasses, *id*. §2621(f.2).

18.     Respondent Jessica Mathis is the Director of the Bureau of Election Services and Notaries ("Bureau"). The Bureau is responsible for planning, developing, and coordinating the statewide implementation of the Election Code, voter registration process, and notaries public.

## GENERAL ALLEGATIONS

**A.    The COVID-19 pandemic has upended daily life across the country and in Pennsylvania and will continue into the fall.**

19.    Virtually all aspects of life in the United States today are affected by the COVID-19 pandemic. Schools and many businesses are closed; people are sheltering in their homes; well over 35 million people have lost their jobs; and approximately 132,000 people have lost their lives. The Commonwealth has not been spared COVID-19's devastation either. To date, the virus has infected 99,794 Pennsylvanians, resulting in 6,950 deaths, and this crisis has no clear end in sight.

20.    Though the Commonwealth has been phasing into reopening, officials still recommend social distancing, universal masking, and avoiding public transportation and large gatherings in order to prevent a spike in COVID-19 infections, as recently seen throughout many parts of the country.

21.    Public health experts expect the pandemic—worsening already as states have begun to reopen—to extend well into the fall; the federal government is preparing for the COVID-19 crisis to last 18 months and has warned that the pandemic could come in multiple waves. Indeed, the White House's coronavirus advisor and the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, has publicly acknowledged that coronavirus will likely strike again in the fall because of its transmissibility.

22.    The Director of the Centers for Disease Control and Prevention ("CDC") has also warned that the country may encounter a second, more deadly wave of COVID-19 in the fall, which will be more difficult than the first wave of the virus. Similarly, the Director of the National Center for Immunization and Respiratory Diseases at the CDC, Dr. Nancy Messionnier, said on March 10, 2020 that she expected the virus to continue spreading in the United States through *next year*.

23.    These sentiments are also shared by scientists outside the United States government. The COVID-19 Response Team at the Imperial College of London has estimated that social distancing and other preventative measures will be required until a vaccine is developed and distributed widely, which they predict could take 18 months or more. There is little question that the spread of COVID-19 in Pennsylvania will continue this fall and, in particular, during the November general election.

**B.    Amid the ongoing pandemic, recent changes to Pennsylvania's election system will not be enough to guarantee a free and fair election in November.**

24.    Historically, most Pennsylvanians cast their ballots in person because absentee voting was available only to those who could not appear at their polling location due to illness, physical disability, absence from their home county on Election Day, or observance of a religious holiday. But in October 2019, the General

Assembly enacted legislation, through Act 77, that allowed all eligible Pennsylvanians to vote by mail through the use of mail-in ballots. 25 P.S. § 3150.11(a). The law also extended the deadline for voters to submit their mail ballots: now, in order to be counted, all mail ballots must be received by the county board of elections office by 8:00 p.m. on Election Day. 25 P.S. §§ 3146.6(c), 3150.16(c). Mail ballots, moreover, must be delivered either through the mail, postage prepaid, or in person, by the voter, at a county board of elections office or designated drop box. 25 P.S. §§ 3146.6(a); 3150.16(a).

25.    To be sure, the expansion of mail voting to all eligible voters through Act 77 is a positive step in ensuring access to the franchise under normal conditions. But these are not normal times and voters in November will not encounter a normal election. Absent additional safeguards ensuring sufficient access to safe and reliable means to vote during the COVID-19 pandemic, the Commonwealth will fail once again to meet its obligation to conduct a free and equal election, as mandated in the Pennsylvania Constitution, and will unlawfully deny many Pennsylvanians their constitutional right to vote by forcing them into one of two impermissible choices: (a) cast a ballot in-person (or hand-deliver their mail ballot, assuming they receive it in time) to ensure their vote is counted and subject themselves to the health risks of COVID-19; or (b) submit their ballot by mail and risk arbitrary disenfranchisement for reasons outside their control. Both options impose severe burdens on the

franchise and led at least two courts of common pleas, on Election Day, to extend the deadline for the return of mail ballots in the primary election without striking down any other portion of Act 77.[4]

26.     The Commonwealth, even in times of emergency, has a constitutional obligation to ensure that all citizens have access to a free and equal election, yet the June 2 primary was anything but that. Before the June 2 primary, Governor Tom Wolf, to his credit, urged residents to stay home, practice social distancing, and, by June 2, to vote by mail. But neither the Governor's encouragement nor Pennsylvanians' enthusiasm for mail ballots was enough to protect the right to vote.

27.     Pennsylvania's primary election further illustrates that the Commonwealth's current procedures will violate voters' constitutional rights. The Commonwealth, even in times of emergency, has a constitutional obligation to ensure that all citizens have access to a free and equal election.

### *Problems with mail voting.*

28.     By May 22, less than two weeks before the primary, nearly 173,000 mail ballot applications were still pending, and almost 70,000 ballots had yet to be mailed to voters whose applications were approved. Six days later, and just four days

---

[4] *In re Extension of Time for Absentee and Mail-In Ballots to be Received by Mail and Counted in the 2020 Primary Election*, No. 2020-003416 (Court of Common Pleas of Delaware County June 2, 2020) ("Delaware County Order"); *In re: Extension of Time for Absentee and Mail-In Ballots to be Received by Mail and Counted in the 2020 Primary Election*, No. 2020-02322-37 (Court of Common Pleas of Bucks County June 2, 2020) ("Bucks County Order").

before the election, the number of voters who had applied for mail ballots had grown to nearly 1.8 million, 17 times higher than the number of voters who requested absentee ballots during the 2016 presidential primary.

29.     With a record number of mail ballots requested for the June 2 primary, many counties experienced delays in processing and in delivering ballots to voters. One county elections department placed blame at the feet of the United States Postal Service ("USPS"), stating: "The source of this slowdown is a combination of systems operating at a slower rate due to the circumstances created by the COVID-19 pandemic and USPS prioritizing official election mail coming from [the County] in a manner that is not consistent with protocols that the County was informed would be in place."[5]  Some county elections officials went so far as to advise voters to avoid mailing back their ballots altogether and instead to hand deliver them directly to their county Board of Elections, or risk disenfranchisement.

30.     While attempting to manage these backlogs, counties also had to prepare for in-person voting. Officials acknowledged in legislative testimony that they "miscalculated the fallout from massive scaling up of mail voting because there

---

[5] Harri Leigh, *A record number of mail-in ballot applications, but will they arrive in time?* FOX43 (May 26, 2020), https://www.fox43.com/article/news/politics/elections/a-record-number-of-mail-in-ballot-applications-but-will-they-arrive-in-time/521-de6f5ff0-38eb-47a5-a935-313e6a6a1ee3.

was one bottle neck we couldn't avoid—processing applications."[6] In Delaware County, for example, election officials began "falling behind on processing mail-in ballot requests" a full month and a half before the primary election.[7] And roughly 6,000 ballots were not mailed to voters until *the day before* the June primary. Beyond that, another 400 voters in Delaware County were never even sent the ballots which they had timely requested after election officials admitted they would be unable to deliver the ballots until *after the election.* Judicial intervention—through an Order filed on Election Day at 3:03 p.m.—was required to extend the deadline for these voters, but could provide no relief for voters who had already incurred the health risks of attempting to vote in person; the approximately 6,000 voters whose ballots were mailed by Delaware County only the day before the primary and were highly unlikely to have received them in less than 24 hours (much less review, mark and submit them); and those who either did not learn of the 3:03 p.m. Order, or were unable to get to a post office in time to have their ballots postmarked by June 2.

31.    Delaware County was not alone. Tens of thousands of mail ballots for which voters had timely applied were not delivered to voters' homes until the week

---

[6] Jeff Greenburg, Tim Benyo, Ed Allison, *County Election Official Notes for Senate Hearing* (Apr. 30, 2020), https://stategovernment.pasenategop.com/wp-content/uploads/sites/30/2020/04/tioga-county.pdf.

[7] Jonathan Tamari & Jonathan Lai, *Pennsylvania, New Jersey, and other states struggle to avoid repeat of Wisconsin election fiasco*, PHILA. INQUIRER (Apr. 12, 2020), https://www.inquirer.com/news/pennsylvania-new-jersey-vote-by-mail-primary-election-challenges-20200412.html.

*after* the primary. Thousands more could not be returned to county boards after the ballot receipt deadline. Approximately 14,600 ballots in Philadelphia; 9,400 in Allegheny County; 1,600 in Chester County; 5,800 in Montgomery County; 2,500 in Delaware County; and over 1,200 in Bucks County arrived at county board of elections offices after the ballot receipt deadline. Data from the Pennsylvania Department of State suggests that the total number could be over 75,000 late ballots statewide.

32.     Acknowledging several barriers to mail voting, Governor Wolf signed an executive order—on the evening before the primary—which extended the ballot receipt deadline in Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia Counties. The number of late-delivered ballots in Philadelphia in a single day alone that otherwise would not have been counted is visually staggering:

[Remainder of the page intentionally left blank]



Source: Jonathan Lai, *Tens of thousands of Pennsylvania mail ballots were turned in after the deadline. November could be worse.*, PHILA. INQUIRER (Jun. 10, 2020), https://www.inquirer.com/politics/election/pa-mail-ballots-deadline-2020-primary-election-20200610.html?fbclid=IwAR1lgxciLknrb75yq2VFjfTJ12wdnJXxBPcycDjyYO1T1bLC11IXiCqdf6A.

33.     Making matters worse, the mail voting problems in Pennsylvania were not equally distributed—they fell hardest on poor and minority communities.

### *Problems with in-person voting.*

34.     Leading up to election day, counties encountered staffing shortages, as poll workers, many of whom are elderly, were less than willing to risk potential exposure to COVID-19. Emergency legislation, Act 12 of 2020, P.L. 41 ("Act 12") and subsequent guidance from the Department of State attempted to solve this

problem by allowing counties to offer fewer voting sites (by consolidating polling locations), staffed with fewer poll workers than would be expected under normal circumstances. The result was a drastic reduction in the number of polling places available in the June 2 primary: in Philadelphia, for instance, only 190 of the 831 typical polling places were open to voters. Not only did most voters have to travel farther to vote in person, but those sites became even less accessible as public transportation and rideshare services became much less viable options during the pandemic.

35.     Operating consolidated sites still required more poll workers than were available, and packing more voters into fewer sites created congestion at the few polling locations that remained open, and confusion among voters who arrived at their normal polling locations only to find facilities shuttered with no information directing them to the new, consolidated location. On top of the loss of poll workers and the confusion over polling place consolidation, many counties were using for the first-time new voting machines, which required in-person training, but many of those trainings were canceled entirely.

36.     Sure enough, these lapses translated into congestion and excessive wait times—in the middle of a public health crisis. More than 1,000 calls concerning problems related to voting and polling locations were made to a toll-free Election Protection Hotline. And poll watchers from the advocacy groups assigned to polling

locations reported substantial confusion among voters regarding where they could vote. Those who were able to find their polling location were required to wait in lines when they arrived.



Source: Michaelle Bond, Julia Terruso, Justine McDaniel, *Polling locations in Northwest Philly got the wrong voting machines, causing confusion and long lines: 'It was a mess'* (June 2, 2020), https://www.inquirer.com/politics/election/northwest-philadelphia-voting-lines-2020-pa-primary-20200602.html.

37.     Amidst the crowded polling locations, some election workers were not provided personal protective equipment. Others refused to wear them. And many voters expressed concerns about the lack of social distancing.

38.     These problems, too, fell heaviest on historically disadvantaged communities: the poor, the elderly, and other vulnerable populations. Many of these individuals have historically relied on in-person voting. But polling places in minority communities saw longer lines than in other areas. Voters at some polling

locations in Philadelphia waited in lines for two hours. More than 100 voters remained in line at 8 p.m. at one polling location in the Pittsburgh area.

**C.     Pennsylvania's own election officials predicted the problems that the Commonwealth's voters encountered.**

39.    Several weeks before the June 2 primary, election officials and voters across the Commonwealth sounded the alarm with increasing urgency in an effort to spur action from the Commonwealth (and its courts) in order to protect the right to vote during the COVID-19 pandemic.

40.    County officials repeatedly voiced concerns about fulfilling mail ballot requests in time for the election. In Mercer County, officials explained that they were barely keeping pace with the incoming mail ballot requests, stating "[a]s fast as we can put them out, they're coming in even faster."[8] Delaware County publicly acknowledged that voters would be receiving ballots close to or on Election Day, and the County Commissioner stated that she was "very worried that people [were] going to be disenfranchised."[9]

41.    Officials in Bucks and Montgomery Counties, unable to obtain relief through other means, filed lawsuits asking local courts to give voters more time to

---

[8] Eric Poole, *Mail-in ballot requests swamp Mercer County elections office*, THE HERALD (May 13, 2020), https://www.sharonherald.com/news/local_news/mail-in-ballot-requests-swamp-mercer-county-elections-office/article_2275e4c8-b78a-5d87-a710-cf9cd77f3c2e.html.

[9] Jonathan Lai, *Thousands of Pennsylvania voters might not get their mail ballots in time to actually vote*, PHILA. INQUIRER (May 26, 2020), https://www.inquirer.com/politics/election/pa-mail-ballots-deadline-2020-primary-20200526.html.

return their mail ballots. The county officials recognized that the ballot receipt deadline would disenfranchise legions of voters in the face of mail delays and bottlenecks in processing applications to vote by mail caused (or exacerbated) by the global pandemic. As Montgomery County's chief operating officer and clerk of its elections board, Lee Soltysiak, remarked in the press, "It's insufficient and unrealistic that anyone could ever apply for a ballot on or, frankly, near the deadline and have any faith that it would be returned by 8 p.m. . . . It's not realistic. It's disingenuous to suggest it's even possible."[10]

42.   Weeks before the primary, at least a dozen counties also proposed conducting the election entirely by mail, signaling—or even outright asserting—that they would not be prepared to handle in-person voting. Montgomery County warned that its "polling places [would] be inadequately staffed or not staffed at all" simply because it "[would] not have enough people who are eligible and willing to do it."[11] And the elections director of Fayette County warned that his county, too, was not prepared to host in-person elections in part because the county did not have a sufficient number of commitments from poll workers.

---

[10] *Supra*, note 2.
[11] Letter from Chair of the Montgomery County Board of Commissioners, Dr. Valerie A. Arkoosh, and Vice Chair of the Montgomery County Board of Commissioners, Kenneth E. Lawrence, addressed to Pennsylvania Governor, Tom Wolf, regarding the Pennsylvania 2020 Primary Election. Petitioners' counsel received a copy of this letter from John Marlatt, Senior Assistant Solicitor for Montgomery County, on May 1, 2020.

43.     In response to one county's consolidation efforts—packing more voters into fewer, more crowded venues—local election officials questioned the wisdom and public health ramifications of that strategy. Montgomery County warned that combining polling locations increased the "potential for confusion" and introduced "greater . . . logistical challenges" in "ensuring that people are being directed to the correct precinct to sign in, are given the proper ballot, and are casting that ballot in the correct scanner."[12] Six members of the Pennsylvania House of Representatives, including the Speaker of the House, also acknowledged that significantly reducing the number of polling places "threatens the public health" and "artificially concentrates voters" into fewer locations, which "is completely at odds with the recommendation of social distancing," and "undermines the core of our Republic— free and fair elections."[13]

---

[12] *Id.*

[13] Letter signed by Speaker of the Pennsylvania House of Representatives Mike Turzai, 46th Legislative District Member Jason Ortitay, 54th Legislative District Member Bob Brooks, 39th Legislative District Member Michael Puskaric, 40th Legislative District Member Natalie Mihalek, and Lori Mizgorski from the 30th Legislative District and addressed to Secretary of State Kathryn Boockvar on May 21, 2020, available at http://www.pahousegop.com/Display/SiteFiles/1/2020/alleghenypoll.pdf; Eric Poole, *Mail-in ballot requests swamp Mercer County elections office*, THE HERALD (May 13, 2020), https://www.sharonherald.com/news/local_news/mail-in-ballot-requests-swamp-mercer-county-elections-office/article_2275e4c8-b78a-5d87-a710-

**D.**  **The issues that plagued Pennsylvania's primary election were foreshadowed by and repeated in other states.**

44.     Voters and local election officials were not the only prognosticators of Pennsylvania's election woes. Despite the Commonwealth's failed attempts to distinguish itself from the growing trend of jurisdictions experiencing election administration issues during COVID-19, Pennsylvania was plagued by the same issues that confronted voters in other elections occurring before and after the June 2 primary.

45.     In Wisconsin, "the extent of the risk of holding [the] election ha[d] become increasingly clear" well before Election Day. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *1 (W.D. Wis. Apr. 2, 2020). Election officials there, similar to Pennsylvania, were facing a huge backlog of requests for absentee ballots and concerns about returning the ballots in time to be counted. *Id.*

46.     When Wisconsin proceeded to hold an election without sufficiently addressing these issues, chaos and widespread disenfranchisement ensued. The U.S. Postal Service struggled to deliver absentee ballots to voters, and some ballots were delayed while others did not arrive at all. In response, both of Wisconsin's U.S. Senators wrote to the Inspector General for the U.S. Postal Service seeking an investigation into "absentee ballots not being delivered in a timely manner" and the

Postal Service's failure to deliver in this regard.[14] There were similar delays in returning voters' marked ballots to elections officials. In total, approximately 107,871 absentee ballots were received by elections officials after the day of the election. Those who voted in person encountered up to five hour waits at consolidated polling places, and the Wisconsin Department of Health Services reported that 52 people who voted in-person or worked as poll workers during the primary tested positive for COVID-19.[15]

47.     Shortly after Wisconsin's primary, Ohio encountered similar issues in its April 28 primary. The Ohio Secretary of State reported that election officials were experiencing "missed mail deliveries" as well as delivery times "in excess of ten days" for first class mail.[16]

48.     In Georgia's June 9 primary, tens of thousands of voters never received their mail ballots. Given the poll worker shortage, and the expectation that most of the electorate would vote absentee, cities closed and consolidated polling locations. But when voters did not receive their absentee ballots, they were forced to appear in

---

[14] *See* Letter from Senators Tammy Baldwin and Ron Johnson to U.S. Postal Service Inspector General (Apr. 9, 2020), https://www.wispolitics.com/wp-content/uploads/2020/04/200409LETTER.pdf.

[15] Devi Shastri, *In-person voting was likely a 'disaster' for Wisconsin's efforts to flatten coronavirus curve, national experts say*, MILWAUKEE J. SENTINEL (Apr. 8, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/08/coronavirus-wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/.

[16] Letter from Ohio Secretary of State Frank LaRose to the Ohio Congressional Delegation (Apr. 23, 2020), available at https://www.dispatch.com/assets/pdf/OH35713424.pdf.

large numbers at fewer voting sites. On top of that, untrained and understaffed poll workers across the state struggled to operate new voting equipment. In Atlanta, voters waited for up to six hours; some voted after midnight.

49.      So too in Nevada. During the June 9 primary, cities consolidated in-person voting locations, and voters waited in lines for up to five hours. The last vote in Las Vegas was cast at 3 a.m.



Source: *Long lines to vote delay Nevada election returns*, LAS VEGAS SUN (June 9, 2020), https://lasvegassun.com/news/2020/jun/09/no-mailing-it-in-voters-line-up-to-cast-ballots-in/.

50.      If this is all starting to sound repetitive, that is because it is. Election after election, voters have congregated in seemingly never-ending lines at

consolidated polling places, and tens of thousands of delayed ballots—and potentially more by some estimates—were delivered to election officials after Election Day. Thousands more never even made it from the local clerks to the voters who had requested them. Despite this clear pattern of disenfranchisement, the Commonwealth has yet to implement adequate safeguards to address these recurring barriers to vote by mail, which ultimately lead many to brave the long lines in congested polling places, not to mention the accompanying health risks, in order to exercise their right to vote.[17]

### E.   The Commonwealth will encounter the same barriers to voting in November absent the Court's intervention.

51.   There is no reason to believe that county election operations will fare any better in the November general election, especially since *many* more mail ballot applications are expected. The Secretary herself recently acknowledged, in discussing mail ballots, that she expects a lot more applications in the November general election than counties received in the June 2 primary. After the difficulty election officials encountered in handling the much lower turnout primary, there can

---

[17] *See* Michelle Ye Hee Lee, "Kentucky braces for possible voting problems in Tuesday's primary amid signs of high turnout," WASH. POST (June 19, 2020), https://www.washingtonpost.com/politics/kentucky-braces-for-possible-voting-problems-in-tuesdays-primary-amid-signs-of-high-turnout/2020/06/19/b7b960ce-b199-11ea-8f56-63f38c990077_story.html ("Fewer than 200 polling places will be open for voters in Kentucky's primary Tuesday, down from 3,700 in a typical election year. Amid a huge influx in requests for mail-in ballots, some voters still had not received theirs days before they must be turned in. And turnout is expected to be higher than in past primaries because of a suddenly competitive fight for the Democratic Senate nomination.").

be no doubt that the Commonwealth is unprepared to face the challenges to the electoral system posed by COVID-19 during the general election in November.

### *Ballot receipt deadline*

52.    The ballot receipt deadline remains in effect and will continue to be enforced indiscriminately, despite well documented delays in processing requests and delivering mail ballots. During the primary, data from the Pennsylvania Department of State suggests that tens of thousands of voted mail ballots were delivered after Election Day, most of which were not counted, thus the voters who cast them were most likely disenfranchised.

53.    As detailed above, the ability to process mail ballot applications and deliver ballots on time has been compromised by the ongoing public health crisis and the drastic expansion in demand for mail ballots. If the lower-turnout primary tested the limits of the Commonwealth's electoral apparatus and overwhelmed some counties; the general election, which is expected to dwarf the primary in turnout, will lead to an outright collapse of the mail voting system.

54.    There is also no indication that USPS delays are likely to improve. The agency has reported "nationwide issues" integrating election procedures with Postal Service processes.[18] Specifically, the agency has reported a high risk that election-

---

[18] Office of Inspector General, United States Postal Service, *Management Alert: Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Service Area* (July 7, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-235-R20.pdf.

related mail requested less than seven days before a deadline will not be delivered in time. The agency has warned that those issues could impact future elections. Furthermore, as the number of self-quarantined and infected postal workers increase nationally and locally, the more likely it is the USPS will continue to face severe staffing shortages, thereby slowing the delivery and receipt of a rapidly increasing volume of election mail.

55.    At this point, it is anyone's guess whether voters who timely request mail ballots will receive them in time to complete the ballot and mail them back to county officials such that they arrive by 8 p.m. on Election Day.

56.    Although Pennsylvania may have an interest in the finality of elections, the Commonwealth can continue to enforce its ballot receipt deadline while providing separate, temporary procedures to allow voters to cast an effective mail ballot during COVID-19, given the virus's impact on election administration and mail delivery. And doing so can still serve the Commonwealth's interest. Pennsylvania currently counts military-overseas ballots as long as they are received "by 5 p.m. on the seventh day following the election." 25 Pa C.S. § 3511(a). County boards of elections have seven days after Election Day to examine provisional ballots. *Id*. at § 3050(a.4)(4). Challenges and appeals to provisional ballots can last another nine days. *Id*. at § 3050(a.4)(4)(ii), (v). And Pennsylvania officials need not

certify election results to the Secretary until 20 days after Election Day. 25 P.S. § 2642(k).

57.     There is nothing sacrosanct about the receipt deadline as recent judicially-enacted exemptions indicate. Shortly after Hurricane Sandy struck parts of Pennsylvania in 2012, the Governor extended the deadline for absentee ballots returns in Philadelphia, Bucks, Montgomery, and Chester Counties from 5:00 p.m. on the Friday before Election Day to 5:00 p.m. on the Monday before Election Day.[19] In 2016, a Montgomery County Court judge extended the deadline from the Friday before the election to 8:00 p.m. on Election Day after elections officials received unprecedented demand for absentee ballots and voters complained that they had not yet received their ballots with the Friday deadline impending. *In re Extension of time for Absentee Ballots to be Received and Counted in the 2016 General Electi*on, No. 2016-26326 (Court of Common Pleas of Montgomery County Nov. 3, 2016). And before the June 2 primary, the Courts of Common Pleas in Delaware County and Bucks County granted extensions of time to accept and tabulate mail ballots.[20]

58.     Adopting such emergency procedures, moreover, does not require the Court to apply Act 77's non-severability clause. Ostensibly, Section 11 of Act 77

---

[19] *Absentee ballot deadline extended in some Pa. counties*, WHYY (Nov. 5, 2012), https://whyy.org/articles/absentee-ballot-deadline-extended-in-aome-pa-counties/.

[20] *See* Delaware County Order and Bucks County Order, *supra* note 4.

renders much of its provisions non-severable, and states that "[if] any provision of th[e] act or its application to any person or circumstance is held invalid, the remaining provisions or applications . . . are void." But just as the Courts of Common Pleas in Delaware County and Bucks County were able to extend deadlines for submitting mail ballots without striking or enjoining any provision of Act 77, Petitioners' requested relief does not render the ballot receipt deadline invalid, but rather seeks temporary accommodations for voters affected by COVID-19's disruptions to the electoral process, and can be enforced without applying the non-severability clause.

59.    Furthermore, non-severability provisions are not inexorable commands, nor are they controlling in all circumstances, and courts must effectuate their independent judgment in determining whether to apply such provisions.

60.    Applying the non-severability clause here would only exacerbate (exponentially) the already-existing constitutional injury by forcing millions of voters who would otherwise cast mail ballots to vote in-person, which, as discussed above, would be all but impossible given the significant barriers to in-person voting. The Commonwealth's long-held rules of statutory construction counsel against applying a non-severability provision that would disenfranchise a significant portion of its voters.

61.     Moreover, indiscriminately rejecting all mail ballots that arrive after 8:00 p.m. on Election Day will disenfranchise countless Pennsylvania voters for reasons entirely outside their control.

### Ban on third party ballot delivery

62.     A voter who seeks to avoid the risk of arbitrary disenfranchisement due to mail delivery delays, and the health risks of in-person voting or ballot submission, cannot turn to family, friends, or others whom they trust for assistance in delivering their ballots because of an overly broad and unnecessary prohibition on *all* third-party ballot collection or delivery assistance.

63.     Voters like Petitioner Dwayne Thomas and other members of the Alliance who have struggled with delayed mail delivery will be forced to deliver their ballots for the general election in-person this year to ensure their votes are counted, or subject themselves to the risk of arbitrary disenfranchisement. If permitted by law, these voters would designate a third party to deliver their ballots on time, and the Alliance would participate in those efforts.

64.     The burden caused by the prohibition on third party ballot delivery is particularly pronounced among members of the Alliance—the majority of whom are over the age of 65 and are vulnerable to serious illness from COVID-19—who will be voting by mail for the first time while navigating the public health risks posed by

the pandemic, but have no sufficiently reliable method of submitting their ballots without risking their health.

65.     The prohibition on third party ballot collection also disproportionately burdens poor, minority, and rural communities who generally have less access to postal services, live in areas that lack reliable access to public transportation (and especially amid the pandemic), and are less able to bear the costs of waiting in long lines to vote or exposing themselves to health risks in order to submit a mail ballot in person. Voters in rural communities, moreover, face longer travel distances to their county board of elections office and even less reliable mail service. This prohibition thus presents an undue burden on a large swath of Pennsylvania's eligible voters during the pandemic in violation of their constitutional rights.

### *Cost of postage*

66.     Most voters who choose to return their ballots by mail must also provide their own postage, which imposes both monetary and transaction costs that bear most heavily on the individuals who are least likely to be able to overcome them. Thus, for many voters who do not regularly keep postage stamps in their homes—including some members of the Alliance— submitting a ballot by mail will require them to either visit a post office or other essential business to obtain the correct postage, or purchase a book of stamps online for approximately $11—an unnecessary expense that could be cost prohibitive for individuals who are

economically vulnerable, along with those whose employment and source of income were eradicated by the devastating economic impact of COVID-19.

67.    A trip to the post office or any other establishment that sells stamps, at a time when individuals have been instructed to maintain social distancing guidelines to stem the spread of COVID-19, forces voters to expose themselves to the risk of severe illness in order to vote. This is especially true for elderly and immunocompromised voters, as well as those who lack access to vehicles and must rely on public transportation.[21]

68.    Providing postage to allow citizens to complete important government-related functions is a common practice that has been adopted by federal, state, and county governments in other contexts. For instance, the United States Census Bureau sends census surveys with postage-prepaid return envelopes. Pennsylvania provides, as the National Voter Registration Act requires, a postage-prepaid return envelope when it asks voters to verify their address for the purpose of voter registration. Counties in Pennsylvania send juror questionnaires with postage-prepaid envelopes. And in its coronavirus stimulus package, Congress allocated $400 million for

---

[21] In Southeastern Pennsylvania, public transportation has been radically altered in light of the COVID-19 pandemic. Riders are encouraged to "Stay Home, Stay Safe," face coverings are required for those who do continue to use the service; bus, train, and trolley routes have been cancelled; many subway stations have been shuttered; and those routes which are operating are doing so on a significantly lessened schedule. *See* SEPTA, *New Lifeline Service Schedules Effective Thursday, April 9, 2020*, http://septa.org/covid-19/, (last visited Jul. 6, 2020).

elections, which can be used to cover the cost of prepaying postage, among other expenses. At least one Pennsylvania county has recognized the importance of paying for mail ballot postage: during the primary election, Allegheny County sent mail-in ballot applications to all registered voters with prepaid postage.[22] Philadelphia County sent mail ballots with postage-prepaid return envelopes.[23]

69.     Studies have shown that sending absentee ballots in postage-prepaid envelopes increases mail voting turnout. When King County, Washington launched prepaid postage pilot programs during the 2017 and 2018 primary elections, the county found that voters returned their absentee ballots via the USPS at higher rates when they received return envelopes with postage prepaid. In the 2016 general election, 48% of the tested group of voters returned their absentee ballots via the USPS. In contrast, in 2017, 81% of those same voters did. Following these pilot programs, King County sent all absentee ballots with postage-prepaid return envelopes.

70.     Voting by mail—without additional safeguards or accommodations— will not provide the reliable alternative to in-person voting that Pennsylvanians need

---

[22] Ryan Deto, *Allegheny County is sending all county voters mail-in ballot applications with prepaid postage*, PITTSBURGH CITY PAPER (Apr. 17, 2020), https://www.pghcitypaper.com/pittsburgh/allegheny-county-is-sending-all-county-voters-mail-in-ballot-applications-with-prepaid-postage/Content?oid=17142631.

[23] Claire Sasko, *Pennsylvania's Big Mail-In Primary Could Get Messy. What you Need to Know to Make Your Vote Count*, PHILA. MAG. (May 27, 2020), https://www.phillymag.com/news/2020/05/27/mail-in-pennsylvania-primary/.

to exercise their constitutional rights to vote and to participate in a free and equal election during the ongoing public health crisis. These barriers to the franchise, moreover, will weigh most heavily on traditionally disadvantaged communities, along with elderly and immunocompromised individuals who are especially vulnerable to the health risks posed by the COVID-19 pandemic.

## COUNT I

### Violation of Pennsylvania Constitution, Article I, Section 5
### Free and Equal Elections Clause

71.    Petitioners reallege and reincorporate by reference all prior paragraphs and the paragraphs in the counts below as though fully set forth herein.

72.    "Elections shall be free and equal" in Pennsylvania. Pa. Const. art. I, § 5. Elections are "free and equal" only when "the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him." *Winston v. Moore*, 91 A. 520, 523 (1914). The Free and Equal Elections Clause is "specifically intended to equalize the power of voters in our Commonwealth's election process." *League of Women Voters of Pa. v. Pennsylvania*, 178 A.3d 737, 812 (2018), and protects voting rights even if they are denied or impeded "by inadvertence." *Id*. at 810 (citing *In re New Britain Borough Sch. Dist.*, 145 A. 597, 599 (1929)).

73.     Pennsylvania's Constitution thus imposes a clear and unambiguous duty on the Commonwealth to ensure that all elections are free and equal, and this constitutional guarantee applies with equal force during emergencies that threaten to deny its citizens the right to vote.

74.     The Commonwealth's failure to provide safe, accessible, and reliable means for its citizens to vote in the upcoming general election denies Petitioners and Pennsylvania voters the rights guaranteed to them under the Free and Equal Elections Clause. As the primary election demonstrated, in-person voting will be severely restricted due to a significant reduction in the number of polling places and the health risks posed by packing more voters and poll workers into fewer, consolidated voting sites. At the same time, voting by mail presents a significant risk of disenfranchisement due to the dramatic expansion of mail voters, backlogs in processing mail ballot requests, and U.S. Postal Service delivery delays, all of which are either caused or exacerbated by the COVID-19 pandemic and will prevent voters from receiving or submitting their mail ballots in time to be counted, subjecting mail voters to an impermissible risk of arbitrary disenfranchisement for reasons outside their control. And for many Pennsylvanians, including some of the Alliance's members, voting by mail will require them to obtain postage, which imposes monetary and transaction costs that significantly burden or deny them the franchise altogether.

75.    The failure to provide adequate safeguards to ensure access to the franchise during the COVID-19 pandemic forces Pennsylvania voters to make an impermissible choice: either (a) cast a ballot in-person (or hand-deliver their mail ballot assuming they receive it in time) to ensure their vote is counted and subject themselves to the health risks of COVID-19, or (b) vote by mail and risk arbitrary disenfranchisement for reasons outside their control. Neither option satisfies the Commonwealth's constitutional duty to conduct a free and equal election.

76.    Both election officials and Pennsylvania courts have even recognized the need for such safeguards but neither have taken appropriate steps to address the inevitable voting rights debacle that awaits Pennsylvanians who attempt to vote in the November general election. Multiple county boards of elections requested extensions of the ballot receipt deadline because they were powerless to act on their own; two Courts of Common Pleas granted such extensions but claimed they lacked jurisdiction to do so until Election Day, effectively denying relief to the voters who determined (correctly) that mailing their ballots would result in disenfranchisement and opted to either risk their health to vote in person or not vote at all; and one county announced the day before the election that it would permit voters to designate a third party to deliver their ballots. These piecemeal, emergency measures, while a step in the right direction, were made available too late in the voting process, and for too

few voters, to alleviate the burdens on the franchise that deterred countless voters in the primary election and will disenfranchise many more in November.

77.     The Free and Equal Elections Clause reaches "all aspects of the electoral process, to the greatest degree possible" and "strike[s] . . . at all regulations of law which shall impair the right of suffrage rather than facilitate or reasonably direct the manner of its exercise." *League of Women Voters of Pa.*178 A.3d, 804, 809. To enforce its protections, this "Court possesses broad authority to craft meaningful remedies." *Id*. at 822. Where, as here, the Commonwealth's citizens lack any reasonably accessible options for voting in the upcoming general election, this Court can and should intervene and protect the constitutional right to a free and equal election.

## COUNT II

### Violation of Pennsylvania Constitution, Article I, Sections 1, 26
### Equal Protection

78.     Petitioners reallege and reincorporate by reference all prior paragraphs and the paragraphs in the counts below as though fully set forth herein.

79.     The Pennsylvania Constitution states that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. It also prohibits the Commonwealth and any other political

subdivision from denying to any person "the enjoyment of any civil right," and prohibits "discriminat[ion] against any person in the exercise of any civil right." Pa. Const. art. I, § 26. These equal protection provisions are analyzed "under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution." *Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1139 (1991) (citing *James v. SEPTA*, 477 A.2d 1302 (1984)).

80.    Those standards are best understood under the *Anderson-Burdick* balancing test, which commands courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also In re Zulick*, 832 A.2d 572, 580 (Pa. Commw. Ct. 2003) (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), which in turn cites the *Anderson-Burdick* balancing test). Where the restrictions are severe, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "However slight th[e] burden [on voting] may appear, . . .  it must be justified by relevant and legitimate

state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quotation marks omitted).

81.    Pennsylvania has failed to provide adequate safeguards to ensure access to the franchise during the COVID-19 pandemic, and remove barriers to voting by mail, including: (a) the indiscriminate rejection of mail ballots placed in the mail before, but delivered after, Election Day despite delays in mail ballot processing or delivery; (b) the failure to allow voters to designate third parties to assist them in submitting their sealed mail ballots; and (c) the failure to provide prepaid postage for all mail ballots, as a result of which voters must incur monetary and transaction costs in some instances to vote by mail, or risk their health in order to vote in person—an impermissible choice that imposes a severe burden on the right to vote, particularly for Petitioners and the Alliance's members, most of whom are over the age of 65, and some of whom have underlying health conditions that place them at higher risk for severe illness from COVID-19.

82.    The Commonwealth has no interest of sufficient importance that can outweigh the burdens imposed by its failure to implement additional safeguards or provide accommodations to protect the right to vote and ensure access to a free and equal election during the COVID-19 pandemic.

## **PRAYER FOR RELIEF**

83.    Wherefore, Petitioners respectfully request that this Honorable Court enter judgment in their favor against Respondents, and:

a) Declare unconstitutional the Commonwealth's failure to provide adequate safeguards to ensure access to a free and equal election, and to safe and reliable means through which Petitioners and other voters in the Commonwealth may exercise their right to vote during the COVID-19 pandemic.

b) Declare unconstitutional the Commonwealth's failure to remove barriers to voting by mail, to ensure access to a safe and reliable means to vote during the COVID-19 pandemic, including: (1) the indiscriminate rejection of mail ballots delivered after Election Day despite delays in mail ballot processing or delivery; (2) the failure to allow voters to designate third parties to assist them in submitting their sealed mail ballots; and (3) the failure to provide pre-paid postage for all mail ballots, only to the extent that such relief for any of the above procedures do not require the Court to apply Act 77's non-severability clause.

c) Issue an order directing Respondents to implement additional safeguards for the November 3, 2020 general election and any other

election conducted during the COVID-19 pandemic, which may include:

    i.   Providing prepaid postage on all absentee and mail-in ballots;

    ii.   Implementing additional emergency procedures to ensure that ballots delivered after 8:00 p.m. on Election Day will be counted if otherwise eligible, only to the extent that such procedures do not require the court to apply Act 77's non-severability clause; and

    iii.   Allowing voters to designate a third party to assist in collecting and submitting absentee or mail-in ballots and ensure that all such ballots are counted if otherwise eligible, only to the extent that such procedures do not require the court to apply Act 77's non-severability clause;

d)  Maintain jurisdiction over this dispute to ensure that the Respondents comply with their obligations under the Pennsylvania Constitution.

e)  Provide such other and further relief as the Court may deem just and proper.

Dated:  July 13, 2020

By: _Adam C. Bonin_____

Marc E. Elias*
Uzoma N. Nkwonta*
Emily R. Brailey*
Stephanie I. Command*
Zachary J. Newkirk*
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211

Adam C. Bonin
LAW OFFICE OF ADAM C. BONIN
The North American Building
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 827-5300
adam@boninlaw.com

Sarah L. Schirack**
PERKINS COIE LLP
1029 W. 3rd Ave., Suite 300
Anchorage, AK 99517
Telephone: 907.279.8561

Torryn Taylor Rodgers**
PERKINS COIE LLP
505 Howard St., Suite 1000
San Francisco, CA 94105-3204
Telephone: 415.344.7000

*Counsel for Petitioners*
*Admitted pro hac vice.
**Not admitted in Pennsylvania. Pro hac vice application forthcoming.

Received 7/13/2020 4:32:04 PM Supreme Court Middle District

Filed 7/13/2020 4:32:00 PM Supreme Court Middle District
108 MM 2020

# IN THE SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Michael Crossey, Dwayne Thomas, Irvin Weinreich, Brenda Weinreich, and the Pennsylvania Alliance for Retired Americans, Petitioners<br>v.<br>Kathy Boockvar, Secretary of the Commonwealth, and Jessica Mathis, Director of the Bureau of Election Services and Notaries, Respondents | : : : | 108 MM 2020 |

## **PROOF OF SERVICE**

I hereby certify that this 13th day of July, 2020, I have served the attached document(s) to the persons on the date(s) and in the manner(s) stated below, which service satisfies the requirements of Pa.R.A.P. 121:

**Service**

| | |
|---|---|
| Served: | Christina Crane Matthias |
| Service Method: | eService |
| Email: | cmatthias@hangley.com |
| Service Date: | 7/13/2020 |
| Address: | One Logan Square |
| | 18th and Cherry Streets, 27th Floor |
| | Philadelphia, PA 19103 |
| Phone: | 215--49-6-7056 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

| | |
|---|---|
| Served: | Dimitrios Mavroudis |
| Service Method: | eService |
| Email: | dmavroudis@tlgattorneys.com |
| Service Date: | 7/13/2020 |
| Address: | Tucker Law Group |
| | 1801 Market Street, Suite 2500 |
| | Philadelphia, PA 19103 |
| Phone: | 215--87-5-0609 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

**IN THE SUPREME COURT OF PENNSYLVANIA**

## PROOF OF SERVICE

*(Continued)*

| | |
|---|---|
| Served: | Jessica Ann Rickabaugh |
| Service Method: | eService |
| Email: | jrickabaugh@tlgattorneys.com |
| Service Date: | 7/13/2020 |
| Address: | Tucker Law Group |
| | Ten Penn Center, 1801 Market Street, Suite 2500 |
| | Philadelphia, PA 19103 |
| Phone: | 215--98-2-2278 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

| | |
|---|---|
| Served: | Joe H. Tucker Jr. |
| Service Method: | eService |
| Email: | jtucker@tlgattorneys.com |
| Service Date: | 7/13/2020 |
| Address: | Tucker Law Group |
| | 1617 JFK Blvd., Suite 1700 |
| | Philadelphia, PA 19103 |
| Phone: | 215--87-5-0609 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

| | |
|---|---|
| Served: | Kathleen Marie Kotula |
| Service Method: | eService |
| Email: | kkotula@pa.gov |
| Service Date: | 7/13/2020 |
| Address: | Room 306 North Office Building |
| | 401 North Street |
| | Harrisburg, PA 17120-0500 |
| Phone: | (71-7) -783-0736 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

**IN THE SUPREME COURT OF PENNSYLVANIA**

**<u>PROOF OF SERVICE</u>**

*(Continued)*

| | |
|---|---|
| Served: | Mark Alan Aronchick |
| Service Method: | eService |
| Email: | maronchick@hangley.com |
| Service Date: | 7/13/2020 |
| Address: | One Logan Square |
| | 27th Floor |
| | Philadelphia, PA 19103 |
| Phone: | 215--49-6-7002 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

| | |
|---|---|
| Served: | Michele D. Hangley |
| Service Method: | eService |
| Email: | mhangley@hangley.com |
| Service Date: | 7/13/2020 |
| Address: | Hangley Aronchick Segal Pudlin & Schiller |
| | One Logan Square, 27th Floor |
| | Philadelphia, PA 19103 |
| Phone: | 215--49-6-7061 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

| | |
|---|---|
| Served: | Robert Andrew Wiygul |
| Service Method: | eService |
| Email: | rwiygul@hangley.com |
| Service Date: | 7/13/2020 |
| Address: | Hangley Aronchick Segal Pudlin & Schiller |
| | One Logan Square, 27th Floor |
| | Philadelphia, PA 19103 |
| Phone: | 215--49-6-7042 |
| Representing: | Respondent   Jessica Mathis |
| | Respondent   Kathy Boockvar |

# IN THE SUPREME COURT OF PENNSYLVANIA

## PROOF OF SERVICE

*(Continued)*

**Courtesy Copy**

| | |
|---|---|
| Served: | Devin Arlie Winklosky |
| Service Method: | eService |
| Email: | dwinklosky@porterwright.com |
| Service Date: | 7/13/2020 |
| Address: | 2783 Blackstone Drive |
| | Gibsonia, PA 15044 |
| Phone: | 434-989-9645 |
| Representing: | Possible Intervenor   National Republican Congressional Committee |
| | Possible Intervenor   Republican National Committee |
| | Possible Intervenor   Republican Party of Pennsylvania |

| | |
|---|---|
| Served: | James Edmond DelBello Jr. |
| Service Method: | eService |
| Email: | james.delbello@hklaw.com |
| Service Date: | 7/13/2020 |
| Address: | Holland & Knight LLP |
| | Cira Centre, 2929 Arch Street, Suite 800 |
| | Philadelphia, PA 10104 |
| Phone: | (21-5) -252-9524 |
| Representing: | Possible Intervenor   Bryan Cutler |
| | Possible Intervenor   Mike Turzai |

| | |
|---|---|
| Served: | Kathleen A. Gallagher |
| Service Method: | eService |
| Email: | KGallagher@porterwright.com |
| Service Date: | 7/13/2020 |
| Address: | 6 PPG Place |
| | Third Floor |
| | Pittsburgh, PA 15222 |
| Phone: | 412-235-1466 |
| Representing: | Possible Intervenor   National Republican Congressional Committee |
| | Possible Intervenor   Republican National Committee |
| | Possible Intervenor   Republican Party of Pennsylvania |

**IN THE SUPREME COURT OF PENNSYLVANIA**

**<u>PROOF OF SERVICE</u>**

*(Continued)*

| | |
|---|---|
| Served: | Lawrence J. Tabas |
| Service Method: | eService |
| Email: | lawrence.tabas@obermayer.com |
| Service Date: | 7/13/2020 |
| Address: | 1617 John F. Kennedy Blvd |
| | One Penn Center |
| | Philadelphia, PA 19103 |
| Phone: | 215--66-5-3158 |
| Representing: | Possible Intervenor   Jake Corman |
| | Possible Intervenor   Joseph B. Scarnati, III |

| | |
|---|---|
| Served: | Mathieu Jode Shapiro |
| Service Method: | eService |
| Email: | mathieu.shapiro@obermayer.com |
| Service Date: | 7/13/2020 |
| Address: | 1617 John F. Kennedy Blvd. |
| | 19th Floor |
| | Philadelphia, PA 19103 |
| Phone: | 215--66-5-3014 |
| Representing: | Possible Intervenor   Jake Corman |
| | Possible Intervenor   Joseph B. Scarnati, III |

| | |
|---|---|
| Served: | Richard P. Limburg |
| Service Method: | eService |
| Email: | richard.limburg@obermayer.com |
| Service Date: | 7/13/2020 |
| Address: | Obermayer Rebmann Maxwell & Hippel LLP |
| | 1500 Market Street, Suite 3400 |
| | Philadelphia, PA 19102 |
| Phone: | 215--66-5-3000 |
| Representing: | Possible Intervenor   Jake Corman |
| | Possible Intervenor   Joseph B. Scarnati, III |

# IN THE SUPREME COURT OF PENNSYLVANIA

## PROOF OF SERVICE

*(Continued)*

| | |
|---|---|
| Served: | Russell David Giancola |
| Service Method: | eService |
| Email: | rgiancola@porterwright.com |
| Service Date: | 7/13/2020 |
| Address: | Porter Wright Morris & Arthur LLP |
| | 6 PPG Place, Third Floor |
| | Pittsburgh, PA 15222 |
| Phone: | 412--23-5-4500 |
| Representing: | Possible Intervenor   National Republican Congressional Committee |
| | Possible Intervenor   Republican National Committee |
| | Possible Intervenor   Republican Party of Pennsylvania |

| | |
|---|---|
| Served: | Zachary Michael Wallen |
| Service Method: | eService |
| Email: | zwallen@cpblawgroup.com |
| Service Date: | 7/13/2020 |
| Address: | 301 South Hills Village Drive |
| | Suite LL200-420 |
| | Pittsburgh, PA 15241 |
| Phone: | 412-200-0842 |
| Representing: | Possible Intervenor   Bryan Cutler |
| | Possible Intervenor   Mike Turzai |

/s/  Adam Craig Bonin
_____
*(Signature of Person Serving)*

| | |
|---|---|
| Person Serving: | Bonin, Adam Craig |
| Attorney Registration No: | 080929 |
| Law Firm: | The Law Office of Adam C. Bonin |
| Address: | 121 S Broad St |
| | Ste 400 |
| | Philadelphia, PA 19107 |
| Representing: | Petitioner   Crossey, Michael |
| | Petitioner   Pennsylvania Alliance for Retired Americans |
| | Petitioner   Thomas, Dwayne |
| | Petitioner   Weinreich, Brenda |
| | Petitioner   Weinreich, Irvin |

**IN THE SUPREME COURT OF PENNSYLVANIA**