# EXHIBIT 10

EXHIBIT 10
Received 9/8/2020 3:51:34 PM Supreme Court Middle District

Filed 9/8/2020 3:51:00 PM Supreme Court Middle District
133 MM 2020

# IN THE SUPREME COURT OF PENNSYLVANIA

## No. 133 MM 2020

PENNSYLVANIA DEMOCRATIC PARTY *et al.,*

Petitioners,

v.

KATHY BOOCKVAR, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA *et al.*,

Respondents.

## REPUBLICAN PARTY OF PENNSYLVANIA'S SUPPLEMENTAL BRIEF

**PORTER WRIGHT MORRIS
  & ARTHUR LLP**
Kathleen A. Gallagher
PA I.D. #37950
Russell D. Giancola
PA I.D. #200058
6 PPG Place, Third Floor
Pittsburgh, PA 15222
Phone:  (412) 235-4500

**JONES DAY**
John M. Gore *
E. Stewart Crosland *
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939

*\*Pro hac vice application forthcoming*

*Counsel for Intervenor-Respondent The Republican Party of Pennsylvania*

# TABLE OF CONTENTS

**Page**

BACKGROUND ..................................................................................2

    A.    Act 77 & Pennsylvania Election Code..................................2

    B.    Act 77: A Grand Bipartisan Compromise...........................5

    C.    *Crossey v. Boockvar*, No. 108 MM 2020 (Pa. 2020) and *NAACP v. Boockvar*, No. 364 MD 2020 (Pa. Commw. Ct. Aug. 28, 2020)........................................................................8

    D.    *Donald J. Trump for President, Inc.*, *et al. v. Kathy Boockvar, et al.*, No. 2:20-cv-966-NR (W.D. Pa. 2020) and *Pa. Democratic Party v. Boockvar*, 133 MM 2020 (Pa. 2020)...............11

ARGUMENT ....................................................................................15

I.    STATE AND FEDERAL LAW REQUIRE THIS COURT TO UPHOLD ACT 77's PLAIN STATUTORY TEXT ...................15

II.    THE PLAIN STATUTORY TEXT FORECLOSES THE DEMOCRATIC PARTY'S REQUESTED CONSTRUCTION OF ACT 77 .......................................................................................20

    A.    Act 77 Creates The Valid And Binding Election Day Received-By Deadline........................................................22

        1.    Act 77's Non-Severability Clause Forecloses Extension Of The Received-By Deadline...............23

        2.    Act 77's Received-By Deadline Is Constitutional, Including During The COVID-19 Pandemic...........24

        3.    Federal Law Strictly Limits Any Extension Of The Received-By Deadline .............................................27

    B.    Act 77 And The Election Code Invalidate Absentee And Mail-In Ballots That Lack A Secrecy Envelope .........................30

        1.    Act 77 Implements A Constitutional Command And Mandates That Voters Use Secrecy Envelopes ......30

        2.    The Secretary's Contrary Construction Ignores The Constitution, The Plain Statutory Text, And This Court's Precedents ...............................................................32

**TABLE OF CONTENTS**
**(continued)**

**Page**

C.    Act 77 Prohibits County Boards From Designating Locations Other Than Their Offices For Delivery Of Ballots ............................ 39

D.    The Democratic Party Provides No Basis For Requiring The Commonwealth To Provide A Cure Opportunity To Certain Voters ........................................................................................ 41

III.    The Poll Watcher Residency Requirement Is Unconstitutional .................. 44

CONCLUSION ...................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agre v. Wolf,*
    284 F. Supp. 3d 591 (E.D. Pa. 2018)...................................................17

*Anderson v. United States,*
    417 U.S. 211 (1974)........................................................................45

*Appeal of Orsatti,*
    598 A.2d 1341 (Pa. Commw. Ct. 1991) ...........................................30

*Appeal of Weiskerger,*
    290 A.2d 108 (Pa. 1972)..........................................................*passim*

*A.S. v. Pa. State Police,*
    143 A.3d 896 (Pa. 2016)..................................................................22

*Banfield v. Cortes,*
    110 A.3d 155 (Pa. 2015)..............................................30, 31, 33, 37

*Bush v. Gore,*
    531 U.S. 98 (2000).....................................................................20, 41

*Cali v. Phila.,*
    177 A.2d 824 (Pa. 1962)..................................................................16

*Crossey v. Boockvar,*
    No. 108 MM 2020 (Pa. 2020)....................................................8, 9, 26

*Crossey v. Boockvar,*
    No. 266 MD 2020 (Pa. Commw. Ct. Sept. 4, 2020) ...........................8

*Delisle v. Boockvar,*
    No. 95 MM 2020, 2020 WL 3053629 (Pa. May 29, 2020).........24, 25

*Disability Rights Pa. v. Boockvar,*
    No. 83 MM 2020, 2020 WL 2507661 (Pa. May 15, 2020).........24, 25

*Donald J. Trump for President, Inc., et al. v. Kathy Boockvar, et al.,*
    No. 2:20-cv-966-NR (W.D. Pa. 2020)..............................................11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Ex parte Siebold*,
  100 U.S. 371 (1879).............................................................27

*Foster v. Love*,
  522 U.S. 67 (1997)................................................27, 28, 29

*Hamilton v. Johnson*,
  141 A. 846 (Pa. 1928)........................................................21

*Heller v. Frankston*,
  475 A.2d 1291 (Pa. 1984)...................................................16

*In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*,
  843 A.2d 1223 (Pa. 2004)...........................................*passim*

*In re: Fortieth Statewide Investigating Grand Jury*,
  197 A.3d 712 (Pa. 2018)......................................................16

*In re Gen. Election for Dist. Justice*,
  670 A.2d 629 (Pa. 1996).....................................................30

*In re Gen. Election of Nov. 4, 1975*,
  71 Pa. D. & C. 2d 83 (Pa. Ct. Com. Pl. Pike 1975)..................30

*Koken v. Reliance Ins. Co.*,
  893 A.2d 70 (Pa. 2006).......................................................22

*Kool v. Coffey*,
  300 F.3d 340 (3d Cir. 2002) ...............................................44

*League of Women Voters v. Commonwealth*,
  178 A.3d 737 (Pa. 2018)................................................25, 38

*Mays v. LaRose*,
  951 F.3d 775 (6th Cir. 2020) ..........................................24, 27

*McPherson v. Blacker*,
  146 U.S. 1 (1892).............................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*NAACP v. Boockvar*,
   No. 364 MD 2020 (Pa. Commw. Ct. Aug. 28, 2020)............................8, 9, 10, 26

*Nielsen v. DeSantis*,
   No. 4:20-cv-236-RH-MJF (N.D. Fla. June 24, 2020) ............................24, 25, 26

*Nw. Youth Servs., Inc. v. Com., Dep't of Public Welfare*,
   66 A.3d 301 (Pa. 2013)..............................................................................22

*Office of Admin. v. Pa. Labor Relations Bd.*,
   916 A.2d 541 (Pa. 2007)........................................................................16, 39

*Pa. Democratic Party v. Boockvar*,
   No. 133 MM 2020 (Pa. 2020)...................................................................11

*Pa. State Educ. Ass'n v. Commonwealth, Dep't. of Cmty. & Econ. Dev.*,
   148 A.3d 142 (Pa. 2016).........................................................................34

*Patterson v. Barlow*,
   60 Pa. 54 (1869)..............................................................................25, 38, 42

*Perzel v. Cortes*,
   870 A.2d 759 (Pa. 2005)...............................................................21, 44, 45, 47

*Pierce v. Allegheny Cty. Bd. of Elections*,
   324 F. Supp. 2d 684 (W.D. Pa. 2003)........................................................41, 47

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006)..............................................................................42

*Rep. Nat'l Comm. v. Dem. Nat'l Comm.*,
   140 S. Ct. 1205 (Apr. 6, 2020) .............................................................26

*Republican Party of Pa. v. Cortes*,
   218 F. Supp. 3d 396 (E.D. Pa. 2016).......................................................44, 47

*Reynolds v. Sims*,
   377 U.S. 533 (1964)...........................................................................41, 45

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Robinson Twp. v. Commonwealth*,
  147 A.3d 536 (Pa. 2016) ......................................................................16

*Rosario v. Rockefeller*,
  410 U.S. 752 (1973) ........................................................................24, 27

*Shambach v. Bickhart*,
  845 A.2d 793 (Pa. 2004) ......................................................................35

*Stapleton v. Thirteenth Judicial Dist. Ct.*,
  No. OP 20-0293 (Mont. May 27, 2020) ...............................................24

*State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*,
  272 A.2d 478 (Pa. 1971) ......................................................................16

*Stilp v. Commonwealth*,
  905 A.2d 918 (Pa. 2006) ..................................................18, 19, 23, 32

*Storer v. Brown*,
  415 U.S. 724 (1974) ..............................................................................26

*Thomas v. Andino*,
  No. 3:20-cv-01552-JMC, 2020 WL 2617329
  (D.S.C. May 25, 2020) ..............................................................24, 26, 27

*Tiryak v. Jordan*,
  472 F. Supp. 822 (E.D. Pa. 1979) ........................................................46

*United States v. DeMuro*,
  No. 2:20cr112 (E.D. Pa. Mar. 03, 2020) ..............................................46

*Verizon Pa., Inc. v. Commonwealth*,
  127 A.3d 745 (Pa. 2015) ......................................................................34

*Voting Integrity Project, Inc. v. Bomer*,
  199 F.3d 773 (5th Cir. 2000) ...............................................................28

*Winston v. Moore*,
  91 A. 520 (Pa. 1914) ...........................................................17, 19, 42, 43

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Zauflik v. Pennsbury School Dist.*,
   104 A.3d 1096 (Pa. 2014) ..................................................................................38

**Statutes**

25 P.S. § 2621 ...................................................................................................21

25 P.S. § 2687(b)...................................................................................................5

25 P.S. § 3146.1 ....................................................................................................2

25 P.S. § 3146.2a(a) ..............................................................................................2

25 P.S. § 3146.6 ...........................................................................................*passim*

25 P.S. § 3146.6(a)...................................................................................36, 39

25 P.S. § 3146.6(c)....................................................................................3, 39

25 P.S. § 3146.8(g)..............................................................................................32

25 P.S. § 3146.8(g)(4)(ii) ...........................................................................3, 31, 37

25 P.S. § 3150.11 ..................................................................................................2

25 P.S. § 3150.12a(a) ............................................................................................2

25 P.S. § 3150.16 .........................................................................................*passim*

25 P.S. § 3150.16(a)............................................................................................39

25 P.S. § 3150.16(c)...................................................................................3, 39

1 Pa. C.S. § 1921(a) ...........................................................................................16

1 Pa. C.S. § 1921(b) ...........................................................................................16

2 U.S.C. § 1 ........................................................................................................29

2 U.S.C. § 2 ..............................................................................................28, 29

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

2 U.S.C. § 7 ................................................................................28, 29

3 U.S.C. § 1 ...........................................................................27, 28, 29

52 U.S.C. § 10502(d) ....................................................................29

## Constitutions

PA. CONST. art. VII, § 4..................................................................*passim*

PA. CONST. art. VII, § 14(a) .................................................................17

U.S. CONST. art. I, § 4, cl. 1 .................................................................19

U.S. CONST. art. II, § 1, cl. 2................................................................20

## Other Authorities

2019 Voter Registration Statistics – Official (Nov. 5, 2019),
   https://www.dos.pa.gov/VotingElections/OtherServicesEvents/
   VotingElectionStatistics/Documents/2019%20Election%20VR%2
   0Stats%20%20final.pdf ...............................................................47

*Absentee and Mail-in Ballot Return Guidance* (Aug. 19, 2020),
   https://www.dos.pa.gov/VotingElections/
   OtherServicesEvents/Documents/PADOS_BallotReturn_Guidance_1.0.pdf................21

Act 77, P.L. 552, S.B. 421, 203d Gen. Assemb., Reg. Sess. (Pa. 2019),
   https://www.legis.state.pa.us/cfdocs/billinfo/bill_history.cfm?syear
   =2019&sind=0&body=S&type=B&bn=421 .......................................................2

Department Reports and Data, *Historical Citywide Voter Registration
   Data (1940-2019)*, Office of the Phila. City Commissioners,
   https://www.philadelphiavotes.com/en/home/item/101-historical-
   citywide-voter-registration-data-now-available ..........................................46, 47

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Guidance for Missing Official Election Ballot Envelopes* (Aug. 19, 2020),
https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS_NakedBallot_Guidance_1.0.pdf.............................................21

*Legislative Journal–Senate: Consideration of and Concurrence in House Amendments to S.B. 421*, 203d Gen. Assemb. Sess. 46 1000 (Pa. 2019), https://www.legis.state.pa.us/WU01/LI/SJ/ 2019/0/Sj20191029.pdf...........................................................................6

*Legislative Journal–House: Third Consideration of S.B. 421*, 203d Gen. Assemb. Sess. 64 1740–41 (Pa. 2019), https://www.legis.state.pa.us/WU01/LI/HJ/ 2019/0/20191029.pdf ....................8

Paul Muschick, *How Pennsylvania's biggest elections reforms in 80 years started in the Lehigh Valley*, The Morning Call (Dec. 6, 2019) ...................................................................................5, 6

Press Release, Tom Wolf, Governor of Pennsylvania, *Governor Wolf Signs Historic Election Reform Bill Including New Mail-in Voting* (Oct. 31, 2019), https://www.governor.pa.gov/newsroom/governor-wolf-signs-election-reform-bill-including-new-mail-in-voting/........................................2, 6

*Political Maps*, Office of the Phila. City Commissioners https://www.philadelphiavotes.com/en/resources-a-data/political-maps .....................................................................................................46

Intervenor-Respondent the Republican Party of Pennsylvania ("RPP") supports and seeks to uphold free and fair elections on behalf of all Pennsylvanians.

For that reason, RPP seeks to uphold the plain terms of the Pennsylvania Election Code as enacted by the General Assembly and signed into law by the Governor. Unfortunately, despite acting primarily in a ministerial capacity, with no authority to intrude on the province of the General Assembly, the Secretary now has sided with the Democratic Party in seeking a judicial rewrite of the Election Code fewer than 60 days before election day and fewer than 10 days before voters may apply for an absentee or mail-in ballot. The Secretary and the Democratic Party ask the Court to impose their preferred new and wide-ranging election-administration regime on the Commonwealth, its citizens, and its voters. In the process, the Secretary and the Democratic Party invite the Court to undo the grand bipartisan compromise to promote free and fair elections that Pennsylvania's political branches crafted in last year's historic Act 77.

The Secretary's and the Democratic Party's proposed construction of the Election Code is irreconcilable with the plain statutory text, contravenes Pennsylvania and federal law, and, in fact, would trigger invalidation of Pennsylvania's *entire no-excuse mail-in voting scheme* under Act 77's non-severability clause. The Court should reject the Secretary's and the Democratic

Party's construction, uphold Act 77 according to its plain terms, and declare the Election Code's poll watcher residency requirement unconstitutional.

## BACKGROUND

### A.   Act 77 & Pennsylvania Election Code

Act 77 embodied a grand bipartisan compromise to modernize Pennsylvania's election system and to provide no-excuse mail-in voting.  The Pennsylvania House of Representatives passed Act 77 with bipartisan support by a vote of 138-61.  The Pennsylvania Senate passed Act 77 with bipartisan support by a vote of 35-14. Governor Wolf signed Act 77 into law on October 31, 2019.  *See* Act 77, P.L. 552, S.B. 421, 203d Gen. Assemb., Reg. Sess. (Pa. 2019), https://www.legis.state.pa.us/ cfdocs/billinfo/bill_history.cfm?syear=2019&sind=0&body=S&type=B&bn=421.

As amended by Act 77, the Election Code permits all Pennsylvania voters to vote absentee as "qualified absentee electors," 25 P.S. § 3146.1, or by mail as "qualified mail-in electors," 25 P.S. § 3150.11.  Voters can begin applying for an absentee or mail-in ballot 50 days before Election Day.  25 P.S. §§ 3146.2a(a), 3150.12a(a).  This 50-day period is the longest in the country. *See* Press Release, Tom Wolf, Governor of Pennsylvania, *Governor Wolf Signs Historic Election Reform Bill Including New Mail-in Voting* (Oct. 31, 2019), https://www.governor.pa.gov/newsroom/governor- wolf-signs-election-reform-bill-including-new-mail-in-voting/.

Act 77 spells out several rules and requirements to vote by absentee or mail-in ballot.  Four are principally relevant here.

*First*, Act 77 directs that absentee and mail-in ballots "must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election."  Act 77, sec. 6, § 1306, 2019 Pa. Laws 77 (codified as amended at 25 P.S. § 3146.6(c)); Act 77, sec. 8, § 1306-D, 2019 Pa. Laws 77 (codified as amended at 25 P.S. § 3150.16(c)) (hereinafter "Act 77").  This is the Election Day received-by deadline.  Prior to Act 77, the received-by deadline for non-emergency absentee ballots was five o'clock P.M. on the Friday before the primary or general election.  Act 77 § 1306.

*Second*, Act 77 mandates for both absentee and mail-in ballots that the "elector shall . . . fold the ballot" and "enclose and securely seal the same in the" secrecy envelope, which shields the identity of the voter from election officials.  *Id.* As amended by Act 77 and Act 12 of 2020, the Election Code also directs that election officials "shall . . . set aside and declare[] void" any ballot whose secrecy envelope contains "any text, mark, or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." 25 P.S. § 3146.8(g)(4)(ii).  Act 77's secrecy envelope requirement and Act 12's markings rule implement the Pennsylvania Constitution's command "[t]hat secrecy in voting be preserved."  PA. CONST. art. VII, § 4.  These provisions follow previous

provisions of the Election Code's absentee voting law, which this Court construed in 2004.  *See In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1226 (Pa. 2004).

*Third*, Act 77 requires that voters "shall return" their absentee or mail-in ballots to the office of the county board of elections "by mail" or "in person."  Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6, 3150.16.  This language follows the Election Code's previous absentee voting law, which this Court held in 2004 prohibits third-party delivery of non-disabled voters' ballots.  *See In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1226, 1231, 1234.  Act 77 thus prohibits third-party delivery or "ballot harvesting" of absentee or mail-in ballots, as well as returning ballots to any location other than the office of the county board of elections.

*Fourth*, Act 77 requires that the voter must "fill out" the declaration on the absentee or mail-in ballot outer envelope and return the ballot so that it is "received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election."   Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6, 3150.16.  Act 77 therefore does not permit voters to cure noncompliant ballots after Election Day.

Act 77's non-severability provision, Section 11, provides: "Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable.  If any provision of this act or its application to any person or circumstance is held invalid, the remaining

provisions or applications of this act are void." Act 77, sec. 11.  The four provisions outlined above are all covered by the non-severability clause: they appear in section 6 of Act 77 for absentee ballots and in section 8 of Act 77 for mail-in ballots.  *See* Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6, 3150.16.  In addition, Pennsylvania's entire new no-excuse mail-in voting scheme is contained in section 8 of Act 77.  *See* Act 77, sec. 8.  Accordingly, invalidation of any provision of Act 77 covered by the non-severability clause triggers invalidation of the entire no-excuse mail-in voting scheme.  *See id.*, sec. 11.

Act 77 did not amend every provision of the Election Code.  Among the provisions that Act 77 left intact is 25 P.S. § 2687(b), which requires that a poll watcher "must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located."  This is the poll watcher residency requirement.

### B.    Act 77: A Grand Bipartisan Compromise

Act 77 began as a one-subject bill introduced by Senator Boscola to target straight-ticket voting.  *See* Paul Muschick, *How Pennsylvania's biggest elections reforms in 80 years started in the Lehigh Valley*, The Morning Call (Dec. 6, 2019), https://www.mcall.com/opinion/mc-opi-pa-elections-reform-legislation-compromise-muschick-20191206-euuesozlw5dnpcuunu3lhl2tga-story.html.  Over time, Senator Boscola's bill was amended to authorize payments to

counties for voting machines, extend deadlines, and so on. *Id.* And after the Governor vetoed an earlier iteration of the bill, the General Assembly and the Governor went back to the drawing board and, through difficult and prolonged negotiations, ultimately reached a middle ground. *Id.*

It is no secret that Act 77 was the result of a tough compromise. On the House floor, Senator Boscola (a Democrat), who introduced the bill, expressed "disappoint[ment] that the bill would not go as far as I would like" and did "not include every reform I would like to see." *Legislative Journal–Senate: Consideration of and Concurrence in House Amendments to S.B. 421*, 203d Gen. Assemb. Sess. 46 1000 (Pa. 2019), https://www.legis.state.pa.us/WU01/LI/SJ/ 2019/0/Sj20191029.pdf. But she pushed forward nonetheless because "modernizing our elections and providing greater voter access are key." *Id.* On the Senate floor, Republican Senate Majority Leader Corman described a similar experience:

> All negotiations add some things and, unfortunately, lose some things. But to get to a point where there is bipartisan support to get agreement—we have a divided government in Pennsylvania, we have a Democratic Governor and a Republican legislature—there is always give and take. You have to be able to give to get. I think this bill is a product of that. The Governor led a difficult negotiation. It received 130 votes in the House, it was bipartisan, almost two-thirds of the Chamber, and we come here today. Again, every bill we can pick some pieces that we do not like about it, but I think, ultimately, this is the most significant modernization of our Election Code in decades.

*Id.* at 1002. The Governor likewise described Act 77 as "bipartisan compromise legislation." Press Release, Tom Wolf, *supra* 2.

It is also no secret that Act 77's non-severability provision was a key part of that compromise. This precise issue arose on the House floor in a colloquy involving State Government Committee Chair Garth Everett:

> Mrs. DAVIDSON. Thank you.
>
> My second question has to do with the severability clause. It is my understanding that the bill says that the Supreme Court will have exclusive jurisdiction over challenges to elimination of straight-party voting, absentee voting, and mail-in voting. Then I also understand it also reads that the provisions of the bill will be nonseverable. So is that to mean that if somebody wants to challenge whether or not they were discriminated against because they did not have a ballot in braille, would they be able to – would that be a suit that they could bring to the Supreme Court under the severability clause?
>
> Mr. EVERETT. Thank you, Mr. Speaker.
>
> There is a nonseverability clause, and there is also the section that you mentioned that gives the Supreme Court of Pennsylvania jurisdiction, because the intent of this is that this bill works together, that it not be divided up into parts, and there is also a provision that the desire is, and of course, that could be probably gotten around legally, but that suits be brought within 180 days so that we can settle everything before this would take effect. So those are the provisions that have to do with nonseverability.
>
> Mrs. DAVIDSON. So in effect, if a suit was brought to the Supreme Court of Pennsylvania and they found it to be unconstitutional, it would eliminate the entire bill because it cannot be severed.
>
> Mr. EVERETT. Yes; that would be just in those sections that have been designated as nonseverable.
>
> Mrs. DAVIDSON. All right. Thank you.

*Legislative Journal–House: Third Consideration of S.B. 421*, 203d Gen. Assemb. Sess. 64 1740–41 (Pa. 2019), https://www.legis.state.pa.us/WU01/LI/HJ/2019/0/20191029.pdf.

### C. *Crossey v. Boockvar*, No. 108 MM 2020 (Pa. 2020) and *NAACP v. Boockvar*, No. 364 MD 2020 (Pa. Commw. Ct. Aug. 28, 2020)

The petitioners in *Crossey v. Boockvar*, No. 108 MM 2020, which is currently pending within this Court's original jurisdiction, have challenged the Election Day received-by deadline and Act 77's prohibition on ballot harvesting. This Court appointed "Commonwealth Court Presiding Judge Mary Hannah Leavitt as Special Master to conduct all necessary proceedings so as to create an evidentiary record on claims raised in this case including the ability of the United States Postal Service to comply with deadlines for the November 3, 2020 general election." Order, *Crossey v. Boockvar*, No. 108 MM 2020 (Pa. Aug. 26, 2020). In compliance with that order, Judge Leavitt filed "her proposed findings of facts and conclusions of law and recommended disposition" on September 4, 2020. *See id.*

Reviewing the record evidence and allegations regarding mail-delivery delays, Judge Leavitt found that the "performance" of the U.S. Postal Service ("USPS") in Pennsylvania "exceeds the national average." Proposed Finding of Fact at 26 ¶ 12, *Crossey v. Boockvar*, No. 266 MD 2020 (Pa. Commw. Ct. Sept. 4, 2020) (Ex. A). "The USPS delivery standards are set in ranges," and the delivery standard for Pennsylvania is "2 to 3 days." *Id.* at 26 ¶ 11. "There is no evidence that USPS

- 8 -

performance in Pennsylvania extends beyond that range." *Id.* To the contrary, "the USPS performance in Pennsylvania falls within that range over 98% of the time." *Id.*

In fact, "[i]n the first quarter of 2020 for Pennsylvania, 99.5% of outbound Presort First-Class Mail was delivered within 3 days," and "[m]ore than 98% was delivered within 1 day." *Id.* at 26 ¶ 12. Even during the second quarter of 2020—when the COVID-19 pandemic was sweeping across the Commonwealth—"99.4% of USPS outbound Presort First-Class Mail was delivered within 3 days" in Pennsylvania and "[m]ore than 98% was delivered within 1 day." *Id.*

Moreover, even a massive surge in absentee and mail-in voting in the 2020 general election will not lead to postal delays. To the contrary, "[i]f all 8.5 million registered voters in Pennsylvania elect to vote by absentee or mail-in ballot, the quantity of mail generated will represent only 1.2% of USPS' capacity in the Eastern service area and will not overwhelm the system." *Id.* at 26–27 ¶ 13.

Judge Leavitt's findings comport with the USPS' own statements and the evidence it provided in *NAACP v. Boockvar*, No. 364 MD 2020 (Pa. Commw. Ct.). The *NAACP* petitioners have brought a range of challenges to Act 77 and the Election Code that implicate the received-by deadline, but they do not seek invalidation of it. As part of their case, the *NAACP* petitioners requested a *Touhy* deposition of a USPS official. USPS produced a declaration in response to that

request.  *See* Decl. of Angela Curtis, *NAACP v. Boockvar*, No. 364 MD 2020 (Pa. Commw. Ct. Aug. 28, 2020) ("Curtis Decl.") (Ex. B).

That declaration demonstrates that, as the Postmaster General told Congress, "the Postal Service is ready to take on and handle whatever volume of election mail it receives this fall." *Examining the Finances and Operations of the United States Postal Service During COVID-19 and Upcoming Elections: Hearing Before the S. Comm. on Homeland Sec. and Governmental Affairs*, 116th Cong. 13 (2020) (statement of Louis DeJoy, Postmaster General and Chief Executive Officer of the United States Postal Service) (Curtis Decl. at Ex. A.).  "Even with the challenges of keeping our employees and customers safe and healthy as they operate in a pandemic, the American public should know that this is our number one priority between now and Election Day." *Id.*  USPS has not "changed [its] delivery standards, [its] processing, [its] rules, or [its] prices for Election Mail." *Id.* at 15. USPS "can, and will, handle the volume of Election Mail [it] receive[s]." *Id.*

The declaration further explains that USPS not only has prioritized delivery of election mail, but also has implemented measures to facilitate prompt delivery of absentee and mail-in ballots in the 2020 general election.  USPS local officials routinely undertake review and removal of collection boxes and machines that are underutilized, outdated, or no longer necessary for efficient and effective processing of the mail.  *See* Curtis Decl. ¶¶ 5–19.  In order to allay any concerns regarding the

effect of such removals on delivery of election mail and ballots, the Postmaster General has instructed local post officials to "cease [such] removals . . . until after the election."  *Id.* ¶¶ 12, 19; *see also* DeJoy Senate Statement at 10–12, 14. Similarly, USPS routinely reviews retail hours at Post Offices and overtime hours worked by employees, but the Postmaster General has determined that such hours "will not be changed prior to the election."   Curtis Decl. ¶ 30; DeJoy Senate Statement at 14.   The Postmaster General also has announced that, starting on October 1, 2020, USPS will "engage standby resources in all areas of [its] operations, including transportation," in order "to satisfy any unforeseen demand" regarding election mail.  DeJoy Senate Statement at 14.

> **D.**    ***Donald J. Trump for President, Inc.*, *et al. v. Kathy Boockvar, et al.*, No. 2:20-cv-966-NR (W.D. Pa. 2020) and *Pa. Democratic Party v. Boockvar*, 133 MM 2020 (Pa. 2020)**

On June 29, 2020, Donald J. Trump for President, Inc. (the "Trump Campaign") and the Republican National Committee ("RNC"), together with Congressmen Glenn Thompson, Mike Kelly, John Joyce, and Guy Reschenthaler, and registered voters Melanie Stringhill Patterson and Clayton David Show (collectively, the "Republican Plaintiffs") commenced an action in the U.S. District Court for the Western District of Pennsylvania, under the caption *Donald J. Trump for President, Inc., et al. v. Kathy Boockvar, et al.*, No. 2:20-cv-966-NR (the

"Federal Action"). The Republican Plaintiffs joined the Secretary and all 67 Boards of Elections as defendants.

The Republican Plaintiffs have asked the federal court for a faithful and constitutional construction of the Election Code. The Republican Plaintiffs therefore seek, *inter alia*, declarations that:

a.  the return of absentee and mail-in ballots to drop-boxes or locations other than the offices of the county election boards, or via third-party delivery for non-disabled voters, violates Act 77;

b.  the counting of absentee or mail-in ballots that lack the secrecy envelope, contain any other text, mark, or symbol which reveals the electors' identity, or lacks a completed or signed declaration violates Act 77; and

c.  the Election Code's residency requirement for poll watchers is unconstitutional.

*See* Federal Action Am. Compl. (Doc. 234) at 70–73 (Ex. C).

In light of the imminent 2020 general election, the Republican Plaintiffs sought expedited consideration of their claims, which the federal court granted. Petitioners in this action (collectively, "the Democratic Party") moved to intervene in the Federal Action. *See* Federal Action Doc. 83 (Ex. D). The federal court granted that motion. *See* Federal Action Doc. 309 (Ex. E).

The Democratic Party filed this suit on July 10, eleven days after the Republican Plaintiffs filed the Federal Action. The Democratic Party named as Respondents the same sixty-eight parties (the Secretary of State and every Board of Elections) whom the Republican Plaintiffs named as defendants in the Federal

Action.  *See* Pet.  Among other relief, the Democratic Party seeks mirror-image declarations that run directly opposite of the relief that the Republican Plaintiffs seek in the Federal Action.  For example, the Democratic Party seeks declarations permitting voters to return ballots to locations other than the offices of county boards of elections; permitting election officials to count ballots that lack a secrecy envelope or completed declaration; and upholding the poll watcher residency requirement. *See id.*  The Democratic Party also seeks judicial declarations extending Act 77's received-by deadline and requiring Commonwealth election officials to extend certain voters an opportunity to cure noncompliance with absentee and mail-in ballot requirements.  *See id.*

Although the Federal Action was already proceeding on an expedited schedule, the Democratic Party sought an expedited schedule in this case.  *See* App. For Extraordinary Relief.  The Commonwealth Court granted that application in part and denied it in part.  *See* Order (July 30, 2020).  The Commonwealth Court set an accelerated schedule to brief preliminary objections to the Petition.  *See id.*

The Secretary then petitioned this Court for an exercise of extraordinary jurisdiction in this case.  *See* App. For Court To Exercise Extraordinary Jurisdiction (Aug. 16, 2020).  In her Application, the Secretary revealed that she now agrees with the Democratic Party's position with respect to returning ballots to locations other than the office of county boards of elections, counting ballots without secrecy

envelopes, and the poll watcher residency requirement. *See* App. 23–26, 31–39. The Secretary also asks the Court to set aside the Election Day received-by deadline, although she seeks a shorter extension of that deadline than the Democratic Party. *See id.* at 27–29. To her credit, the Secretary still opposes the Democratic Party's request to create an extra-statutory notice-and-cure procedure for certain voters. *See id.* at 29–31.

RPP and the other Republican Committees who sought to intervene in this case—the Trump Campaign and RNC—opposed the Secretary's request for extraordinary jurisdiction. *See* Answer To App. (Aug. 23, 2020). One week after the Secretary filed her petition, the federal court stayed the Federal Action. *See* Federal Action Doc. 410 (Ex. F). The Republican Plaintiffs in the Federal Action later moved to modify the federal court's stay order and for limited preliminary injunctive relief to preserve their right to pursue their challenges to the Secretary's unconstitutional implementation of Act 77 and the Election Code. *See* Federal Action Doc. 414 (Ex. G).

This Court granted extraordinary jurisdiction two business days after the Republican Plaintiffs filed their motion in the Federal Action. *See* Order (Sept. 1, 2020). The Court's order directed that "[t]he parties and intervenors in this matter are permitted to file supplemental briefing and/or affidavits to support their respective positions on the claims raised in this case on or before Tuesday,

September 8, 2020 at 5:00 pm." *Id.* The Court granted RPP intervention on September 3. RPP now files this supplemental brief.

## ARGUMENT

The Court should deny the Secretary's and the Democratic Party's request to substitute by judicial fiat their preferred election-administration regime for the regime enacted by the General Assembly in the Election Code and Act 77. The Secretary and the Democratic Party jointly ask the Court to rewrite three provisions of Act 77; the Democratic Party asks the Court to rewrite a fourth; and the Secretary and the Democratic Party ask the Court to uphold the Election Code's poll watcher residency requirement. All of this requested relief exceeds this Court's authority under Pennsylvania and federal law. The requested changes to Act 77, moreover, run afoul of the Act 77's non-severability clause and would trigger invalidation of all of the covered provisions of Act 77, *including Pennsylvania's entire no-excuse mail-in voting scheme*. The Court should deny the requested declaratory relief, uphold Act 77 according to its plain terms, and declare the poll watcher residency requirement unconstitutional.

## I.   STATE AND FEDERAL LAW REQUIRE THIS COURT TO UPHOLD ACT 77'S PLAIN STATUTORY TEXT

State and federal law delineate the Court's task: to construe Act 77 and the Election Code in accordance with their plain terms and the mandates of the Pennsylvania and U.S. Constitutions.

- 15 -

1.      This Court's obligation in construing statutes is clear: to "ascertain and effectuate the intention of the General Assembly."  1 Pa. C.S. § 1921(a).  "The best indication of legislative intent is the language used in the statute."  *Office of Admin. v. Pa. Labor Relations Bd.*, 916 A.2d 541, 547–48 (Pa. 2007).  Accordingly, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing the spirit."  1 Pa. C.S. § 1921(b).

Moreover, this Court lacks the authority to rewrite the General Assembly's enactments because the General Assembly—not the judiciary—holds the sole power to write the laws for the Commonwealth.  As this Court recently reaffirmed, the judiciary "may not usurp the province of the legislature by rewriting [statutes] … as that is not [the court's] proper role under our constitutionally established tripartite form of governance."  *See In re: Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712, 722 (Pa. 2018); *accord Heller v. Frankston*, 475 A.2d 1291, 1296 (Pa. 1984) ("Where a legislative scheme is determined to have run afoul of constitutional mandate, it is not the role of this Court to design an alternative scheme which may pass constitutional muster.").  Thus, the Court cannot take unilateral action to rewrite the law.  *Robinson Twp. v. Commonwealth*, 147 A.3d 536, 583 (Pa. 2016); *Cali v. Phila.*, 177 A.2d 824, 835 (Pa. 1962).  "[E]diting of [a statute]" by the Court "would amount to judicial legislation."  *State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*, 272 A.2d 478, 482 (Pa. 1971).

The foundational rules of statutory construction and fundamental limitations on the Court's authority apply with even greater force when the Election Code is at issue. "The power to regulate elections is a legislative one, and has been exercised by the General Assembly since the foundation of the government." *Winston v. Moore*, 91 A. 520, 522 (Pa. 1914) (citing *Patterson v. Barlow*, 60 Pa. 54 (1869)); *see also Agre v. Wolf*, 284 F. Supp. 3d 591, 620 (E.D. Pa. 2018) (Smith, C.J.) ("The process for crafting procedural regulations is textually committed to state legislatures and to Congress.").

The Pennsylvania Constitution is explicit regarding the separation of powers in the context of absentee voting. It provides:

> The ***Legislature*** shall, by general law, provide a manner in which, and the time and place at which, qualified electors who may, on the occurrence of any election, be absent from the municipality of their residence, because their duties, occupation or business require them to be elsewhere or who, on the occurrence of any election, are unable to attend at their proper polling places because of illness or physical disability or who will not attend a polling place because of the observance of a religious holiday or who cannot vote because of election day duties, in the case of a county employee, may vote, and for the return and canvass of their votes in the election district in which they respectively reside.

PA. CONST. art. VII, § 14(a) (emphasis added).

2.     The requirements of deference to the General Assembly's enactments—not the Secretary's purported "interpretations" of them—and faithful adherence to the statutory text take on particular importance under Act 77. Act 77

contains a non-severability clause that covers the entirety of Pennsylvania's no-excuse mail-in voting scheme and every statutory provision implicated in this case other than the poll watcher residency requirement.  *See* Act 77, sec. 11.

The Court has "assume[d] that, as a general matter, nonseverability provisions are constitutionally proper."  *Stilp v. Commonwealth*, 905 A.2d 918, 978 (Pa. 2006). And that is particularly true here for two reasons.

*First*, as this Court has recognized, non-severability provisions should be upheld when they legitimately arise from "the concerns and compromises which animate the legislative process."  *Id.*  "In an instance involving such compromise, the General Assembly may determine, the court's application of [ordinary severability principles] might undo the compromise; a nonseverability provision, in such an instance, may be essential to securing the support necessary to enact the legislation in the first place."  *Id.*  That is the case here, since the non-severability clause was part and parcel of the grand bipartisan compromise embodied in Act 77. *See* Background *supra* Section B.

*Second*, Act 77's non-severability provision avoids the defect that the Court identified in *Stilp*.  The defect in the provision the Court declined to enforce in *Stilp* was that it had been "employed as a sword against the Judiciary" and appeared "to be aimed at securing a coercive effect upon the Judiciary" (by threatening decreased judicial compensation) in violation of the separation of powers.  905 A.2d at 978–

80.  Such provisions are "ineffective and cannot be permitted to dictate [the Court's] analysis."  *Id.* at 980.

Act 77's non-severability provision is nothing of the sort.  It was permissibly employed by the Legislature "as a shield to ensure preservation of a legislative scheme or compromise," *id.* at 978, in an area "regarded as peculiarly within the province of the legislative branch of government," *Winston*, 91 A. at 522.  Not only is there no evidence or basis to believe that the non-severability provision in a law concerning election administration was intended to coerce the courts, but it is also clear that the provision was intended to preserve the compromise struck in Act 77.

Act 77's non-severability clause therefore is valid, enforceable, and binding on this Court.  Accordingly, invalidation of any of the provisions of Act 77 covered by the non-severability clause—including any of the Act 77 provisions implicated in this case—triggers invalidation of *all* covered provisions, including the entire no-excuse mail-in voting scheme contained in section 8 of Act 77.  *See* Act 77, sec. 11.

3.     Finally, the U.S. Constitution also places crucial and inviolate prohibitions on judicial rewriting of the Election Code.  The Constitution's Elections Clause directs that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed by *the Legislature thereof*," subject to directives of Congress.  U.S. CONST. art. I, § 4, cl. 1 (emphasis added).  Likewise, the Constitution's Electors Clause directs that "[e]ach State shall appoint,

in such Manner as *the Legislature thereof* may direct," electors for President and Vice President.  U.S. CONST. art. II, § 1, cl. 2 (emphasis added).

The Electors Clause in particular "convey[s] the broadest power of determination" and "leaves it to the legislature exclusively to define the method" of appointment of electors.  *McPherson v. Blacker*, 146 U.S. 1, 27 (1892).  "Thus, the text of the election law itself, and not just its interpretation by the courts of the States, takes on independent significance."  *Bush v. Gore*, 531 U.S. 98, 112–13 (2000) (Rehnquist, J., concurring).  "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question," including when such departure is carried out by the state judiciary. *Id.* at 113.  "[W]ith respect to a Presidential election," state courts must be "mindful of the legislature's role under Article II in choosing the manner of appointing electors." *Id.* at 114.  For this reason as well, the Court may not deviate from Act 77's plain text or rewrite the Election Code.

## II.    THE PLAIN STATUTORY TEXT FORECLOSES THE DEMOCRATIC PARTY'S REQUESTED CONSTRUCTION OF ACT 77

The Secretary and the Democratic Party ask the Court to rewrite Act 77's received-by deadline, secrecy envelope requirement, and requirement to return a ballot to the office of the county board of elections.  The Democratic Party also asks the Court to graft an extra-statutory notice-and-cure requirement onto Act 77.  All of this requested relief contravenes Act 77's plain terms and non-severability

provision.   Moreover, the requested extension of the received-by deadline contravenes the federal laws establishing a uniform nationwide federal Election Day, and the requested elimination of the secrecy envelope requirement violates the Pennsylvania Constitution's command "[t]hat secrecy in voting be preserved."  PA. CONST. art. VII, § 4.

The Secretary has attempted to buttress her preferred construction of Act 77 by issuing "Guidances" regarding the secrecy envelope requirement and requirement to return ballots to the office of the county board of elections.  *See Guidance for Missing Official Election Ballot Envelopes* (Aug. 19, 2020), https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS _NakedBallot_Guidance_1.0.pdf; *Absentee and Mail-in Ballot Return Guidance* (Aug. 19, 2020), https://www.dos.pa.gov/VotingElections/ OtherServicesEvents/Documents/PADOS_BallotReturn_Guidance_1.0.pdf.   The Secretary, however, acts in a ministerial capacity under the Election Code and has no power or authority to intrude upon the province of the General Assembly.  *See* 25 P.S. § 2621; *Perzel v. Cortes*, 870 A.2d 759, 764 (Pa. 2005); *Hamilton v. Johnson*, 141 A. 846, 847 (Pa. 1928).   She therefore has no authority to construe—and is entitled to no deference in her "interpretation" of—the Election Code.  *See* 25 P.S. § 2621; *Perzel*, 870 A.2d at 764; *Hamilton*, 141 A. at 847.   Thus, her guidance documents are of no moment, and they cannot override the plain terms of Act 77 and

the Election Code in any event. *See, e.g.*, *Nw. Youth Servs., Inc. v. Com., Dep't of Public Welfare*, 66 A.3d 301, 312 (Pa. 2013) ("[I]nterpretive rules outside the realm of an agency's delegated lawmaking authority may be disregarded," as may such rules that are "unwise or violative of legislative intent.").

Accordingly, and as explained more fully below, the Court should deny the Democratic Party's requested relief and uphold Act 77 according to its plain statutory text. *See A.S. v. Pa. State Police*, 143 A.3d 896, 903 (Pa. 2016) (when interpreting statutes, the Statutory Construction Act directs that legislative intent is to be ascertained from the statute's plain language); *Koken v. Reliance Ins. Co.*, 893 A.2d 70, 82 (Pa. 2006) ("[T]he plain language of a statute 'cannot be ignored in pursuit of the statute's alleged contrary spirit or purpose.'").

### A. Act 77 Creates The Valid And Binding Election Day Received-By Deadline

Act 77 directs that absentee and mail-in ballots "must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election." Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6, 3150.16. For at least three reasons, this Court lacks authority to depart from this express requirement and to extend the received-by deadline as requested by the Secretary and the Democratic Party. *First*, any such order would trigger Act 77's non-severability clause and invalidation of Pennsylvania's entire no-excuse mail-in voting scheme. *Second*, the received-by deadline is an evenhanded and constitutional rule of election

- 22 -

administration. *Third*, federal law strictly limits any extension of the received-by deadline in any event. The Court should reject the Secretary's and the Democratic Party's invitation to override the Legislature's received-by deadline in Act 77.

> **1.    Act 77's Non-Severability Clause Forecloses Extension Of The Received-By Deadline**

The Secretary acknowledges that the Election Day received-by deadline is an express requirement of Act 77. *See* App. 27. The Secretary and the Democratic Party nonetheless both seek a judicial order invalidating the deadline, crafting a new Election Day postmark requirement, and creating an extended received-by deadline, although they seek different extensions. *See id.* But neither the Secretary nor the Democratic Party even mentions Act 77's non-severability clause, let alone explains how the relief they seek would not trigger that clause and invalidation of Pennsylvania's no-excuse mail-in voting scheme. *See id.*; *see also* Pet.

The reason is plain: Act 77's non-severability clause forecloses the requested relief. The received-by deadline is covered by Act 77's non-severability clause. *See* Act 77, secs. 6, 8, 11. Accordingly, any invalidation of the received-by deadline—including a replacement of that deadline with either of the extensions that the Secretary or the Democratic Party requests—would trigger invalidation of the other covered provisions, including the entire mail-in voting scheme. *See id.*, sec. 11; *see also Stilp*, 905 A.2d at 978–80; *supra* Part I.2.

2.   **Act 77's Received-By Deadline Is Constitutional, Including During The COVID-19 Pandemic**

The U.S. Supreme Court and other courts have recognized that election-related deadlines, including deadlines on the exercise of the franchise, are constitutional.  *See Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973); *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020).  Consistent with this authority, courts across the country—*including this Court on two separate occasions*—have upheld Election Day received-by deadlines as constitutional even during the COVID-19 pandemic.  *See Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, 2020 WL 2507661 (Pa. May 15, 2020); *Delisle v. Boockvar*, No. 95 MM 2020, 2020 WL 3053629 (Pa. May 29, 2020); *see also Stapleton v. Thirteenth Judicial Dist. Ct.*, No. OP 20-0293 (Mont. May 27, 2020) (Ex. H); *Nielsen v. DeSantis*, No. 4:20-cv-236-RH-MJF (N.D. Fla. June 24, 2020) (Ex. I); *Thomas v. Andino*, No. 3:20-cv-01552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020).  As these courts have recognized, Election Day received-by deadlines "ensur[e] a smooth process for [voters] to cast ballots and officials to count those ballots."  *Thomas*, 2020 WL 2617329, at *26 (citation omitted).  The Northern District of Florida recently explained:

> A state could reasonably so provide [a postmark deadline]; some do. But . . . a state could also reasonably decide, as Florida has, to require receipt on or before election day. This eliminates the problem of missing, unclear, or even altered postmarks, eliminates delay that can have adverse consequences, and eliminates the remote possibility that

in an extremely close election—Florida has had some—a person who did not vote on or before election day can fill out and submit a ballot later.

*Nielsen*, No. 4:20-cv-236-RH-MJF at 3 (Ex. I).

The Secretary previously told the Court that the received-by deadline is constitutional under the Free and Equal Elections Clause. *See* Resps.' Opp. To App. For Prelim. Inj. at 34–37, *Disability Rights Pa.*, 2020 WL 2507661. The Secretary nonetheless now suggests that enforcement of the received-by deadline violates that Clause. *See* App. 27. The Secretary was right the first time, as the Court recognized. *See Disability Rights Pa.*, 2020 WL 2507661; *Delisle*, 2020 WL 3053629. After all, the received-by deadline is a neutral, evenhanded rule that applies to all Pennsylvania voters equally. It therefore is constitutional. *See, e.g.*, *League of Women Voters v. Commonwealth*, 178 A.3d 737, 804 (Pa. 2018). Indeed, neither the Secretary nor the Democratic Party has shown—or can show—that the Election Day received-by deadline is a "plain, palpable and clear abuse of the [legislative] power which actually infringes the rights of the electors." *Patterson*, 60 Pa. at 75 (1869).

The Secretary's related contention that an extension of the received-by deadline is appropriate to address "the threat of mail-delivery delays during an ongoing pandemic," App. 28, fails as a matter of fact and law. *First*, the alleged "threat of mail-delivery delays" affecting the general election is speculative at best, *e.g.*, *Disability Rights Pa.*, 2020 WL 2507661; *Delisle*, 2020 WL 3053629, and, in

fact, is contradicted by Judge Leavitt's findings in *Crossey* and USPS' own evidence in *NAACP*.  *See* Background *supra* Section C.

*Second*, even if a "threat of mail-delivery delays during [the] ongoing pandemic" existed, App. 28, it would not be unique to Pennsylvania.  Such alleged delays, however, have not been sufficient to persuade other courts to invalidate election day receipt deadlines—including in states with shorter absentee and mail-in voting periods than the Commonwealth's longest-in-the-nation 50-day period. *See Thomas*, 2020 WL 2617329, at *24–27 (South Carolina: 30 days); *Nielsen*, No. 4:20-cv-236-RH-MJF (Florida: up to 40 days).  Yet the Secretary has not even cited, much less attempted to distinguish, this weight of authority.

Moreover, the Election Day received-by deadline affects only voters who wait until late in the absentee or mail-in voting period to submit their ballots.  But any "interest . . . in making a late rather than an early decision" to request or complete a ballot is slight at best, and is outweighed by the Commonwealth's interests advanced by the deadline.  *Storer v. Brown*, 415 U.S. 724, 736 (1974); *see also Rep. Nat'l Comm. v. Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (Apr. 6, 2020).  And given Pennsylvania's unparalleled and generous absentee and mail-in voting period, any voter's inability to cast a timely ballot is "not caused by" the Election Day received-by deadline but instead "by their own failure to take timely steps to effect"

completion and return of their ballot. *Rosario*, 410 U.S. at 758; *see also Mays*, 951 F.3d at 786–87; *Thomas*, 2020 WL 2617329, at *26.

Act 77's received-by deadline is constitutional, including during the COVID-19 pandemic.

### 3. Federal Law Strictly Limits Any Extension Of The Received-By Deadline

Finally, in all events, federal law strictly limits any extension of the received-by deadline. Federal law creates a uniform nationwide federal Election Day that preempts any counting in federal elections of ballots that were not cast or mailed by Election Day, including ballots that lack a postmark and are received after Election Day.

"[I]t is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citing *U.S. Term Limits v. Thornton*, 514 U.S. 779, 832–33 (1995)). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879); *see also Foster*, 522 U.S. at 69.

Congress has prescribed a single nationwide federal Election Day in three federal statutes. The first, 3 U.S.C. § 1, provides that "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first

Monday in November, every fourth year succeeding every election of a President and Vice President."  The second, 2 U.S.C. § 7, directs that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."  And the third, 2 U.S.C. § 1, mandates that "[a]t the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for a term commencing on the 3d day of January next thereafter."

This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70.  The term "election" within these statutes means the "combined actions of voters and officials meant to make a final selection of an officeholder."  *Id.* at 71.  In other words, "election" is the consummation of a process to elect an official.  *See id.*  Thus, these three federal statutes require the 2020 general election to be consummated on Election Day (November 3, 2020).  *See id.*; *see also* 3 U.S.C. § 1; 2 U.S.C. §§ 2, 7.

Consistent with these federal statutes, "the Voting Rights Act Amendments of 1970 require that citizens be allowed to vote by absentee ballot in Presidential elections *on or before* the day of the election."  *Voting Integrity Project, Inc. v.*

- 28 -

*Bomer*, 199 F.3d 773, 778 (5th Cir. 2000) (emphasis added); *see also* 52 U.S.C. § 10502(d).  But whatever latitude states retain under federal law to define the process of casting mail ballots through the USPS, they cannot create a process under which ballots cast or mailed *after* Election Day can be considered timely.  After all, such a process would permit a voter to take "actions . . . meant to make a final selection of an officeholder" after Election Day, in contravention of federal law. *Foster*, 522 U.S. at 70; 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7.

An extension of the received-by deadline, however, threatens to do precisely that.  Such an extension could lead to election officials receiving ballots that were cast or mailed after Election Day.  It also could lead to election officials receiving ballots after Election Day that bear no proof, such as a postmark, establishing that they were cast and mailed on or before Election Day.  Counting such ballots in federal elections would violate the federal laws establishing a nationwide federal Election Day.  *Foster*, 522 U.S. at 70–71; *see also* 3 U.S.C. § 1; 2 U.S.C. §§ 2, 7. Any extension of the received-by deadline, therefore, "ceases to be operative" to the extent that it purports to permit the counting of such ballots in federal elections. *Foster*, 522 U.S. at 69; *see also* 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7.

For all of these reasons, the Court should deny the Secretary's and the Democratic Party's requests to extend Act 77's received-by deadline.

**B.     Act 77 And The Election Code Invalidate Absentee And Mail-In Ballots That Lack A Secrecy Envelope**

**1.     Act 77 Implements A Constitutional Command And Mandates That Voters Use Secrecy Envelopes**

The Pennsylvania Constitution directs that "[a]ll elections by the citizens shall be by ballot or by such other method as may be prescribed by law: Provided, That secrecy in voting be preserved." PA. CONST. art. VII, § 4.  This Constitutional command is a "keystone of our democracy" that "must be preserved." *Appeal of Orsatti*, 598 A.2d 1341, 1344 (Pa. Commw. Ct. 1991) (internal quotation omitted). It prohibits methods of voting "which may allow officials to ascertain a voter's identity."  *Banfield v. Cortes*, 110 A.3d 155, 168 n.10 (Pa. 2015).   Thus, an individual cannot waive, voluntarily or by compulsion, the secrecy of her ballot, except in cases where an individual has cast an illegal vote (for example, because she was ineligible to vote) or an individual's vote has been altered by a third party. *See, e.g.*, *In re Gen. Election for Dist. Justice*, 670 A.2d 629, 635, 639–40 (Pa. 1996); *Appeal of Orsatti*, 598 A.2d at 1343–44; *In re Gen. Election of Nov. 4, 1975*, 71 Pa. D. & C. 2d 83, 91–92 (Pa. Ct. Com. Pl. Pike 1975).

Consistent with longstanding practice in Pennsylvania, Act 77 implements this Constitutional requirement by mandating that the "elector shall . . . fold the ballot" and "enclose and securely seal the same in the" secrecy envelope, which, as officially prepared, does not disclose the voter's identity.  Act 77 §§ 1306, 1306-D;

25 P.S. §§ 3146.6, 3150.16.  Act 77's use of the word "shall" carries "an imperative or mandatory meaning."  *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231.  Accordingly, its "clear mandate[]" requires exclusion of any ballot that the voter fails to secure in a secrecy envelope.  *Id.*

Act 12's markings rule confirms this result.  That rule directs that election officials "shall . . . set aside and declare[] void" any ballot whose secrecy envelope contains "any text, mark, or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference."   25 P.S. § 3146.8(g)(4)(ii).  The purpose of Act 77's secrecy envelope requirement and Act 12's markings rule is to protect the secret ballot and "to prevent ballots from being identifiable" to election officials or other persons.  *Appeal of Weiskerger*, 290 A.2d 108, 109 (Pa. 1972); *see also Banfield*, 110 A.3d at 168 n.10.  "The[se] provision[s], thus, [are] consistent with the spirit and intent of our election law, which requires that a voter cast his ballot alone, and that it remain secret and inviolate."  *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1232.

Act 77 and Act 12 therefore mandate that an absentee or mail-in ballot is "invalid" whenever the envelope that contains it "reveals the identity of the elector." 25 P.S. § 3146.8(g)(4)(ii).  This occurs when a marking on the secrecy envelope reveals the voter's identity in contravention of Act 12.  *Id.*  It also occurs when a voter omits the secrecy envelope in contravention of Act 77.  In that scenario, the

voter places the ballot in an outer envelope that contains identifying information—in particular, the completed declaration by which election officials confirm the voter's identity and eligibility to vote. *See id.* § 3146.8(g)(3). Accordingly, absentee and mail-in ballots without a secrecy envelope also are "identifiable" and invalid. *Appeal of Weiskerger*, 290 A.2d at 109. In other words, *any* ballot contained in an envelope with markings that reveal the identity of the voter cannot be counted. *See* 25 P.S. § 3146.8(g); *Appeal of Weiskerger*, 290 A.2d at 109.

The plain Constitutional and statutory text thus foreclose the Secretary's and the Democratic Party's request to order election officials to count absentee and mail-in ballots submitted without a secrecy envelope. Moreover, because the secrecy envelope requirement is covered by Act 77's non-severability provision, any such order would trigger invalidation of *all* covered provisions of Act 77, including the entire no-excuse mail-in voting scheme. *See* Act 77, secs. 6, 8, 11; *see also Stilp*, 905 A.2d at 978–80; *supra* Part I.2.

> ## 2. The Secretary's Contrary Construction Ignores The Constitution, The Plain Statutory Text, And This Court's Precedents

The Secretary acknowledges that ballots submitted in secrecy envelopes with marks that reveal the identity of the voter are invalid and cannot be counted. *See* App. 32–33. She nonetheless argues that ballots submitted without a secrecy envelope in contravention of Act 77 should be counted. *See id.* The Secretary,

however, never mentions the Pennsylvania Constitution's command "[t]hat secrecy in voting be preserved." PA. CONST. art. VII, § 4.  Nor does she offer any explanation as to why the General Assembly would have invalidated one category of ballots that reveal the identity of the voter but not the other.  *See* App. 32–33.  Instead, the Secretary makes four attempts to parse the statutory language toward her preferred construction, all of which fail.

*First*, the Secretary suggests that noncompliance with Act 77's secrecy envelope requirement does not "permit fraud."  App. 34.  But even if that unsubstantiated assertion were true (and it is not), it does not affect the outcome here.  After all, Act 77's secrecy envelope requirement does at least as much to prevent fraud as Act 12's markings rule.  Moreover, as the Secretary acknowledges, this Court has recognized that the Commonwealth has a strong interest in preventing ballots from "being identifiable" to election officials or anyone else.  *Id.*; *see also Banfield*, 110 A.3d at 168 n.10; *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1232; *Appeal of Weiskerger*, 290 A.2d at 109.  Indeed, advancing that interest promotes the integrity of, and public confidence in, the Commonwealth's elections.  The Secretary, however, never addresses this interest, much less explains why the Court should undermine it by invalidating the secrecy envelope requirement.  *See* App. 34.

*Second*, the Secretary suggests that the use of the word "shall" in Act 77's secrecy envelope provision is "merely directory," like a direction to use a particular color of ink or not to write in the name of a candidate who appears on the ballot. App. 32. But as this Court already has explained, the case the Secretary cites in support of this suggestion, *Appeal of Weiskerger*, "was decided before the enactment of the Statutory Construction Act, which dictates that legislative intent is to be considered only when a statute is ambiguous." *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231. Since that enactment, this Court "has repeatedly recognized the unambiguous meaning of the word" "shall" to be "imperative or mandatory." *Id.* at 1231–32. More importantly, "[t]he legislature is presumed to know about this body of case law, as it is well-settled that if the legislature in a later statute uses the same language used in a prior statute which has been construed by the courts, there is a presumption that the repeated language is to be interpreted in the same manner as such language had previously interpreted when the court construed the earlier statue." *Pa. State Educ. Ass'n v. Commonwealth, Dep't. of Cmty. & Econ. Dev.*, 148 A.3d 142, 157 (Pa. 2016). *See also Verizon Pa., Inc. v. Commonwealth,* 127 A.3d 745, 757 (Pa. 2015), and the cases cited therein.

The plain statutory text provides no basis to depart from the unambiguous and mandatory construction of the word "shall" here. "[T]here is nothing" in Act 77 "to suggest that a voter has a choice between" whether or not she uses a secrecy

envelope. *Id.* at 1231. To construe Act 77's secrecy envelope requirement "as merely directory would render [it] meaningless and, ultimately, absurd." *Id.*

After all, even "so-called technicalities of the Election Code are necessary *for the preservation of secrecy* and the sanctity of the ballot and must be observed—particularly where, as here, they are designed" to implement a Constitutional mandate. *Id.* at 1234 (emphasis added). Thus, noncompliance with a procedure to safeguard the secret ballot—which implements a command of Constitutional magnitude, *see* PA. CONST. art. VII, § 4—is a far cry from "minor irregularities" like using the wrong color of ink or writing in a candidate whose name appears on the ballot. *See Appeal of Weiskerger*, 290 A.2d at 109; *Shambach v. Bickhart*, 845 A.2d 793, 798 (Pa. 2004); *see also* App. 31–35; *Canvass of Absentee Ballots of Apr. 28, 1964, Primary Election*, 34 Pa. D. & C. 2d 419, 423, 425 (Pa. Ct. Com. Pl. Phila. 1964) ("[a] voter, by failing to observe the statutory requirements, has disenfranchised himself," and such disenfranchisement includes when the voter fails to sign the outer envelope declaration). The Secretary recognizes as much because she concedes that ballots that violate Act 12's markings rule are invalid. *See* App. 32–33. So too, are ballots submitted without complying with Act 77's "mandatory" secrecy envelope requirement. *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231–34.

*Third*, the Secretary points out that Act 12 expressly requires exclusion of ballots submitted in secrecy envelopes with marks that reveal the voter's identity, but that Act 77 does not "provide that naked ballots or mail-in ballots without interior envelopes should not be counted." App. 33. But there was no reason for the General Assembly to specify that consequence under Act 77: that consequence already flows from the "imperative and mandatory" requirement that the voter "shall" secure her ballot in a secrecy envelope. *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231. Indeed, the version of 25 P.S. § 3146.6(a) that this Court construed in *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election* likewise did not provide that ballots hand-delivered by third persons should not be counted. *See id.* at 1226. The Court, however, concluded that such third-party delivery required invalidation of the ballot because the voter had failed to comply with the statutory mandate that she "shall" send her ballot "by mail" or deliver it "in person." *Id.*; *see also id.* at 1231–35.

The Secretary thus ignores the crucial difference in Act 77's and Act 12's plain statutory text. Act 77 directs what the *voter* "shall" do with the ballot, Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6, 3150.16, so the voter's noncompliance with the "mandatory" secrecy envelope requirement requires invalidation of the ballot, *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231–35. But Act 12's markings rule does not direct the voter to do anything. Rather, it directs

what *election officials* "shall" do when they receive a ballot in a secrecy envelope with markings that reveal the identity of the voter.  25 P.S. § 3146.8(g)(4)(ii).

Thus, there was no reason for the General Assembly to specify the consequence for noncompliance with Act 77's secrecy envelope requirement: under the Pennsylvania Constitution and this Court's precedents, such noncompliance already required invalidation of the ballot.  PA. CONST. art. VII, § 4; *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231–35.  In Act 12, by contrast, the General Assembly gave instructions to election officials encountering a scenario where the voter had complied Act 77's secrecy envelope requirement but the envelope still revealed the voter's identity or vote.  25 P.S. § 3146.8(g)(4)(ii).

Thus, in all events, the General Assembly's clarification in Act 12 that absentee or mail-in ballots in *secrecy* envelopes that reveal the voter's identity are invalid does not imply that absentee or mail-in ballots in *outer* envelopes that reveal the voter's identity in contravention of Act 77 are somehow valid.  Rather, the statutory language makes clear that the General Assembly invalidated *any* ballot contained in an envelope that reveals the identity of the voter, regardless of whether that envelope is a secrecy envelope or an outer envelope.  The Secretary's cramped contrary reading would frustrate the Constitution's and the General Assembly's directive to protect the secret ballot.  *See, e.g.*, PA. CONST. art. VII, § 4; *Banfield*,

110 A.3d at 168 n.10; *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231–35; *Appeal of Weiskerger*, 290 A.2d at 109.

*Fourth*, the Secretary suggests that invalidating naked ballots would violate the constitutional mandate of "free and equal elections."  App. 34.  But, of course, the mandate that "secrecy in voting be preserved" is *also* a constitutional mandate. PA. CONST. art. VII, § 4.  As a specific mandate requiring secrecy in voting, it trumps the more general mandate of free and equal elections.  *See, e.g.*, *Zauflik v. Pennsbury School Dist.*, 104 A.3d 1096, 1126–27 (Pa. 2014).

In all events, the secrecy envelope requirement is a neutral and evenhanded rule that applies to all Pennsylvania voters on equal terms.  It therefore does not violate the Free and Equal Elections Clause.  *See, e.g.*, *League of Women Voters*, 178 A.3d at 804.  And once again, neither the Secretary nor the Democratic Party can show a "plain, palpable and clear abuse of the [legislative] power which actually infringes the rights of the electors," *Patterson*, 60 Pa. at 75, in the Legislature's faithful implementation of the Constitutional mandate that "secrecy in voting be preserved," PA. CONST. art. VII, § 4.  The Court should reject the Secretary's and the Democratic Party's proposed evisceration of the secrecy envelope requirement and uphold Act 77 in its entirety.

## C.     Act 77 Prohibits County Boards From Designating Locations Other Than Their Offices For Delivery Of Ballots

Act 77 mandates that voters "shall" return their absentee or mail-in ballots to the office of the county board of elections "by mail" or "in person."  Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6, 3150.16.  This requirement of return by mail or in person "is mandatory."  *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231–35.

Act 77 makes clear, moreover, that the absentee or mail-in ballots must be returned to the *office* of the county board of elections, not to the board as a *body*.  Indeed, Act 77 mandates that "a completed [absentee or mail-in] ballot must be received *in the office of the county board of elections* no later than eight o'clock P.M. on the day of the primary or election."   Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6(c), 3150.16(c) (emphasis added).  Act 77 also requires that the declaration envelope for absentee and mail-in ballots must have printed upon it "the address of the elector's county board of election," so that "the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election."  Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6(a) and 3150.16(a).  Thus, Act 77 contemplates that absentee and mail-in ballots be mailed or delivered to the office of the county election board that appears on the declaration envelope.  Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6(a), (c) and 3150.16(a), (c).

The Secretary makes no argument that the terms "drop-boxes" or "satellite locations" appear anywhere in the Election Code.   The Secretary also offers no explanation as to how election officials would monitor drop-boxes and guarantee that Act 77's prohibition on third-party delivery and ballot harvesting is upheld and enforced at drop-boxes.   The Secretary and the Democratic Party nonetheless ask the Court to authorize voters to return their ballots to locations other than the office of the county board of elections, including unmanned and unmonitored drop-boxes. *See* App. 23–26; *see also* Pet.  By invalidating a plain requirement of Act 77, however, this relief would trigger Act 77's non-severability clause and invalidation of Pennsylvania's entire no-excuse mail-in voting scheme.   *See* Act 77, sec. 11.

Moreover, the Secretary's and the Democratic Party's preferred scheme would permit individual counties to implement vastly different ballot-return regimes.  *See, e.g.*, App. 23 (discussing ballot-return regimes in Delaware County, Montgomery County, and Philadelphia County).   In fact, the Secretary's and the Democratic Party's requested remedy would permit *each* of Pennsylvania's 67 counties to adopt its *own* ballot-return regime.  An outcome permitting variation across counties would create disparities and potential confusion for voters and candidates participating in statewide elections or in elections in districts covering more than one county.  It also would violate the Equal Protection Clause of the U.S. Constitution: "[h]aving once granted the right to vote on equal terms, the State may

not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104–05 (holding that standardless manual recount across counties violated Equal Protection); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("[T]he right to suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). Indeed, "[a] state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote. Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment." *Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 697 (W.D. Pa. 2003). The Secretary's and the Democratic Party's requested relief would run headlong into these precise constitutional problems and thus fails.

### D. The Democratic Party Provides No Basis For Requiring The Commonwealth To Provide A Cure Opportunity To Certain Voters

The Secretary is entirely correct that "[t]he Democratic Party provides no statutory or constitutional basis for requiring County Boards to contact voters whose ballots contain 'minor errors' and afford them an opportunity to cure." App. 29. The only authority the Democratic Party cites for this novel claim is Pennsylvania's Free and Equal Elections Clause. Pet. ¶ 185. But as this Court has long made clear, that provision does not imbue courts with freestanding authority to rewrite the Election Code to comport with a litigant's notion of good election policy. Rather,

"ballot and election laws have always been regarded as peculiarly within the province of the legislative branch of government." *Winston*, 91 A. at 522. If some restrictions are "onerous or burdensome, the Legislature may be appealed to for such relief, or for such amendments, as the people may think proper to amend." *Id.*

The legislative nature of the request at issue is readily apparent here. Notifying voters of defective ballots and providing them with an opportunity to cure would be a monumental undertaking—particularly on the eve of an election. Outlining and implementing that requested relief statewide would require the expenditure of significant resources. As the Secretary again correctly notes, "[s]uch logistical policy decisions are more properly addressed by the legislature." App. 30. That body, not this Court, is the entity best suited to balance the Commonwealth's interests and the likely fiscal and administrative burdens resulting from a policy such as that proposed by the Democratic Party.

The tardiness of the Democratic Party's request, made in the "weeks" leading up to the imminent general election, alone is a sufficient basis to deny it. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). In all events, the Democratic Party cannot show a "plain, palpable and clear abuse of the [legislative] power which actually infringes the rights of the electors." *Patterson*, 60 Pa. at 75. To the contrary, the requirement that voters follow the appropriate procedures when filling out their ballots easily passes muster. Those procedures treat all voters alike. *Winston*, 91 A. at 523. They

deny no qualified electors the right to vote. *Id.* Each voter "has the right to cast his ballot and have it honestly counted" under the same standard. *Id.* And "the inconveniences if any bear upon all in the same way under similar circumstances." *Id.*

In all events, the Democratic Party's requested relief would trigger Act 77's non-severability clause. *See* Act 77, sec. 11. Requiring county officials to offer voters a chance to "cure," through the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") period, defective ballots discovered "on, or after Election Day," Pet. ¶ 187, would necessitate invalidation of the requirement in section 8 of Act 77 that the voter "fill out" the declaration on the outer envelope and submit the ballot in time for it to be "received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election," Act 77 §§ 1306, 1306-D; 25 P.S. §§ 3146.6, 3150.16 (emphasis added). Because that requirement is covered by Act 77's non-severability clause, any such invalidation would trigger invalidation of the entire no-excuse mail-in voting scheme. *See* Act 77, secs. 8, 11.

Finally, under the Democratic Party's requested approach, a ballot cured during the UOCAVA period would not be cast until after Election Day. Accordingly, counting any such ballots in a federal election is preempted by the federal statutes creating a uniform nationwide federal Election Day. *See supra* Part II.A. The Court should reject the Democratic Party's claim.

## III.   THE   POLL   WATCHER   RESIDENCY   REQUIREMENT   IS UNCONSTITUTIONAL

The Court may not grant the Secretary's and the Democratic Party's request to uphold the poll watcher residency requirement, *see* App. 36, because that requirement is unconstitutional.  The Secretary relies primarily on the U.S. District Court for the Eastern District of Pennsylvania's decision in *Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396 (E.D. Pa. 2016).  *See* App. 38-39.  That decision, however, is distinguishable, and the Secretary improperly dismisses the vital role of poll watchers in safeguarding all Pennsylvanians from election fraud or ballot tampering.

As an initial matter, *Cortes* was decided on a very different procedural posture and a limited record.  In that case, the plaintiffs sought a preliminary injunction just eighteen days before the general election, and the requested relief, if granted, "would [have] alter[ed] Pennsylvania's laws just five days before the election."  *Cortes*, 218 F. Supp. 3d at 405.  Accordingly, "avoid[ing] last-minute intervention in a state's election process" served as the primary reason for why the court denied the requested relief, because the court found that "[a]ny intervention … risks practical concerns including disruption, confusion or other unforeseen deleterious effects." *Id.* at 404–405. Thus, having found that the requested injunctive relief was untimely, any further ruling by the court in that case was dicta.  *See, e.g.*, *Kool v. Coffey*, 300 F.3d 340, 355 (3d Cir. 2002) (having concluded notice was inadequate, the

court's "comments about the merits of the case [were] simply precatory and [were] not necessary to the actual holding of the case").

More fundamentally, the *Cortes* decision, like the Secretary here, gives short shrift to the Commonwealth's obligation to safeguard the electorate from voter fraud. "Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974). This "right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Id.* at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)). Ultimately, "the deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial." *Id.*; *see also Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). *See also* Patterson Aff. (Ex. J).

Poll watchers help prevent such injury.  Their "statutory role" in "[p]rotecting the purity of the electoral process" "promotes a free and fair election" and "serve[s] to guard the integrity of the vote." *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979).  In the absence of poll watchers, fraud can flourish—a fact demonstrated just months ago when a former election judge pled guilty to ringing up fraudulent votes in South Philadelphia.  He was able to commit this crime, in part, because there were no poll watchers at his precinct.  *See* Information and Counts, *United States v. DeMuro*, No. 2:20cr112 (E.D. Pa. Mar. 03, 2020), ECF No. 1.   And with Pennsylvania moving to an entirely new election regime under Act 77—with increased opportunities for ballot fraud and tampering—the need for poll watchers has never been more apparent.

Nevertheless, due to the distribution of voters throughout the Commonwealth, the county-residence requirement makes it difficult for both political parties to identify qualified poll watchers in all precincts.  *See* Vonne Aff. (Ex. K).  For example, in Philadelphia County, there exist 66 voting wards which are divided into 1,686 divisions.  *See Political Maps*, Office of the Phila. City Commissioners,   https://www.philadelphiavotes.com/en/resources-a-data/political-maps (last visited Sept. 7, 2020).  Republicans are not a majority of registered voters in any ward in Philadelphia County.  *See* Department Reports and Data, *Historical Citywide Voter Registration Data (1940-2019)*, Office of the Phila. City

Commissioners,   https://www.philadelphiavotes.com/en/home/item/101-historical-citywide-voter-registration-data-now-available (last visited Sept. 7, 2020).  Conversely, in some contiguous geographic areas of the Commonwealth, such as in Fulton, Franklin, Bedford, Huntingdon and Perry counties, Republicans account for almost 70% of the voters.  *See* 2019 Voter Registration Statistics – Official (Nov. 5, 2019), https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/2019%20Election%20VR%20Stats%20%20final.pdf.

Given these disparities, there is no rational basis for the Commonwealth to adhere to its county-residence rule. While the *Cortes* court claimed that rule was rationally related to Pennsylvania's "county-by-county system of elections," *Cortes*, 218 F. Supp. 3d at 409, the fact remains that the Election Code sets forth the uniform standards that *all sixty-seven Pennsylvania counties* must follow in order to conduct any election in this Commonwealth.  Indeed,  the Equal Protection Clause requires such uniformity.  *See, e.g.*, *Pierce*, 324 F. Supp. 2d at 697 ("A state must impose uniform statewide standards in each county to protect the legality of a citizen's vote.").  Accordingly, the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction that effectively denies political parties, their candidates, and the voters an essential safeguard against voter fraud.  The poll watcher residency requirement is unconstitutional.

## CONCLUSION

The Court should uphold Act 77 according to its plain text and declare the poll watcher residency requirement unconstitutional.

Dated:  September 8, 2020

Respectfully submitted,

*/s/ Kathleen A. Gallagher*
Kathleen A. Gallagher
PA I.D. #37950
Russell D. Giancola
PA I.D. #200058
PORTER WRIGHT MORRIS
  & ARTHUR LLP
6 PPG Place, Third Floor
Pittsburgh, PA 15222
(412) 235-4500
kgallagher@porterwright.com
rgiancola@porterwright.com

John M. Gore *
E. Stewart Crosland *
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com

*Counsel for Intervenor-Respondent the
Republican Party of Pennsylvania*

*\*Pro hac vice application forthcoming*

## <u>CERTIFICATION OF WORD COUNT</u>

Pursuant to Rule 2135 of the Pennsylvania Rules of Appellate Procedure, I certify that this Brief contains 11,538 words, exclusive of the supplementary matter as defined by Pa.R.A.P. 2135(b).

/s/ Kathleen A. Gallagher
Counsel for Intervenor-Respondent
the Republican Party of Pennsylvania

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.


*/s/ Kathleen A. Gallagher*
*Counsel for Intervenor-Respondent*
*the Republican Party of Pennsylvania*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2020, I caused a true and correct copy

of this document to be served on all counsel of record via PACFile.

*/s/ Kathleen A. Gallagher*
Kathleen A. Gallagher
*Counsel for Intervenor-Respondent*
*the Republican Party of Pennsylvania,*